UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TINA M. VARLESI

      Plaintiff,

-vs-                                  Case No. 10-CV-14793

WAYNE STATE UNIVERSITY, *a Michigan*      HON. MARK A. GOLDSMITH
*non-profit corporation;* CAROL PREMO, PH.D.,
ANWAR NAJOR-DURACK, DEAN PHYLLIS
I. VROOM,  SHAWNA J. LEE, ANTONIO
GONZALES-PRENDES, MARGARET
BRUNHOFER, THE SALVATION ARMY,
*a foreign non-profit corporation;* and JOYCE
STEFANSKI, *jointly and severally,*

      Defendants.

---

| | |
|---|---|
| Deborah L. Gordon, PLC | Miller Canfield Paddock and Stone |
| Deborah L. Gordon (P27058) | Megan P. Norris (P393 18) |
| Carol A. Laughbaum (P41711) | M. Misbah Shahid (P73450) |
| Attorneys for Plaintiff | Attorney for WSU, Premo, Najor-Durack, |
| 33 Bloomfield Hills Parkway, Suite 275 | Vroom, Lee & Gonzales-Prendes |
| Bloomfield Hills, Michigan 48304 | 150 W. Jefferson, Suite 2500 |
| 248-258-2500/FAX 248-258-7881 | Detroit, Michigan 48226 |
| dgordon@deborahgordonlaw.com | 313-963-6420 |
| claughbaum@deborahgordonlaw.com | norris@millercanfield.com |
| | shahid@millercanfield.com |
| Dykema Gossett | |
| Patrick F. Hickey (P36648) | Kotz Sangster Wysocki and Berg |
| Lauren M. Phillips (P74102) | John T. Below (P48677) |
| Attorneys for Stefanski | Heather Gelfand Ptasznik (P63344) |
| 400 Renaissance Center, 37th Floor | Attorneys for The Salvation Army |
| Detroit, Michigan 48243 | 400 Renaissance Center, Suite 3400 |
| 313-568-6800/FAX 313-568-6691 | Detroit, Michigan 48243 |
| phickey@dykema.com | 313-259-8300/ FAX 313-259-1451 |
| lmphillips@dykema.com | jbelow@kotzsangster.com |
| | hptasznik@kotzsangster.com |

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS WSU, PREMO,
NAJOR-DURACK, VROOM, LEE, GONZALES-PRENDES
AND BRUNHOFER'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff **Tina M. Varlesi** by her attorneys **Deborah L. Gordon** PLC responds in opposition to the WSU Defendants' motion for summary judgment, as set forth in the accompanying Brief and Appendix, and requests an order denying that motion in its entirety.

**DEBORAH L. GORDON, PLC**
Deborah L. Gordon (P27058)
/s/Carol A. Laughbaum (P41711)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 275
Bloomfield Hills Michigan 48304
Telephone 248 258 2500
dgordon@deborahgordonlaw.com
Dated: November 4, 2011                claughbaum@deborahgordonlaw.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TINA M. VARLESI

       Plaintiff,

-vs-                                 Case No. 10-CV-14793

WAYNE STATE UNIVERSITY, *a Michigan*    HON. MARK A. GOLDSMITH
*non-profit corporation;* CAROL PREMO, PH.D.,
ANWAR NAJOR-DURACK, DEAN PHYLLIS
I. VROOM,  SHAWNA J. LEE, ANTONIO
GONZALES-PRENDES, MARGARET
BRUNHOFER, THE SALVATION ARMY,
*a foreign non-profit corporation;* and JOYCE
STEFANSKI, *jointly and severally,*

       Defendants.

---

Deborah L. Gordon, PLC
Deborah L. Gordon (P27058)
Carol A. Laughbaum (P41711)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 275
Bloomfield Hills, Michigan 48304
248-258-2500/FAX 248-258-7881
dgordon@deborahgordonlaw.com
claughbaum@deborahgordonlaw.com

Dykema Gossett
Patrick F. Hickey (P36648)
Lauren M. Phillips (P74102)
Attorneys for Stefanski
400 Renaissance Center, 37th Floor
Detroit, Michigan 48243
313-568-6800/FAX 313-568-6691
phickey@dykema.com
lmphillips@dykema.com

Miller Canfield Paddock and Stone
Megan P. Norris (P393 18)
M. Misbah Shahid (P73450)
Attorney for WSU, Premo, Najor-Durack,
Vroom, Lee & Gonzales-Prendes
150 W. Jefferson, Suite 2500
Detroit, Michigan 48226
313-963-6420
norris@millercanfield.com
shahid@millercanfield.com

Kotz Sangster Wysocki and Berg
John T. Below (P48677)
Heather Gelfand Ptasznik (P63344)
Attorneys for The Salvation Army
400 Renaissance Center, Suite 3400
Detroit, Michigan 48243
313-259-8300/ FAX 313-259-1451
jbelow@kotzsangster.com
hptasznik@kotzsangster.com

---

**BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS WSU, PREMO, NAJOR-DURACK, VROOM, LEE, GONZALES-PRENDES
AND BRUNHOFER'S MOTION FOR SUMMARY JUDGMENT**

## STATEMENT OF ISSUES PRESENTED

I.      WHETHER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED AS TO
        PLAINTIFF'S PREGNANCY/MARITAL STATUS DISCRIMINATION CLAIMS (TITLE IX, ELCRA)?

II.     WHETHER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED AS TO
        PLAINTIFF'S RETALIATION CLAIMS (TITLE IX, ELCRA)?

III.    WHETHER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED AS TO
        PLAINTIFF'S §1983 DUE PROCESS CLAIMS?

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

### Cases

*Board of Curators of the University of Missouri v. Horowitz,*
        435 U.S. 78, 98 S.Ct. 948 (1978)

*Chipman v. Grant County School District,*
        30 F.Supp.2d 975 (E.D. Ky 1998)

*Davis v. Monroe County,*
        526 U.S. 629, 119 S.Ct. 1661 (1999)

*Hardeman v. The Salvation Army,*
        2011 WL 5008398 (E.D. MI, October 20, 2011)

*Harris v. Board of Governors of Wayne State University,*
        2010 WL 5173666 (E.D. MI)

*Harrison v. Olde Financial Corp,*
        225 Mich App 601, 572 NW2d 679 (1997)

*McDonnell-Douglas Corp. v. Green,*
        411 U.S. 792, 93 S.Ct.1817 (1973)

*Moon v. Michigan Reproductive & IVF Center,*
        2011 WL 4503310 (Mich App)(unpublished)

*Ku v. State of Tennessee,*
        322 F.3d 431 (6th Cir. 2003)

*Regents of the University of Michigan v Ewing,*
        474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985)

*Satterfield v. State of Tennessee*
        295 F.3d 611 (6th Cir. 2002)

*Staub v. Proctor Hospital,*
        131 S.Ct. 1186 (March 1, 2011)

*Zwick v. Regents of the University of Michigan,*
        2008 WL 1902031 (E.D. MI)(unpublished)

### Other

Fed.R.Civ.P. 56

Title IX of the Education Amendments of 1972, as amended
     20 USC §1681 *et seq*
     34 CFR §106.31 *et seq*

Michigan's Elliott-Larsen Civil Rights Act
     MCL §37.2102
     MCL §37.2301 *et seq* (public accommodations and services)
     MCL §37.2401 *et seq* (educational institutions)

## COUNTER-STATEMENT OF MATERIAL FACTS[1]

**"Background"**

1.      Admitted

2.      Admitted

**"School of Social Work Field Placement"**

3.      Admitted

4.      Admitted

5.      Contested as stated; in the second year, an MSW student is expected to build on the knowledge and experience she acquired in the first year.  **Exhibit 1**, Varlesi 105

6.      Contested; while WSU has generally accurately summarized the *objectives* of the first and second years of its MSW program, per its Field Education Manual, this was not WSU's actual practice.  **Exhibit 1,** Varlesi 118-122-123, 129, 186, 329-330, 347; **Exhibit 2**, Bergin 32-35, 49, 70-71, 80-82; 89-92

7.      Contested; there is no evidence or testimony that doing well in classroom work and failing field is "not uncommon."

8.      Contested; according to its Field Education Manual, WSU has 400+ students total (BSW + MSW programs) in its School of Social Work.  **Exhibit B**, 2007 Field Education Manual, p 14

9.      Contested as stated; other staff in the Office of Field Education handle this function.  *Id.,* p 10, 16; **Exhibit 6**, Najor-Durack 15

10.     Contested as stated; the faculty advisor can be a part-time or full- time WSU faculty member; a task supervisor (agency employee) may also be assigned to the student.  **Exhibit C**, School of Social Work Policy Manual, pp 33-34

11.     Contested; Defendants' policies require that a field instructor possess an MSW.  **Exhibit B**, p 14; **Exhibit 6**, Najor-Durack 6; **Exhibit 10**, Vroom 75

12.     Contested; while WSU has generally accurately summarized some of the tasks of the Faculty Advisor, the list is incomplete and omits, for example, that the Faculty Advisor also "monitors and grades the student's field work performance."  **Exhibit B**, p 14

---

[1] Plaintiff objects to the WSU Defendants' purported "Statement of Facts" as much of the listed "facts" are Defendants' arguments, or simply reiterations of Defendants' written policies, without regard to the evidence in the record that these policies were not followed as to Plaintiff.

13.     Contested; a student may request a change in her field placement for various reasons, including that the placement is not meeting the student's learning goals or not giving the student clients; "unforeseen circumstances" is not the criteria.  *Id.;* **Exhibit 7**, Premo 48

14.     Contested; the cited deposition testimony says nothing of the sort.

15.     Contested that switching field placements is "discouraged."  That language does not appear in WSU written policies and is at odds with the concept that is contained in those policies that WSU is to provide social work students  with a meaningful experience that meets their  learning goals.  It is uncontested that WSU often accommodates requests to switch placements.  **Exhibit B**, 38; **Exhibit 7**, Premo 80

16.     Contested; the cited deposition testimony does not say that.  WSU's policies state that the decision to switch placements is made by the faculty advisor, the field instructor, and the student in consultation with the Director of Field Education, or OFE.  **Exhibit B**  14, 38

17.     Contested; according to its Field Education Manual, WSU has 400+ students total (BSW + MSW programs) in its School of Social Work.  **Exhibit B**,  2007 Field Education Manual, p 14.  Plaintiff has no knowledge whether "fewer than 10"  MSW students switch placements each year.

"The Grading Process"

18.     Contested as to the "based on a number of factors" language; the cited testimony does not say that. In addition, the faculty advisor assigns the mark in field work in consultation with the field instructor. **Exhibit B**, p 57

19.     Contested as stated; the Defendants' policies state that in the event of certain  grade/mark deficiencies, the student will receive notification of termination.  **Exhibit C**, p 2

20.     Contested; while WSU cites its written policies for this premise, Plaintiff contests that  this was the actual practice or that [lack of] "personal fitness for the profession" was the reason for Plaintiff's termination.  **Exhibit 1**, Varlesi 169-172

21.     Admitted  that WSU has generally accurately stated its written policies on this issue.

22.     Admitted that WSU has generally accurately stated its written policies on this issue.

23.     Contested only insofar as the cited policy refers to the "instructor" rather than the faculty member being given an opportunity to respond **Exhibit B**,  57

24.     Admitted that WSU has generally accurately stated its written policies on this issue.

25.     Contested as stated; there are 7 individuals in the reinstatement advisory committee pool,  5 of whom are randomly drawn by someone in the Dean's office.  **Exhibit B,** 60

26.     Admitted that WSU has generally accurately stated its written policies on this issue.

27.     Contested; the cited authority does not list these purported "criteria" for reinstatement.

28.     Admitted only that these witnesses gave that general testimony as to their usual practices.

29.     Admitted only that these witnesses gave that general testimony as to their usual practices.

30.     Admitted only that the witness gave that general testimony.

31.     Admitted that WSU has generally accurately stated its written policies on this issue.

**"Plaintiff's Initial Problems with Field Placement"**

32.     Admitted, although "successfully completed" is an understatement.

33.     Admitted

34.     Contested as stated; Plaintiff was dissatisfied with the VA placement for various reasons, including the fact that she given remedial tasks, was not afforded a chance to build rapport with clients, was not provided with an adequate learning experience, did no counseling,  and the internship was not meeting her educational/professional goals .  **Exhibit 1,** Varlesi 107; 122-123, 260

35.     Contested.  Mackey never advised Plaintiff of any performance issues; in fact upon learning that Plaintiff was leaving the VA she told Plaintiff she felt "cheated" because she liked having an intern.  **Exhibit 1**, Varlesi 122-123; 136, 266.  Plaintiff had no "significant attendance issues" nor was she ever told that she did.  **Exhibit D**, Varlesi Affidavit ¶3  Moreover, the "evidence" relied upon by Defendants on this point is an unsworn memo (inadmissible and hearsay) that has been tacked onto Plaintiff's VA evaluation, not originally part of that evaluation nor even shown to Plaintiff.  **Exhibit D**, Varlesi Affidavit, ¶3

36.     Contested.  The deposition testimony cited by Defendants says nothing remotely of the sort.  Mackey never had any discussions with Plaintiff about performance or attendance. **Exhibit 1**, Varlesi 136, 266; **Exhibit D**, Varlesi Affidavit ¶3

37.     Admitted

38.     Contested.  Mackey never had any discussions with Plaintiff about performance or attendance.  **Exhibit 1**, Varlesi 129, 136, 266; **Exhibit D**, Varlesi Affidavit ¶3.  Moreover, the "evidence" relied upon by Defendants on this point is an unsworn memo (inadmissible and hearsay) that has been tacked onto Plaintiff's VA evaluation, not originally part of that evaluation nor even shown to Plaintiff.  **Exhibit D**, Varlesi Affidavit, ¶3

39.     Admitted that Mackey did not make any negative comments about Plaintiff's pregnancy directly to Plaintiff; she did, after the fact, put negative comments in writing.  Defendants' Exhibit 11, Bates 31

40.     Contested in pertinent part; various interns told Plaintiff that Mackey was difficult to work with, and

employees at the VA had told Plaintiff they believed it was because Mackey was angry about her divorce.  Plaintiff merely repeated what she had heard from others.  **Exhibit 1**, Varlesi 265-266. Admitted that Mackey was angry with Plaintiff over this issue.  *Id.*

41.     Contested; Premo came out to the VA the first time on a routine visit, per the handbook, regarding all the interns there.  The second time was because Plaintiff wanted to switch placements, and the third time was to fill out the Field Evaluation, per the handbook.  **Exhibit B**, p 58; **Exhibit 1**, Varlesi 118-119; 122-123

42.     Contested; Plaintiff's discussions with Mackey concerned Plaintiff's desire to switch placements, not Plaintiff's performance. **Exhibit 1**, Varlesi 122-123; 129, 136, 266.  Moreover, the "evidence" relied upon by Defendants on this point is an unsworn memo (inadmissible and hearsay) that has been tacked onto Plaintiff's VA evaluation, not originally part of that evaluation nor even shown to Plaintiff. **Exhibit D**, Varlesi Affidavit ¶3

43.     Admitted

44.     Contested; there was no discussion about any purported performance issues on 11/06/07;  the discussion was that Plaintiff wanted to switch placements because she was not being afforded a meaningful internship experience at the VA.  **Exhibit 1**, Varlesi 107, 118-119, 122-125.  The only "plan" discussed was that Plaintiff would do 2-3 biopsychosocials per day because to that point, she had been doing remedial tasks (resource binders), and that after two weeks if Plaintiff still wanted to switch placements it would be arranged.  *Id.*

45.     Contested, in that no one ever discussed any purported performance issues with Plaintiff at the VA. **Exhibit 1**, Varlesi 122-123; 129, 136, 266

46.     Admitted in part and contested in part. Admitted that on 11/19/07 Plaintiff was  accused by Mackey, as relayed to her by Defendant Premo,  of leaving the VA early, a flatly false claim. **Exhibit 1**, Varlesi 130-131. With respect to Plaintiff's hours, Premo did the math and  confirmed that Plaintiff had met her hours. **Exhibit 1**, Varlesi 145. Admitted that while Plaintiff stated she felt uncomfortable asking clients for financial information, she nevertheless <u>did it anyway.</u> **Exhibit 1**, Varlesi 123, 145

47.     Contested, in that Plaintiff was never informed she was terminated from the VA internship.  Instead, Plaintiff decided she could not go back to the VA and so  informed Defendant Premo on 11/19/07, who agreed she would not have to go back.  **Exhibit 1**, Varlesi 130-131

48.     Contested only as to completing the placement; it is undisputed that Plaintiff made up the hours required to complete the VA internship elsewhere (at the Salvation Army) and was ultimately given the highest mark possible ("satisfactory") for her VA internship.  **Exhibit 8**, Premo 103

49.     Admitted

50.     Contested insofar as the cited authority, Defendants' Exhibit 11, is not the evaluation  Plaintiff ultimately received; it includes narratives that were not provided to Plaintiff until long after her expulsion from Wayne State.  **Exhibit D**, Varlesi Affidavit, ¶3

51.     Contested; approximately 30/53 categories contain that rating.  Defendants' Exhibit 11.

52.     Contested that this "narrative" was part of Plaintiff's evaluation or included legitimate criticisms or was drafted in good faith in that Mackey never previously raised any  performance issues with Plaintiff. **Exhibit 1**, Varlesi 122-123; 129, 136, 266.  It is also inadmissible hearsay.

53.     Contested that this "narrative" was part of Plaintiff's evaluation or included legitimate criticisms or was drafted in good faith in that Mackey never previously raised any  performance issues with Plaintiff, **Exhibit 1**, Varlesi 122-123; 129, 136, 266.  It is also inadmissible hearsay.

54.     Admitted

55.     Contested as Plaintiff did not admit to the "extremely poor" language attributed to her by Defendants; admitted as to the balance. **Exhibit 1**, Varlesi 138-139

56.     Admitted only that Defendants have generally accurately summarized Premo's testimony on this point; Defendants agreed  that the problem with Plaintiff's VA internship may have been a poor fit between instructor and student.  **Exhibit 6**, Najor-Durack 239-240

57.     Contested as stated; it is undisputed that Plaintiff made up the (10) hours required to complete the VA internship elsewhere (at the Salvation Army) and was ultimately given the highest mark possible ("satisfactory") for her VA internship. **Exhibit 10**,  Vroom 25-26

58.     Admitted

**"Plaintiff's Placement at the Salvation Army"**

59.     Admitted that Plaintiff interviewed with Stefanski in early December; contested as to footnote in that Defendants have  cited no testimony from Defendant Najor-Durack that she specifically made an "exception" for Defendant Stefanski regarding her lack of the required MSW degree.

60.     Admitted

61.     Admitted that Stefanski's bizarre comments about Plaintiff's pregnancy occurred later (in January) after Stefanski learned Plaintiff was not married.  **Exhibit 1**, Varlesi 153, 271-283, 314

62.     Contested; Najor-Durack never made such a comment to Plaintiff.  **Exhibit D**, Varlesi ¶4

63.     Contested as to date; admitted that Plaintiff showed up to work at the Salvation Army on approximately 12/13/07, that Stefanski neither showed up nor called Plaintiff to advise she would not be there, had not left anything for Plaintiff (or the other intern) to do, and that Plaintiff  reviewed substance abuse books in Stefanski's office.  **Exhibit 1**, Varlesi 282-288

64.     Admitted

65.     Admitted

66.     Contested; the assertion that  Plaintiff "failed" to attend her orientation- which she was never advised

of – is dishonest. **Exhibit 1**, Varlesi  280-281.  In addition, Plaintiff was never advised of any performance problems at the SA, nor did WSU put anything to that effect in writing prior to Plaintiff's last day. **Exhibit 1**, Varlesi 184; **Exhibit 6**, Najor-Durack 50-52.  [Defendants' cited authority for this is a memo dated 4/16/08, after Plaintiff  received the failing evaluation from Stefanski. **Exhibit 1**, Varlesi 177.]

67.  Admitted

68.  Admitted

69.  Contested that Plaintiff testified the Bergin email was a "turning point;" Defendant Stefanski was immediately informed that Plaintiff had nothing to do with the email yet her hostility toward Plaintiff continued, and Bergin confirms Stefanski's issue with Varlesi *preceded* the Bergin email. **Exhibit 1**, Varlesi 155; 305-306; **Exhibit 2**, Bergin 66-67; 72-76

70.  Contested that the sole purpose of Premo's visit to the Salvation Army on 1/14/08  was to "sort out" issues regarding the Bergin email; Premo was doing a routine site visit with respect to all the interns there. **Exhibit 1**, Varlesi 154.  In addition, neither Plaintiff's performance or attendance were even discussed. *Id.* , **Exhibit D,** Varlesi Affidavit ¶5

71.  Contested; no performance issues were raised on 1/17/08 either; what *was* discussed were Plaintiff's concerns about Stefanski's discriminatory (pregnancy/marital status) comments and other comments, and Plaintiff's desire to switch to another internship. **Exhibit 1**, Varlesi 165. As for attendance, Plaintiff was asked if she had any attendance issues, truthfully stated that she did not, and relayed Stefanski's comments from  their initial interview that Varlesi could come in when she got up, they would work around her schedule, Stefanski did not want her driving after dark, etc. *Id.*

72.  Admitted only that Defendants have generally summarized what a memo says.

73.  Admitted only that Defendants have generally summarized what a memo says.

74.  Admitted that Plaintiff requested to switch placements; contested as to balance because it does not make sense

75.  Admitted that Stefanski's issues with Plaintiff concerned Plaintiff being pregnant and unmarried, and that Defendant Premo advised Plaintiff that she would have to drop out of the program due to pregnancy if Stefanski would not take her back. **Exhibit 1**, Varlesi 166-167

76.  Admitted

77.  Contested as this does not make sense.   Plaintiff admits knowing that she had six years to complete her degree requirements, which included successfully completing her internships. **Exhibit 1**, Varlesi 55-56. Varlesi knows of no other student WSU terminated from the program.

78.  Contested; Stefanski made numerous derogatory comments about Plaintiff's pregnancy (which were confirmed by Premo) and did not raise any performance issues; Plaintiff had completed all of her assignments, and documented her work in emails to Premo. **Exhibit 1**, Varlesi 165-166, 330; **Exhibit**

**6**, Najor Durack 180-181, 185, 188.

79.    Contested; Stefanski also stated that the men liked [Plaintiff's] belly sticking out, and that Plaintiff's pregnancy was sexually stimulating and exciting to the men. **Exhibit 1**, Varlesi 317-318

80.    Contested; for example, Plaintiff was referred to as a "beached whale." **Exhibit 1**, Varlesi 378-381

81.    Contested; Premo told Plaintiff to buy bigger maternity clothes. **Exhibit 1**, Varlesi    173-175

82.    Admitted only that Premo claims to have investigated Plaintiff's discrimination claims, which she testified involved nothing more than asking Varlesi why she felt that way. **Exhibit 8**, Premo 155-156

83.    This is not a statement of fact that can even be responded to. Contested that the cited testimony confirms this point.

84.    This is not a statement of fact that can even be responded to; it is argument. It is also contested that Stefanski's comments about Plaintiff's pregnancy were said in the context of Stefanski repeating to Plaintiff what men at the Salvation Army had told Stefanski; they were not. **Exhibit 1**, Varlesi 317-318.

85.    This is not a statement of fact that can even be responded to; it is argument. It is also contested that Stefanski's comments about Plaintiff's pregnancy were said in the context of Stefanski repeating to Plaintiff what men at the Salvation Army had told Stefanski; they were not. **Exhibit 1**, Varlesi 317-318.

86.    Admitted

87.    Admitted, although Plaintiff's email also specifically states she is concerned about receiving a fair evaluation from Stefanksi given Stefanski's bias and comments about disliking Plaintiff rubbing her stomach due to her pregnancy. Defendants' Exhibit 19

88.    Contested; Plaintiff did not have attendance problems and the cited deposition testimony says nothing of the sort.

89.    Contested that "Plaintiff's performance problems" were discussed unless Plaintiff doing on-line research is a "performance problem" by Stefanski's definition.

90.    Admitted that Plaintiff made this comment in response to Defendant Premo instructing her to buy bigger maternity clothes. **Exhibit 1**, Varlesi 173-175

91.    Admitted that Plaintiff submitted some biopsychosocial assessments, but was unable to do more in that she was not given clients to assess; the biopsychosocial assessments were not part of the grade. **Exhibit 1**, Varlesi 186.

92.    Contested as Defendant Premo never told Plaintiff that there was something deficient about her biopsychosocial assessments. **Exhibit D**, Varlesi Affidavit ¶6

93.    Admitted that Plaintiff was not given clients to complete additional biopsychosocial assessments on. **Exhibit 1**, Varlesi 186.

94.     Admitted that Plaintiff did "process recordings" for clients she had seen at her other job in that she had no clients at the Salvation Army at that time.

95.     Admitted only that Najor-Durack testified that Premo advised her of "concerns" between Plaintiff and Stefanski but could not recall the specifics. **Exhibit 6,** Najor Durack 216-219

**"Plaintiff's Termination from Wayne State"**

96.     Contested as to the first sentence, but on a minor point; Stefanski gave Plaintiff "does not meet" in 53 out of 54 categories.  As for the second sentence, Stefanski admits she wrote this memo at the direction of  Premo and because she understood Plaintiff had a lawyer. **Exhibit 9,** Stefanski 193

97.     Contested; Stefanski's calculations of Plaintiff's "hours" are admittedly wrong. **Exhibit 9,** Stefanski 71-87.  And, Premo admits Plaintiff had enough hours in. **Exhibit 8,** Premo 247–249

98.     Contested; Plaintiff had permission to enter Stefanski's office,  and took only her own time records so that Stefanski could not tamper with them. **Exhibit 1,** Varlesi 332-335.  She later discussed this with Defendant Premo who told her there was no need to return her time records. *Id.*

99.     Admitted

100.    Contested; there is no evidence that Premo reviewed the evaluation or that her decision was careful and deliberate and the cited deposition does not support the statement. In fact, Defendant Premo was furious with Plaintiff for taking her discrimination complaints to Defendant Najor-Durack, and told Plaintiff she was in "deep trouble" for doing so and that she (Premo) would not be changing Plaintiff's internship grade. **Exhibit 1,** Varlesi 239-240.

101.    Contested; this was given to Plaintiff by Julie Alter-Kay on 4/29/08.

102.    Admitted only that Defendants have generally summarized what is stated in Premo's 4/25/08 letter; contested that the contents are accurate.  Plaintiff wrote detailed rebuttals.  *See* **Exhibits CC, EE,** grade appeal letters

103.    Contested; *Id,* **Exhibit E,** Gillow Affidavit

104.    Contested as to date; Plaintiff was terminated from the University 5/2/08

**"Plaintiff's Complaint with Wayne State University's Office of Equal Opportunity"**

105.    Admitted, although Plaintiff made other  complaints to the WSU OEO office, including that she had been called a "beached whale" and "unwed mother" at the SA. **Exhibit 1,** Varlesi 378-381

106.    Admitted

107.    Contested as stated; Plaintiff was unable to complete additional assignments that were dependent on having clients, as they were not provided to her. **Exhibit 1,** Varlesi 186

108.    Admitted

109.    Admitted that the documents appear to confirm that Najor-Durack forwarded these documents to OEO on May 9, 2008.

110.    Admitted that Defendants claim to have reviewed Plaintiff's file (which Defendant Najor-Durack asserts was "as big as a phone book") fully investigated Plaintiff's discrimination claims, and concluded that those claims were without merit in the course of approximately one business day.

**"Plaintiff's Grade Appeal"**

111.    Admitted that this was responsive to Premo's 4/25/08 letter.

112.    Admitted that Defendants have generally accurately summarized Plaintiff's letters dated 4/30/08.

113.    Admitted that Plaintiff testified at deposition that she was unaware of a policy requiring performance issues to be documented in writing, although she was aware that the policies require timely feedback with respect to any perceived performance issues. **Exhibit 1**, Varlesi 219-220.

114.    Admitted only that Defendants have generally accurately summarized Defendant Premo's 6/12/08 letter responding to Plaintiff's grade appeal. Contested that it is accurate. *See*, e.g., **Exhibits CC, EE**

115.    Contested that this is a new appeal; it is a continuation/supplement as it states. Defendants' Exhibit 31.

116.    Admitted

117.    Admitted

118.    Admitted only that Defendants have generally accurately summarized the May 9, 2008 email from Najor-Durack; contested that it is accurate. *See* **Exhibit 1**, Varlesi 170 (Premo told Plaintiff, "*you have the knowledge to go out and do social work.*")

119.    Admitted only that Defendants have generally summarized some of Defendant Vroom's testimony on those issues, but contested that the cited deposition says anything about Stefanski being "well liked" by other interns.

120.    Admitted that, per Defendant Vroom, Defendant Najor-Durack believed the discrimination allegations against Defendant Stefanski were absurd. **Exhibit 10**, Vroom 133.

121.    Contested; Dean Vroom was not provided with Plaintiff's entire student file, and Plaintiff did not get the Vroom letter dated 8/5/08 until long after that date. **Exhibit 10**, Vroom, 221-222; **Exhibit 1**, Varlesi 221

122.    Admitted only that Defendants have generally accurately summarized some of Defendant Vroom's testimony on these points while omitting Vroom' testimony that she knew Stefanski took the position

that Plaintiff pregnancy was "sexually stimulating" to men at the Salvation Army, and so advised Plaintiff. **Exhibit 10**, Vroom 142-143.

123.    Admitted only that Defendants have generally accurately summarized Defendant Vroom's testimony on this point, none of which was based on Premo's personal knowledge.

**"Plaintiff's Request for Reinstatement"**

124.    Admitted only that Defendants have generally accurately summarized some of what is contained in Plaintiff's reinstatement request letter.

125.    Contested that Defendants have accurately characterized this letter, which speaks for itself. Defendants' Exhibit 35.

126.    Admitted, in that Plaintiff was advised by Marilyn Knall that she should not mention discrimination issues in her reinstatement letter, that it could only be "academic." **Exhibit D**, Varlesi Affidavit ¶11

127.    Admitted, although Plaintiff was never advised of the criteria to be used by the reinstatement committee. **Exhibit D**, Varlesi Affidavit ¶12

128.    Admitted that Brunhofer gave this testimony as to her background.

129.    Admitted that Gonzalez-Prendes gave this testimony as to his background.

130.    Admitted that the panel took the position, in writing, that Plaintiff had not met their specific reinstatement criteria, criteria Plaintiff was never given. **Exhibit D**, Varlesi Affidavit ¶ 12

131.    Contested as stated; Plaintiff's testimony was that she did not know if evidence exists that the reinstatement committee considered her pregnancy in denying her request for reinstatement. **Exhibit 1**, Varlesi 232-233.

132.    Admitted only that one member of the committee testified she did not recall if Plaintiff claimed Stefanski had a problem with Plaintiff being pregnant and unmarried. **Exhibit 3**, Lee 51-52

133.    Admitted

134.    Admitted

135.    Admitted

## STATEMENT OF ADDITIONAL MATERIAL FACTS

### Plaintiff's Background

1.  Plaintiff Tina Varlesi was born 3/29/78.  **Exhibit 1**, Varlesi 6

2.  Varlesi has had a nearly life long passion and commitment to social work.  **Exhibit D**, Varlesi Affidavit ¶15

3.  In June 2006, Varlesi obtained a B.A. in psychology (with high distinction) from the University of Michigan - Dearborn.  **Exhibit 1**, Varlesi 27-28; **Exhibit A**, Second Amended Complaint, ¶16

4.  Also in  June 2006, Varlesi  was accepted into  graduate school, and specifically the MSW (Masters of Social Work) program at  Defendant WSU.  **Exhibit 1**, Varlesi 28, 71

5.  Varlesi had also been accepted into an MSW program at Ohio State University. **Exhibit 1,** Varlesi 51.

6.  Varlesi chose WSU over OSU as she was also working at a local social services agency (Vista Maria in Dearborn), working with at-risk girls, and had been promised a job there as a therapist upon receiving her MSW degree. **Exhibit 1**, Varlesi 48, 51-52

### Parties and Witnesses

7.  Defendant Premo was Varlesi's   WSU  faculty advisor with respect to her 2nd (final) year internships/field work.

8.  Defendant Najor-Durack is Director of Field Placement, WSU School of Social Work

9.  Defendant Vroom is the Dean of WSU's School of Social Work

10.  Defendants Lee, Gonzales-Prendes and Brunhofer are WSU School of Social Work faculty who composed the "reinstatement advisory committee" with respect to Plaintiff's appeal of her dismissal.

11.  Julie Alter-Kay was Ms. Varlesi's  WSU academic advisor

12.  Marilyn Knall is assistant to the Associate Dean at the School of Social Work

13.  Defendant Stefanski was Varlesi's Field Instructor in her final (2nd year, 2nd semester) internship at Defendant Salvation Army (SA).

14.  Gary Gillow was at pertinent times the Director of Rehabilitation Services at the SA and Stefanski's supervisor.  **Exhibit E**,  Gillow Affidavit ¶¶2-3

### 2006-2007:  1st Year of MSW Program

    A.    Classroom

15.     In her first year in WSU's MSW program, Varlesi successfully completed all requirements, earning a cumulative GPA of 3.67. **Exhibit F**, WSU transcript.

        **B.      Field Work: Spectrum Internship (both semesters)**

16.     In the fall of 2006, Varlesi was assigned by WSU to intern at Spectrum Human Services, a child welfare agency, in Southfield. **Exhibit 1**, Varlesi 91

17.     Varlesi's supervisor at Spectrum was Director of Family Services Amy Heincelman, MSW. **Exhibit 1**, Varlesi 91-93

18.     Varlesi's WSU faculty advisor at this time was Galen Duncan. **Exhibit 1**, Varlesi 94

19.     In her written evaluation of Varlesi's performance, Heincelman gave Varlesi the highest possible rating ("above expectations") in every single category. **Exhibit G**, Spectrum (1st semester) evaluation.

20.     Heincelman also attached a narrative to her evaluation of Varlesi, stating, among other things:

        Since Tina has been at Spectrum, she has taken the initiative to learn and apply the knowledge to improve the lives of impoverished children and families....She clearly has shown an amazing ability to empathize and build a rapport with clients.... Tina is clearly adept at what it takes to be a successful social worker.  She has gone above and beyond the required duties of a Masters level intern.  She has been an asset to the agency and clients alike. **Exhibit G**, last page.

21.     Varlesi received the highest mark possible (Satisfactory) for her Spectrum internship, first semester. *Id*, first page

22.     Varlesi remained at Spectrum for the second semester of the '06-'07 school year. **Exhibit 1**, Varlesi 98

23.     Galen Duncan remained Plaintiff's WSU faculty advisor, while Varlesi was assigned a new field supervisor that semester, Marcy Johnson. **Exhibit 1**, Varlesi 99

24.     In her written evaluation of Varlesi's performance, Johnson (like Heincelman) gave Varlesi the highest possible rating ("above expectations") in every single category.  **Exhibit H**, Spectrum (2nd semester) evaluation.

25.     Johnson also made positive comments about Varlesi throughout the evaluation, including:
        Tina took the initiative to learn and understand the function and purpose of the agency.... Tina demonstrates excellent skills in engaging clients in the therapeutic process....Tina maintained professionalism at all times and exceeded the level of work and commitment typically expected of interns.  Tina has an excellent knowledge of social work practice philosophy and skills.  She has a great foundation from which to build from in her next practicum experience.  *Id.*

26.     Varlesi received the highest possible mark (Satisfactory) for her Spectrum internship, second semester. *Id.*

27.     Varlesi testified that she had no problems whatsoever with either of her field supervisors at Spectrum (Ms. Heincelman, Ms. Johnson) or with her WSU faculty advisor that year (Mr. Duncan). **Exhibit 1,** Varlesi 94, 97-100

**2007-2008; 2nd (Final) Year of MSW Program**

      A.     **Classroom**

28.     Plaintiff  successfully complete all her classroom  work during her second  year, earning a cumulative GPA of 3.69. **Exhibit F**

      B.     **Field Work: VA Internship (1st semester)**

29.     For her second (final) year internship, Varlesi requested placement at the VA working in mental health. **Exhibit 1,** Varlesi 103-105,107-108; 125; 272

30.     In September 2007, Varlesi began an  internship at the VA in Ann Arbor.  **Exhibit 1,** Varlesi 105

31.      Plaintiff's field instructor at the VA was Pamela Mackey, and her WSU faculty advisor was Carol Premo.  **Exhibit 1,** Varlesi 109

32.     Premo confirms Varlesi is polite, agreeable, cordial and friendly.  **Exhibit 8**, Premo 127, 252

33.     Plaintiff was a paid employee of the VA.  **Exhibit I**, VA personnel form, W-2

34.     One of  Varlesi's initial  assignments at the VA was to update a telephone list and various binders. **Exhibit 1,** Varlesi 111-112

35.     On or about 9/24/07, Varlesi told Mackey that she was pregnant. **Exhibit 1,** Varlesi 115

36.     According to Varlesi, she was experiencing morning sickness during this time for which she had to use the restroom, and felt animosity from Mackey who appeared irritated with Varlesi's requests for the restroom key.  **Exhibit 1**, Varlesi 117

37.     Mackey later put in writing that she felt Varlesi was "very thin" and "unhealthy in appearance." *See* Mackey statement attached to Defendants' Exhibit 11.

38.     Also during this time, Mackey turned Varlesi's desk around so that Varlesi was facing a corner. **Exhibit 1,** Varlesi 122

39.     A social worker at the VA told Varlesi that the VA would never hire someone that was pregnant, which Plaintiff reported to the VA's EEO office. **Exhibit 1**, Varlesi 115-117

40.     Varlesi observed that other interns, unlike her, were actually working in the mental health clinic at the VA, which is what Varlesi had requested.  Instead, Varlesi was doing remedial tasks and discharge planning.  **Exhibit 1,** Varlesi 103-105, 111-112, 129, 262, 272

41.   Beginning in early October 2007, Varlesi began contacting Premo expressing concern that she was not getting adequate clinical experience at the VA and was interested in switching internships. **Exhibit 1**, Varlesi 118

42.   Premo confirms that Varlesi expressed concerns that she was not receiving any experience doing intake evaluations, psychotherapy or service connection and was not being adequately trained at the VA; and that Varlesi inquired whether Premo would consider a different placement. **Exhibit 8**, Premo 97

43.   In her discussions with Premo about her internship, Varlesi requested that Premo come out to the VA. **Exhibit 1**, Varlesi 118

44.   Varlesi also contacted Anwar Najor-Durack (Director of Field Placement) about switching placements. **Exhibit 1**, Varlesi 129

45.   On or about 11/5/07, Varlesi discussed with Mackey her concerns that she was not getting the necessary experience out of the internship. **Exhibit D**, Varlesi Affidavit ¶2

46.   In that 11/5/07 discussion, Mackey was angry with Varlesi and demanded an apology with respect to statements circulating at the agency to the effect that Mackey was difficult to work with because she was bitter about her divorce (these comments originated with VA employees, not Varlesi; Varlesi merely repeated this theory as something she had heard). **Exhibit 1**, Varlesi 265-267

47.   On 11/6/07, Premo came out to the VA and met with Varlesi and Mackey. **Exhibit 1,** Varlesi 115, 121. Plaintiff's pregnancy and due date were discussed. *Id.*

48.   Also on 11/6/07, Varlesi reiterated that the remedial tasks she had been given were not consistent with her wish for a meaningful advanced (second year) internship and would not help her achieve her goals upon graduation, that the tasks she had been given did not afford her a chance to build a rapport with clients, and that she wanted to switch to a placement that would afford her more clinical experience. **Exhibit 1,** Varlesi 122-123

49.   At that meeting, Mackey expressed discontent that Varlesi wanted to leave the VA, stating that she felt "cheated" and liked having an intern. **Exhibit 1,** Varlesi 122- 123, 129

50.   It was also agreed that Varlesi would do 2-3 biopsychosocial assessments per day and obtain more clinical experience, which was consistent with Mackey's prior representations that Plaintiff could shadow another therapist. **Exhibit 1,** Varlesi 107, 125

51.   It was also agreed that Varlesi would stay at the VA for two weeks (which was really 3 days, given the VA holiday) after which time if Varlesi still wanted to switch placements, she could. **Exhibit 1,** Varlesi 125

52.   On 11/6/07, **Mackey made no mention of any dissatisfaction with Plaintiff or her performance whatsoever. Exhibit 1,** Varlesi 118-119; 128-129

53.   Nor was there any discussion that Plaintiff was expected to improve in some way. **Exhibit 1,** Varlesi 125

54.     Varlesi was never made aware about any complaints allegedly made by Mackey to WSU.  **Exhibit 1**, Varlesi 260

55.     Varlesi testified that following the 11/06/07 meeting where she stated she wanted to switch internships, it became "very tense" with Mackey. **Exhibit 1**, Varlesi 125

56.     On 11/15/07 Varlesi met with her MSW academic advisor, Julie Alter-Kay, who asked if she had left work early without informing Mackey.  **Exhibit 1**, Varlesi 126-128

57.     Varlesi said she had not, and that her absences from work had been excused by Mackey.  **Exhibit 1**, Varlesi 127-128

58.     Varlesi advised Alter-Kay that she wanted to switch placements, do therapeutic intervention that coincided with the classes she was taking, and that the VA internship was not going to help her further her career goals.  **Exhibit 1**, Varlesi 130

59.     Varlesi testified that on 11/19/07, she left work at 4:15 p.m. and phoned Premo to discuss Mackey's "cold" attitude toward her.  **Exhibit 1**, Varlesi 130-131.

60.     When Premo asked Varlesi if she had left work early, Varlesi responded that she had not, explaining that she had *just* left.  **Exhibit 1**, Varlesi 130-131.  Premo then stated that Mackey told her (Premo) that Varlesi had left early.  *Id.*

61.     Varlesi immediately phoned Mackey, who denied telling Premo that Varlesi had left early. **Exhibit 1**, Varlesi 130-131

62.     Varlesi then phoned Premo and stated, in so many words, that she was not going back to the VA due to Mackey's gamesmanship and dishonesty. **Exhibit 1**, Varlesi 130-131

63.     In response, Premo agreed that Varlesi did not have to go back to the VA. **Exhibit 1**, Varlesi 130-131

64.     Varlesi terminated her VA internship, with Premo's approval.  **Exhibit 1,** Varlesi 130-131, 260; **Exhibit I,** VA resignation

65.     On 11/27/07, Plaintiff returned to the VA for purposes of completing her evaluation. **Exhibit 1**, Varlesi

66.     <u>Prior to 11/27/07, Varlesi had never been told of any performance issues at the VA.</u> **Exhibit 1**, Varlesi 122-123; 129, 136, 266

67.     When Varlesi received her VA evaluation on 11/27/07, it did not yet have a grade.  **Exhibit 1**, Varlesi 135; **Exhibit J,** VA evaluation

68.     Mackey's evaluation of Varlesi contained mostly "marginal" ratings and many "unsatisfactory" ratings. **Exhibit 1**, Varlesi 135; **Exhibit J,** VA evaluation

69.     Although required, Mackey placed no comments on the evaluation.  *Id.;* **Exhibit 1,** Varlesi 138

70.     According to WSU policies, the faculty advisor (here, Premo) assigns the internship mark, in consultation with the field advisor.

71.     In December, Varlesi received a call from Premo who stated she "could not justify" giving Varlesi a "U" (unsatisfactory) mark for the VA internship.  **Exhibit 1,** Varlesi 140

72.     Premo advised Varlesi that when she finished up her hours elsewhere, she would change Plaintiff's VA internship mark from an "I" (incomplete) to an  "S" (satisfactory).  **Exhibit 1,** Varlesi 140- 141

73.     Premo advised Varlesi that she had ten (10) hours to make up to get credit for her VA internship.  **Exhibit 1,** Varlesi 141, 145

74.     It was agreed that Varlesi would finish up her  hours (VA internship) at a different placement - the Salvation Army Adult Rehabilitation Center in Romulus.  **Exhibit 8**, Premo 98

75.     Varlesi did complete her hours at the SA.  Premo spoke with Varlesi's new field advisor at the SA, Joyce Stefanski, who confirmed that Varlesi was doing fine. **Exhibit 8**, Premo 99, 103

76.     Premo assigned Varlesi  a mark of "S" as to her VA internship, the highest mark possible.  *Id.;* **Exhibit 1**, Varlesi 147; **Exhibit  J**

77.     Premo could have given Varlesi an "M" (marginal pass), a lower but still passing mark,  for her VA internship, but instead gave her the highest  "S" (satisfactory) mark.  **Exhibit J; Exhibit 8**, Premo 99, 103

78.     WSU acknowledges that Varlesi and Mackey were "not a good fit."  **Exhibit 6**, Najor-Durack 239-240

        **C.      Field Work: Salvation Army (2nd semester)**

                **1.      Background**

79.     Varlesi was in good standing as she entered her final semester in the MSW program.  **Exhibit 6**, Najor-Durack 243-244

80.     Premo advised Varlesi she would be doing her final internship at the Salvation Army.  **Exhibit 1,** Varlesi 145, 272

81.     An internship is both a work and learning environment.  **Exhibit 10**, Vroom 111

82.     Varlesi was placed at the Salvation Army Adult Rehabilitation Center in Romulus, an in-house residential and rehab facility for men with substance abuse issues.  The agency provides various services (substance abuse therapy, independent living skills, job training, GED classes) to enable its clients to go out and function in society.  **Exhibit 1**, Varlesi 277-279, 347

83.     Field instructors are required to provide their student interns with a meaningful field placement experience that offers social work opportunities in accordance with outlined learning objectives, including weekly supervision.  **Exhibit 10**, Vroom 76-77

84.     The field placement site is to provide students a quality learning experience consisting of professional guidance, appropriate working conditions and tasks related to learning objectives. **Exhibit 10**, Vroom 81-82

85.     Field work is the component of social work education that helps students integrate classroom learning and reinforce course content. WSU's Office of Field Education (OFE) strives to ensure students are placed at sites that provide meaningful opportunities to grow and learn. In addition the OFE is responsible for assigning faculty advisors and educating field instructors. **Exhibit B,** Field Education Manual, p 10-11

86.     The field instructor is to meet with each intern weekly to evaluate the student, give assignments, review progress and performance, address any issues and questions, give feedback, and keep track of hours worked. **Exhibit 8**, Premo 53, 576

87.     The intern/student is also to fill out a time log, which her supervisor should be reviewing each week; if there are any problems, the field instructor is to let the student and her faculty advisor (Premo) know. **Exhibit 8**, Premo 54

88.     The faculty advisor is supposed to ensure that the student placement experience is educational for the student. **Exhibit 8**, Premo 169-170

89.     Evaluation of a student doing field service is to be an ongoing and continuous process. **Exhibit 6**, Najor-Durack 172

90.     A student is certainly to be alerted to any significant performance issues he or she has. **Exhibit 6**, Najor-Durack 173

### 2.     Stefanski's Lack of Credentials

91.     Varlesi's supervisor (field instructor) at the Salvation Army was Defendant Joyce Stefanski.

92.     Stefanski was fired for poor performance at her prior job (Hegria) and lied about it at deposition. **Exhibit 8**, Stefanski 11-12; **Exhibit K,** Hegria documents.

93.     WSU's School of Social Work policies require that a field instructor possess an MSW degree. **Exhibit 6**, Najor-Durack 33; **Exhibit B**, 39

94.     Stefanski does not have an MSW degree. **Exhibit 9**, Stefanski 10, 38; **Exhibit 8**, Premo 77

95.     WSU's School of Social Work policies require that a field instructor have two years of post MSW experience. **Exhibit B**, 39

96.     Stefanski has no "post MSW" experience. **Exhibit 10**, Vroom 79

97.     WSU's policies also state that a field instructor must be a LMSW (licensed master of social work.) **Exhibit B**, 39

-xx-

98.     Stefanski is not a LMSW.  **Exhibit 10**, Vroom 75

99.     Stefanski is not even a social worker. **Exhibit 6**, Najor-Durack 168, 170, 306

100.    Stefanski met none of the criteria in Wayne State's Field Guide for being a field instructor.  **Exhibit 10**, Vroom 75

101.    WSU written policies do not state that WSU can override the requirement that its field instructors possess an MSW.  **Exhibit 6**, Najor-Durack 33

102.    WSU allowed Stefanski to serve as a field instructor, despite lacking the required credentials,  with the understanding that Defendant Carol Premo would be required to  closely supervise Stefanski.  **Exhibit 8**, Premo 77-79

103.    Premo is  not a licensed social worker, either.  **Exhibit 8**, Premo 39-41, 310

104.    Thus, neither person Varlesi was working under in her final internship in Defendants' Master of Social Work program was a licensed social worker (and Stefanski was not a social worker at all, let alone an MSW).  **Exhibit 6**, Najor-Durack 168, 170, 306

105.     The SA had previously demoted Stefanski from Director of Rehabilitation Services to "counselor II." **Exhibit 9**, Stefanski 7

106.    Stefanski's master's degree is in counseling.  **Exhibit 9**, Stefanski 9

107.    Counseling and social work are two distinct disciplines, a fact which the School of Social Work stresses to its students.  **Exhibit 2**, Bergin 80-81

### 3.      Intern Amber Bergin

108.    Another WSU social work student, Amber Bergin, began an internship at the Salvation Army, working under Defendant Stefanski, at the same time as Varlesi.

109.    Bergin was in the undergraduate (BSW) program, was  a high academic achiever, was in the University Honors program, and was attending Wayne on a Presidential Scholarship.   **Exhibit 10**, Vroom 103; **Exhibit 2**, Bergin 9, 78-79

110.    Bergin had a horrible internship experience under Stefanski, and left the program and WSU, citing the lack of professionalism displayed by the School of Social Work.  **Exhibit 2**, Bergin 70, 83 and passim; **Exhibit M**, Bergin letter

111.    According to Bergin, Stefanski appeared to have "preset ideas and notions" about Tina Varlesi. **Exhibit 2**, Bergin 67

112.    Bergin was present when Stefanski asked Varlesi, who was visibly  pregnant, about the ring she was wearing, and if she was married; and told Varlesi it was  "obvious" that Varlesi had "had relations." Stefanski did not make personal inquiries to any of the other interns, who were also present; she

appeared "fixated" on Varlesi.  **Exhibit 2**, Bergin 66, 72-76

113.   Bergin also heard Stefanski tell Varlesi (wearing  maternity clothes) to wear looser clothing because the men at the SA might get excited.  **Exhibit 2**, Bergin, 73

114.   Stefanski complained to Bergin about Varlesi being sick from her pregnancy. **Exhibit 2**, Bergin 98-99

115.   At Bergin's interview with Stefanski, Stefanski brushed off Bergin's questions about the internship, stated that she did not expect anything of her interns,  and that Bergin would be making a lot of copies. **Exhibit M**; **Exhibit 2**, Bergin 70, 81-82

116.   Bergin testified that Stefanski wanted nothing to do with her interns at the SA, was "completely unapproachable," that the interns were generally on their own to find something to occupy their time for eight hours (some interns brought homework to do) and that Stefanski often could not even be found, and spent a lot of time outside on  cigarette breaks.  **Exhibit 2**, Bergin 32-35, 49, 71

117.   When Bergin attempted to be proactive and find projects to work on, Stefanski took it personally, became upset, and shut down the projects.  **Exhibit 2**, Bergin 83-86

118.   Bergin grew increasingly frustrated at the SA because she was learning nothing, and "getting absolutely nothing out of" the internship.  **Exhibit 2**, Bergin 89-92

119.   Stefanski appeared to like no one, and bragged to Bergin that she didn't like her managers and they didn't like her either.  **Exhibit 2**, Bergin 38, 88

120.   Bergin sent an email to the BSW student body, which was critical of the School of Social Work and her internship experience.  **Exhibit L,** Bergin email.  In a meeting where the email was discussed, Bergin made it clear that she alone wrote the email and that Varlesi had absolutely nothing to do with it. **Exhibit 2**, Bergin 51

121.   At that meeting, Stefanski made clear she did not want  Varlesi or Bergin to remain as interns at the SA, and stated, "*Well I can keep them here but I can just fail them.*"  **Exhibit 2**, Bergin 52

122.   Stefanski's preconceived ideas about Varlesi were evident before the Bergin email issue arose. **Exhibit 2**, Bergin 67

123.   Bergin testified that Stefanski's negative attitude toward Varlesi could not have been based on the email, as Bergin confirmed to Stefanski that Varlesi had nothing to do with it.  **Exhibit 2**, Bergin 50-51; 56-57, 67

124.   Najor-Durack called Bergin a "rebel yeller" and told Bergin she was disappointed with Bergin for sending the email.  **Exhibit 2**, Bergin 91-92, 95

125.   WSU's agents have no reason to believe Ms. Bergin is not being truthful.  **Exhibit 6**, Najor-Durack 135

126.   If Bergin's statements are correct as to her internship experience at the SA, which include:

-interns bringing their homework to the S.A.;
-spending 7 hours a day "doing a whole lot of nothing";
-field instructor (Stefanski) brushing off and refusing to interact with students;
-field instructor (Stefanski) and another counselor openly discussing their dislike for each other;
-field instructor (Stefanski) acting bitter, slighted and cold to interns who attempted to pro-actively find projects to do;

then the SA internship would not be an appropriate or proper internship experience for a WSU social work student.  **Exhibit 6**, Najor-Durack 137-140 ; **Exhibit L**; **Exhibit 2** Bergin 70

### 4.      Plaintiff's Internship at the Salvation Army

127.   In December 2007, Varlesi interviewed with Joyce Stefanski at the Salvation Army, which Varlesi felt went well.  **Exhibit 1,** Varlesi 143, 150-152

128.   At that time, Varlesi was visibly pregnant.

129.   At that interview, Stefanski told Varlesi she did not have to work set hours at the SA, could come in when she got up, that Stefanksi would work around her schedule and would not be keeping track of her hours, and generally made clear that Plaintiff would be afforded flexibility to get in her required 225 internship hours at the agency.  Stefanski also told Varlesi she did not want her driving after dark, citing her pregnancy.  **Exhibit 1**, Varlesi 165, 275-277

130.   As Varlesi was never told about the orientation held for new interns at the SA, she did not attend it.  **Exhibit 1**, Varlesi 280-281

131.   In December 2007, Varlesi began working at the Salvation Army, making up the ten (10) hours she had been missing from her internship at the VA.  **Exhibit 1,** Varlesi 153, 281-283

132.   During this time frame, Stefanski confirmed to WSU (Premo) that Varlesi was doing fine. **Exhibit 8**, Premo 99, 103

133.   On 1/7/08, Varlesi officially began her Salvation Army internship.  **Exhibit 1,** Varlesi 153, 281-283

134.   That day, Stefanski asked Varlesi personal question regarding her family and marital status.  **Exhibit 1**, Varlesi 314

135.   Stefanski stated to Plaintiff, "*I see you have a ring on your finger*" and asked Plaintiff if she was married; Varlesi told her no.  **Exhibit 1**, Varlesi 314

136.   Stefanski also said, "*Obviously you've had relations with someone.  That [ring] does not deter the men.... They can look, but they cannot touch.*"  **Exhibit 1**, Varlesi 314

137.   Varlesi testified that prior to this discussion, Stefanski "seemed fine" with respect to her pregnancy, but that afterwards, "things seemed to go south."  **Exhibit 1**, Varlesi 315

138.   On 1/14/08, Carol Premo made a visit to the Salvation Army site to meet with all the WSU social work interns. **Exhibit 1**, Varlesi 154

139.   At that meeting, the Amber Bergin email was discussed, as was the fact that Varlesi had absolutely nothing to do with it. **Exhibit 1**, Varlesi 154; **Exhibit 2**, Bergin 51

140.   At that meeting, Stefanski told Premo she did not want Varlesi to remain at the SA. **Exhibit 1**, Varlesi 162, 163, 303, 306-307; **Exhibit 9**, Stefanski 149

141.   On 1/17/08, Varlesi met with Stefanski, Premo and Najor-Durack (WSU) at WSU. **Exhibit 1**, Varlesi 160, 307

142.   At that meeting, Premo stated that Stefanski did not like Varlesi rubbing her stomach and complaining about being sick. **Exhibit 1**, Varlesi 161, 163, 315-316.

143.   Najor-Durack confirms they discussed Stefanski's complaints that Varlesi wore clothing "formfitting to her [pregnant] belly" and rubbed her stomach, which could "excite" the men at the SA. **Exhibit 6**, Najor-Durack 180- 181, 185, 188; **Exhibit 9**, Stefanski 134-135

144.   Najor-Durack wrote a memo to Varlesi's student file purporting to "memorialize" this 1/17/08 meeting (WSU Defendants' Exhibit 18) which omits any mention any of these pregnancy related comments, which she admits were made. *Id.*; **Exhibit 6**, Najor-Durack 180-181; 185; 222-225

145.   Najor-Durack's memo, as she admits, contains no specifics as to anything else discussed on 1/17/08. **Exhibit 6**, Najor-Durack 180-181; 185; 222-225

146.   At the meeting, Varlesi was asked whether she had any attendance issues and she stated she did not, relaying what Stefanski had told her at interview about working around Plaintiff's schedule, etc. **Exhibit 1**, Varlesi 165

147.   Varlesi always signed in and out on the time sheets kept in Stefanski's office. **Exhibit 1**, Varlesi 323-324

148.   At the 1/17/08 meeting, Stefanski stated that she also wanted Varlesi to sign in and out at the front desk. **Exhibit 1**, Varlesi 323-324. Plaintiff began doing so. *Id.*

149.   There was no discussion at the meeting about Varlesi's performance. **Exhibit 1**, Varlesi 165-166; **Exhibit 6**, Najor-Durack 180

150.   Many months after the fact, Stefanski put together a memo regarding Varlesi, including the 1/17/08 meeting, which says nothing about Varlesi's performance. It does admit they discussed Varlesi's pregnancy, Stefanski's complaints about Varlesi rubbing her stomach, Stefanski feeling that this "could be construed as suggestive" to the men at the SA; and the fact that Stefanski didn't want Varlesi as an intern any longer. **Exhibit N**, Stefanski memo; **Exhibit 9**, Stefanski 133-134

151.   At that (1/17/08) meeting, Varlesi stated that she wanted to switch internships, and offered several suggestions. **Exhibit 1**, Varlesi 165-166

152.    Premo was not agreeable to the options Varlesi suggested. **Exhibit 1**, Varlesi 165-166

153.    Najor-Durack admits she probably told Varlesi she could just take a year off from school.  **Exhibit 6**, Najor Durack 207-208

154.    It was decided that nothing would be done for two weeks, and that Varlesi would stay at the SA provided Joyce Stefanski would allow it.  **Exhibit 1**, Varlesi 165-166, 307

155.    After this 1/17/08  meeting, Premo walked Varlesi out to the elevator and told her that if Stefanski would not  take her back, Varlesi  would have to **"drop out of the program due to the pregnancy."** **Exhibit 1**, Varlesi 166-167

156.    Varlesi immediately called WSU's Office of Equal Opportunity (Cynthia Moon) and also spoke with the WSU Ombudsman office (Vickie Anderson) about these discriminatory comments. **Exhibit 1**, Varlesi 171, 195

157.    Anderson suggested that Varlesi should wear a  lab coat while at the SA.  **Exhibit** 1, Varlesi 173

158.    Moon advised Varlesi to come in to the OEO office but Plaintiff declined, fearful of retaliation, but asked Ms. Moon to make a note that she had called.  **Exhibit 1**, Varlesi 195

159.    Stefanski continued to tell Varlesi  to wear looser  clothes, that men get turned on by pregnant women, and that her  pregnancy *was sexually exciting and stimulating to the men* at the SA..  **Exhibit 1**, Varlesi 317-319

160.    Stefanski never stated or suggested to Varlesi that any men at the SA had actually made such comments. **Exhibit 1**, Varlesi 317-319

161.    On or about 1/22/08, Varlesi called Premo and Najor-Durack regarding Stefanski's discriminatory comments, including Stefanski stating she didn't like Plaintiff rubbing her stomach.  She also sent Premo an email on the same topic, stating she was worried about receiving a fair evaluation from Stefanski. Varlesi stated she would be documenting her work at the SA and keeping Premo advised. **Exhibit 1**, Varlesi 156-157; 160-161, 330;  **Exhibit P**,1/22/08 email to Premo;  **Exhibit 8**, Premo 183; and see **Exhibit R**, Varlesi emails to Premo documenting work at SA.[2]

162.    Premo admits telling Varlesi she did not want Varlesi complaining to Najor-Durack about discrimination, and that Varlesi's complaints to Najor-Durack were "frustrating" Premo. **Exhibit 8**, Premo 361; **Exhibit 1**, Varlesi 157

163.    Varlesi continued to phone the OEO office, at least weekly, to complain about her treatment and the pregnancy related comments.  **Exhibit 1**, Varlesi 196

164.    On 1/30/08, Varlesi sent Premo an email detailing her progress and completed work at the SA.

---

[2] Stefanski also made disparaging comments to Varlesi about Varlesi's  presumed socioeconomic background. **Exhibit P**

**Exhibit O,** 1/30/08 email to Premo

165.   In response, Premo emailed back, "*You have no idea how much that pleases me.  I knew I was backing a winner.*" **Exhibit Q,** 2/2/08 email from Premo; **Exhibit 8,** Premo 206

166.   Stefanski rarely gave Varlesi any work to do;  instead, Varlesi was left to her own devices to try and find projects. **Exhibit 1,** Varlesi 329-330; 347

167.   In Stefanski's nightly "group sessions" at the SA, she typically had the men  watch Three Stooges videos.  **Exhibit 1,** Varlesi 339

168.   In March or April, Stefanski instructed Varlesi to conduct a "group session" at the SA.  After Varlesi prepared for it, she was informed by one of Stefanski's clients that, per Stefanski, they were just going to watch a video instead.  **Exhibit 1,** Varlesi 341

169.   Varlesi was prohibited from working more than 16 hours a week at the SA.

170.   Varlesi was given two (2) clients, only,  to work with at the SA.  **Exhibit 1,** Varlesi 342

171.   Varlesi observed that other interns did their homework at the SA.  **Exhibit 1,** Varlesi 345-346

172.   Throughout the semester, Varlesi  spoke to Premo about Stefanski's comments relating to Plaintiff's pregnancy, including that Plaintiff needed to wear baggier clothing and that her pregnancy excited the men at the SA.  **Exhibit 1,** Varlesi 168

173.   Premo says she called Najor-Durack in February to report that Varlesi felt she was being discriminated against, but never contacted her further about Varlesi's ongoing discrimination concerns, because she didn't agree.  **Exhibit 8,** Premo  343-344

174.   Premo testified that in March (when Varlesi was 7 months pregnant) Stefanski called her to report that Varlesi was wearing tight clothing, that Varlesi's underwear lines were visible through her pants, that Varlesi  was rubbing her belly, and that some of the men were getting stimulated.  **Exhibit 8,** Premo 106-107, 117-119, 123, 188

175.   Stefanski now denies her "sexually stimulating" comment, claiming that it was *Premo* who told Varlesi her  pregnancy could be sexually stimulating to the men at the SA.  **Exhibit 9,** Stefanski 156-157

176.   Premo observed that Varlesi was always dressed professionally and appropriately. **Exhibit 8,** Premo 120; Gillow confirms the same thing.  **Exhibit E,** ¶7

177.   Nevertheless, Premo asked Varlesi to wear looser clothing to accommodate Stefanski and the SA. **Exhibit 8,** Premo 123-125

178.   On 3/17/08, another meeting took place with Varlesi, Premo and Stefanski. **Exhibit 1,** Varlesi 169. Gary Gillow (SA) was also present.  *Id.*

179.   Gillow had called the meeting because he wanted to replace Stefanski as Varlesi's   field instructor/supervisor, as did Varlesi.  **Exhibit 1,** Varlesi 169

180.    Premo made it clear that Gillow would not be allowed to supervise Varlesi because he did not have a master's degree. **Exhibit 1**, Varlesi 170

181.    Also at the 3/17/08 meeting, Stefanski's comments regarding Varlesi being pregnant and unwed were also discussed. **Exhibit 1**, Varlesi 170

182.    Stefanski stated that she did not want to see the silhouette of Plaintiff's belly.  **Exhibit 1**, Varlesi 170

183.    Premo also asked Varlesi why she couldn't just go out and buy bigger clothes.  **Exhibit 1**, Varlesi 173.

184.    Premo asked Stefanski if she thought what Ms. Varlesi had on (a wrap around top that covered her belly)  was acceptable.  **Exhibit 1**, Varlesi 169, 171-173 Stefanski agreed it was.  *Id.*

185.    At the 3/17/08  meeting, Premo admits telling  Varlesi to stop rubbing her stomach because (as reported to her by Stefanski) the men at the SA found it "hot and stimulating"  **Exhibit 8**, Premo 363-364; and because it was  "distracting."  **Exhibit 1**, Varlesi 170-172

186.    Varlesi stated that she was being discriminated against, and discussed her contacts with WSU's OEO and ombudsman.  **Exhibit 1**, Varlesi 171, 174

187.    Varlesi also stated in this meeting that she was worried that Stefanski would fail her, given Stefanski's discriminatory comments.  **Exhibit 1**, Varlesi 169, 171-173

188.    In response, Premo stated to Varlesi that she was not going to fail, that only she (Premo) could give Varlesi her grade, and that Varlesi **had the knowledge to go out and do social work.  Exhibit 1**, Varlesi 170; **Exhibit 8**, Premo 256

189.    Another employee at the SA also made insulting comments about Varlesi's pregnancy (e.g. referring to her as a "*beached whale*") and having a baby out of wedlock  ("*I'm sure [your parents] are really proud that they have a daughter who is having a baby out of wedlock;" "If you didn't live in Bloomfield Hills then you would be living in Taylor in a trailer park.*") Varlesi was upset and crying after these comments, and began having abdominal pains; she left the site early that day.  Varlesi reported the comments to WSU's OEO office. **Exhibit 1**, Varlesi 378-380; **Exhibit D**, Varlesi Affidavit ¶16

### Defendants Never Raise any Performance Issues with Varlesi
### Nor Put Anything in Writing, Yet Fail her on the Last Day of her Internship

190.    Defendants' agents put nothing in writing, prior to Varlesi's last day at the SA, discussing or documenting  performance or attendance issues.  **Exhibit 6**, Najor-Durack 50-52; **Exhibit 8**, Premo 109-110 (not "a single thing" put in writing to Varlesi)

191.    Only after Varlesi was removed from the program did Premo put anything in writing regarding Varlesi's performance.  **Exhibit 8**, Premo 355-356

192.    Similarly, Stefanski admits she put nothing in writing regarding Varlesi's performance until after Varlesi "failed" the internship, and did so only at  Premo's request, because of a "lawyer threat." **Exhibit 9**, Stefanski 64, 193; **Exhibit 8**, Premo 356

193.   While Stefanski tried to suggest that the 3/17/08 meeting was when Varlesi was told that she had performance problems, she admits the meeting was actually called by Varlesi and Gary Gillow, not by Stefanski, and no performance issues were discussed.  **Exhibit 9**, Stefanski 167-168

194.   On 3/24/08, Varlesi gave Stefanski a performance evaluation form to fill out, as she was required to do.  **Exhibit 1**, Varlesi 177

195.   In late March 2008, Varlesi attended a licensing workshop with her academic advisor in preparation for graduation.  **Exhibit D**, Varlesi Affidavit ¶7

196.   On or about 3/31/08, after telling Varlesi, again, to wear bigger clothing, Stefanski said, *"If you don't do what I say then Carol Premo will fail you."*  **Exhibit D**, Varlesi Affidavit ¶8

197.   In a phone conversation with Varlesi in early April 2008, in which Varlesi expressed concerns about getting a fair evaluation from Stefanski, Premo said she and Stefanski agreed Varlesi was "**doing great**" (Premo admits saying this) **Exhibit 8**, Premo 353; **Exhibit 1**, Varlesi 176, 187, 240

198.   Premo also told Varlesi that Stefanski had never failed anybody. **Exhibit 1**, Varlesi 176, 187, 240

199.   On or about 4/14/08, Stefanski filled out Varlesi's performance evaluation, except for the final mark, which was for Premo to complete.  **Exhibit 1**, Varlesi 177; **Exhibit S**, SA internship evaluation

200.   In it, Stefanski failed Varlesi in 53 out of 54 categories, checking the box "does not meet" expectations 53 times.  *Id.*

201.   At the same time Varlesi received this evaluation - <u>apparently the worst one any WSU social work student has ever received</u> - she had a term GPA of 3.96. **Exhibit 10**, Vroom 215-216; **Exhibit 6**, Najor-Durack 255-257; **Exhibit 8**, Premo 272; **Exhibit F**

202.   Stefanski has never given an intern an evaluation even remotely similar to the one she gave Varlesi (in 10+ years, she has only given 1 student 1 "does not meet" in 1 category.) **Exhibit 9**, Stefanski 172, 175

203.   The evaluation was not "logical" but WSU accepted it.  **Exhibit 6**, Najor Durack 258-259

204.   Stefanski's evaluation was supposed to have a "learning plan" attached to it; it did not. **Exhibit 10**, Vroom 213; **Exhibit 6**, Najor-Durack 248-252, 266, 314

205.   A "learning plan" is a form that documents the assignments and expectations of the student in her internship.  **Exhibit 6**, Najor-Durack 248-249

206.   The lack of learning plan is a "deficit" for a WSU intern because they are supposed to be evaluated against it.  **Exhibit 6**, Najor Durack 315

207.   The evaluation was supposed to contain a specific comment with respect to every "does not meet" mark; it did not.  **Exhibit 6**, Najor-Durack 269

208.    The evaluation also failed to describe the student's assignments and field experiences, as is required. **Exhibit 6**, Najor-Durack 272-274

209.    Najor-Durack is "fine" with the fact that WSU flunked an A student out of its MSW program based on a field supervisor's abysmal evaluation which failed to comply with any of these requirements. **Exhibit 6**, Najor-Durack 2555-257, 278-279

210.    On 4/15/08, Varlesi sent Premo an email (subject: "urgent matter") stating, among other things, that she had received a failing review from Stefanski, that Varlesi was livid, and that the review was discriminatory. **Exhibit T**; **Exhibit 1**, Varlesi 180

211.    Premo did not consider this email urgent, "didn't care" and did not respond. **Exhibit 8**, Premo 216-217

212.    Prior to receiving this negative evaluation, Varlesi had not been made aware of any performance concerns at the SA. **Exhibit 1**, Varlesi 184

213.    The review was completely at odds with Premo's recent admission that Varlesi was "doing great." **Exhibit 1**, Varlesi 187; **Exhibit 8**, Premo 353

214.    On 4/25/08, Varlesi was finally able to have a discussion with Premo about the SA evaluation. **Exhibit 1**, Varlesi 187

215.    Premo told Varlesi to write something up explaining why she felt the evaluation was unfair. **Exhibit 1**, Varlesi 187-189

216.    Varlesi asked Premo why she was making her jump through all these hoops, when Premo had recently told her she was "doing great;"Premo responded she was just making her jump through "a few hoops" and reiterated that she should put together a rebuttal. **Exhibit 1**, Varlesi 187-189

217.    Varlesi wrote a rebuttal to the evaluation, refuting Stefanski's criticisms, giving examples of the work Varlesi had performed, and reiterating Stefanski's inappropriate and discriminatory comments regarding Varlesi's pregnancy. **Exhibit U**, letter to Premo re SA evaluation

218.    She also drafted a "To Whom it May Concern" memo/email (later submitted as part of her grade appeal) regarding the biased evaluation and reiterating Stefanski's discriminatory comments and treatment and Premo's statement that Plaintiff may have to "drop out of program due to pregnancy." **Exhibit V**, 4/27/08 email, subject: Discrimination and Unfair Evaluation; **Exhibit 1**, Varlesi 192

219.    Around this time, Varlesi spoke with Julia Alter-Kay and attempted to clarify the process to follow with respect to challenging her evaluation, in that she had received conflicting information. **Exhibit 1**, Varlesi 197-198

220.    On 4/29/08, Varlesi filed a discrimination complaint with WSU's Office of Equal Opportunity against

Joyce Stefanski.  **Exhibit 1**, Varlesi 183, 189, 196; **Exhibit W**, OEO Complaint Intake Form.[3]

221.    Later that day (4/29/08) Plaintiff received a letter from Premo dated 4/25 stating that Plaintiff had failed her SA internship. **Exhibit X,** 4/25/08 letter;  **Exhibit 1**, Varlesi 183-184

222.    One of  Premo's criticisms in that letter is that Varlesi did not adhere to the directive to wear "looser clothing." *Id.*

223.    Contrary to Premo's letter, there  was no discussion at the 3/17/08  meeting regarding a plan that, going forward, Varlesi was to stay away from other workers, students and staff when they were working and not fraternize with staff/clients.  **Exhibit 1**, Varlesi 185

224.    Moreover, Stefanski's supervisor confirms that Varlesi never did any of those things. **Exhibit E**, Gillow Affidavit, ¶ 10

225.    Nor was there a discussion on 3/17/08 about completing assignments.  **Exhibit 1**, Varlesi 185.

226.    With respect to performing biopsychosocial assessments, Varlesi could not complete them because she did not have the clients necessary to complete them.  **Exhibit 1**, Varlesi 186

227.    <u>Premo never signed the SA evaluation.</u>  **Exhibit S**;  **Exhibit 8**, Premo 273-274

228.    Other than Premo's testimony, there is no evidence that Premo even looked at the evaluation until long after the fact.

229.    The internship grade is supposed to gauge whether the student achieves what the field supervisor wants, per the established learning goals, and if the student has competed her hours.  Defendants have no "learning goals" for Varlesi, and admit she completed all her hours. **Exhibit 8**, Premo 247-249

230.    On 5/1/08, Varlesi called Defendant Najor-Durack regarding her discrimination complaints.  **Exhibit 1**, Varlesi 240

231.    Later that morning, Premo angrily reminded Varlesi that Premo had told her *not* to call Najor-Durack, and stated *"you are in deep trouble with me  and I am not changing your grade."*  **Exhibit 1**, Varlesi 240; **Exhibit D**, Varlesi Affidavit ¶9

232.    According to Defendants' written policies, a student having issues with her field instructor or faculty member is "free to consult" the Director of Field Education (Najor-Durack) among others.  **Exhibit B**, p 61; **Exhibit 5**, Lee 23-25

233.    In fact, WSU policies require a student to immediately report any inappropriate behavior occurring in the field placement to the Director of Field Education or the Associate Dean of the School.  **Exhibit B**, p 22

---

[3]Varlesi's OEO complaint included numerous attachments (**Exhibits L, M, O, S, U, V** and others)  **Exhibit 1**, Varlesi 192-193

234. After Premo's "deep trouble" comment, Varlesi received a letter dated 5/2/08 officially terminating her from the MSW program. **Exhibit 1**, Varlesi 213; **Exhibit Y**, 5/2/08 termination letter

235. Premo admits that she told Varlesi it was not appropriate for her to contact Najor- Durack and that Najor- Durack does not want students calling her. **Exhibit 8**, Premo 337

236. In an email to Premo, Varlesi repeated  Premo's "deep trouble" comment, as well as Premo's admission from a couple weeks earlier that Varlesi was "doing great."  **Exhibit Z,** 5/1/08 email

237. Premo never responded to or refuted that email.

238. Premo has been a faculty advisor to  600+ students; *she has never failed anyone, except Varlesi.* **Exhibit 8**, Premo 61-62; 272

239. Premo previously had an intern exhibit poor judgment and inappropriate behavior, including  taking chronically ill, paranoid schizophrenic patients  to an "S&M" bar;  she did not fail that intern. **Exhibit 8**, Premo 59-61

240. Late afternoon 5/9/08 (a Friday), WSU's OEO office contacted Najor-Durack regarding Plaintiff's OEO complaint. **Exhibit 1**, Varlesi 199-201

241. On 5/9/08 Najor-Durack sent Dean Vroom a "heads up" email regarding Varlesi's OEO pregnancy discrimination complaint, stating that the OEO wanted the School of Social Work to investigate the claims. **Exhibit AA** 5/9/08 email

242. In that email to Vroom (*et al*)  Najor-Durack states that she told the OEO office that Varlesi had a file "as thick as a phone book" and that Varlesi  had attendance and performance issues, although she admits she did not know what they were, and was relying on what  Premo told her, as reported to Premo by Stefanski. **Exhibit 6**, Najor-Durack 327-335, 337-343;  **Exhibit 1**, Varlesi 200-202

243. On  5/13/08 (Tuesday morning), Varlesi received a letter from WSU's OEO stating, among other things,  that their "thorough analysis" had found  insufficient evidence of pregnancy discrimination warranting a formal investigation.  **Exhibit BB**, 5/14/08 OEO letter;  **Exhibit  1**, Varlesi 200-202

244. Any investigation would have had to have been completed within one business day or less. **Exhibits AA, BB**; **Exhibit 1**, Varlesi 199-202

245. In fact, much later, at an MDCR fact finding conference, WSU  OEO Director , Mr. Jones, confirmed that the OEO had not done any investigation.  **Exhibit 1**, Varlesi 202-203

246. The 5/14/08 letter also stated that the School of Social Work had conducted its own investigation. **Exhibit AA**

247. The School of Social Work did not actually investigate anything; Najor-Durack admits she just relied on what Premo said. **Exhibit 6**, Najor Durack 354

248. Najor-Durack concurred with the termination decision. **Exhibit 6**, Najor-Durack 314-315

249.   At the time Najor-Durack concurred in the termination decision, she had not even seen the evaluation filled out by Stefanski.  **Exhibit 6**, Najor-Durack 322

250.   Premo admits that Plaintiff completed her 225 hours in the SA internship.  **Exhibit 8**, Premo 249

251.   At some point, Premo solicited statements from two other WSU interns, LaShawnda Harris and Carmen Ramos.  **Exhibit 1**, Varlesi 182

252.   Ramos told Varlesi that she and Harris wanted nothing to do with writing statements in support of Stefanski, but did it because they did not want to get on Premo's bad side.  **Exhibit 1**, Varlesi 320-321; 358; **Exhibit D**, ¶10

253.   Gary Gillow (to whom Stefanski reported) took the position that Stefanski's evaluation of Varlesi may have been biased.  **Exhibit E**, Gillow Affidavit ¶8

254.   Varlesi met all the requirements for her MSW degree, except for the grade on her final internship.  **Exhibit 6**, Najor-Durack 336

255.   At deposition, Premo attempted to  take the position that something about Varlesi's  "process recordings" was deficient - as they did not include  "cognitive distortion." Premo then admitted that the paperwork  Varlesi was to fill out did not even include a section to note "cognitive distortions,"  that she never even discussed this with Varlesi at the SA, and that Premo never gave Varlesi any feedback and nothing in writing on this purported performance issue. **Exhibit 8**, Premo 129, 141-145. Nor did Premo ever discuss Varlesi's process recordings with Stefanski.  *Id.* 161

256.   Premo admits that Varlesi told her Stefanski was prejudiced against her.  **Exhibit 8**, Premo 154

            5.    Classroom

257.   Plaintiff's GPA for her final semester was a 3.96; her overall GPA was 3.69.  **Exhibit F**

**Grade Appeal**

258.   On or about 5/16/08, Varlesi submitted a grade appeal of her "unsatisfactory" internship grade at the SA  to Dean Vroom.  **Exhibit 1**, Varlesi 204-207; **Exhibit CC**, Grade appeal (2 letters dated  4/30), without attachments[4]

259.   Varlesi's grade appeal set forth in detail her concerns that the evaluation was a result of  bias and discrimination (pregnancy) and her complaints about discrimination.  **Exhibit CC**

260.   While the University has a procedure under which a committee can be formed to review grade disputes, the University declined to use it, asserting there was no need.  **Exhibit 1**, Vroom 239, 240

---

[4]Varlesi's grade appeal packet included many of the documents attached hereto (**Exhibits L, M, O-S, X, Z** ) and other supporting documents (e.g., emails, time sheets from SA internship.)

261.   Varlesi was advised by WSU that she could not have an attorney or a hearing for the grade appeal process.  **Exhibit 1**, Varlesi 78-79

262.   Although Varlesi asked Vroom to contact Gillow (Stefanski's supervisor, who agreed Stefanski's evaluation may have been the result of bias) she refused.  **Exhibit 10**, Vroom 157-160; **Exhibit E**, ¶8

263.   Dean Vroom had never met Varlesi, never met Stefanski, had not been out to the SA during this time frame, had never observed what Varlesi did during the day, but felt that she (Vroom) knew more about whether Stefanski was biased than Stefanski's boss (Gillow) who worked with both Varlesi and Stefanski  **Exhibit 10**, Vroom 60, 159

264.   On 6/19/08, Varlesi received a letter from Premo dated 6/12/08.  **Exhibit DD**, 6/12/08 letter from Premo;  **Exhibit 1**, Varlesi 215

265.   In response to Premo's 6/12/08 letter, Varlesi sent a supplemental letter regarding her grade appeal to Dean Vroom, reiterating that no documentation of any performance issues exist, but should exist, if there truly were concerns about Plaintiff's performance. *Id.*.  **Exhibit EE**, 6/23/08 grade appeal letter to Vroom, with Gillow statement

266.   Premo subsequently sent a letter to Vroom, referencing Plaintiff's "totally implausible" pregnancy discrimination claims, and urging denial of Varlesi's grade appeal.  **Exhibit FF**, 7/2/08, 7/21/08 Vroom-Premo correspondence

267.   Premo and Vroom contradict each other on whether or not the two of them had an impromptu, private meeting regarding Varlesi's grade appeal.  **Exhibit 10**, Vroom 255

268.   Vroom knew that Stefanski was upset that Varlesi rubbed her stomach, believing it could be "sexually stimulating" to the men at the SA.   **Exhibit 10**, Vroom 142, 148-149

269.   Vroom did not believe that Stefanski had a problem with Varlesi being pregnant and unmarried, but did not ask Stefanski about that, because Vroom and Najor-Durack agreed the claim was "absurd." **Exhibit 10**, Vroom 133

270.   By letter dated 8/5/08, Dean Vroom denied Varlesi's grade appeal.  The denial was untimely. **Exhibit GG**, 8/5/08 letter from Vroom;  **Exhibit 1**, Varlesi 221, 226, 229;  **Exhibit 10**, Vroom 256-257

271.   Varlesi never met Vroom, nor had a conversation with her.  **Exhibit 1**, Varlesi 211

272.   Varlesi also pursued her grade appeal with the Provost, which was denied.  **Exhibit 1**, Varlesi 221, 227; **Exhibit HH**, 9/9/08, 12/17/08 correspondence

**Reinstatement Request and Reinstatement Advisory Committee**

273.   By letter dated 8/26/08 to Dean Vroom, Varlesi sought reinstatement to the MSW program.  **Exhibit 1**, Varlesi 226; **Exhibit II**, 8/26/08 letter

274.    A reinstatement advisory committee was formed.  **Exhibit 1**, Varlesi 230

275.    Varlesi was permitted to select 3 faculty members to be on the committee out of an eligible pool of 5 chosen randomly by WSU. **Exhibit 1**, Varlesi 230-231

276.    Varlesi  had never met two of the three faculty members.  *Id.*

277.    The committee members received a form "memo" notifying them that they had been selected to sit on a reinstatement committee for Varlesi and setting for the reinstatement criteria.  **Exhibit 5**, Lee 10, 17; **Exhibit 4,** Gonzales-Prendes 18; *see* **Exhibit JJ,** example of advisory committee selection letter

278.    WSU has not produced the memo sent to Varlesi's reinstatement committee; thus the date of their appointment is unknown.

279.    The entire process, from the time the committee is advised of their selection to the date when they are to make their recommendation to the Dean, is to be completed within 10 days.  **Exhibit 5**, Lee 14

280.    The chair of the reinstatement advisory committee was Defendant Shawna Lee.  **Exhibit 5**, Lee 78. The other members of the panel were Defendant Gonzales-Prendes and Defendant Brunhofer.

281.    The reinstatement committee operates under the presumption that whatever  happened with a student's grade appeal was correct.  **Exhibit 3**, Brunhofer 29

282.    The committee members were instructed to  review a  manila folder of documents regarding Varlesi, put together by someone in the Dean's office, and then return the file; they did not  receive their own copy.  **Exhibit 5**, Lee 10-13

283.    Varlesi  had no input with respect to what documents the Dean's office would submit to the reinstatement committee.  **Exhibit 4**, Gonzales-Prendes 48

284.    The file  provided by the Dean's office  typically is about an inch thick, contains a 1-2 page letter from the student requesting reinstatement, and may contain admissions materials, possibly transcripts, a log of contacts the student has had with the Student Affairs office, and other documents.  **Exhibit 5**, Lee 25-26; **Exhibit 4**, Gonzales Prendes 19; **Exhibit 3**, Brunhofer 29-30

285.    The WSU Defendants have been unable to re-produce a copy of the actual  "file" on Varlesi  that was reviewed by her reinstatement committee.  **Exhibit 5**, Lee 55-57

286.    According to the committee, the three criteria for reinstatement are:
        (1) documentation of extenuating circumstances;
        (2) whether the student accepted or accepts  responsibility; and
        (3) a plan to remediate the situation moving forward.  **Exhibit  5**, Lee 15-16l 32-33

287.    The committee looks to see if these three criteria are met in the student's statement to the reinstatement committee.  **Exhibit 5**, Lee 32-33

288.    **Varlesi was never provided with the three criteria.   Exhibit D**, Varlesi Affidavit ¶ 12

289.    What Varlesi *was* told by the Dean's office is that her reinstatement letter had to be "academic" and should not mention discrimination issues.  Varlesi was also informed that she had no chance of reinstatement unless she accepted blame in her  statement.  **Exhibit D**, Varlesi Affidavit  ¶11

290.    Lee does not know if the student is informed of the three criteria he or she needs to address in their statement.  **Exhibit 5**, Lee 33

291.    Lee has sat on several of these committees, and typically spends 15-30 minutes on the document review.  *Id.*

292.    Neither Lee nor Brunhofer took any notes at any time in this process.  **Exhibit 5**, Lee 78; **Exhibit 3**, Brunhofer 51

293.    Lee has never seen any written policies or procedures that dictate how the reinstatement committee process is suppose to work; she had only the memo.  **Exhibit 5**, Lee 15

294.    Lee first saw the written policies regarding reinstatement (contained in the WSU School of Social Work Policy Manual, and WSU School of Social Work Field Education Manual)  at her deposition in this case.  **Exhibit 5**, Lee 17-18, 21-22

295.    The reinstatement committee typically meets for 30-45 minutes.  **Exhibit 5**, Lee 20

296.    Varlesi never met with the reinstatement committee.  **Exhibit 1**, Varlesi 231

297.    Lee does not believe it is appropriate for the committee to actually talk to the student seeking reinstatement.   **Exhibit 5**, Lee 29-30

298.    The goal of the reinstatement committee is not to obtain insights from the student that may not be contained in the documents provided by the Dean's office.  **Exhibit 5**, Lee 30

299.    Examples of "extenuating circumstances" (reinstatement criteria #1) could be car trouble, child care issues, illness, financial trouble, job issues  **Exhibit 3**, Brunhofer 24-25

300.    A student who receives a failing grade due to discrimination could constitute an "extenuating circumstance" (reinstatement criteria #1). **Exhibit 5**, Lee 41

301.    "Documentation of bias" on the part of the student's  field instructor could constitute an "extenuating circumstance" (reinstatement criteria #1). **Exhibit 5**, Lee 41

302.    Evidence the university was retaliating against a student could constitute an "extenuating circumstance" (reinstatement criteria #1). **Exhibit 5**, Lee 41

303.    According to Lee, if  an employee was dismissed from the program due to discrimination, the reinstatement committee would want to rectify that.  **Exhibit 5**, Lee 42

304.    Lee was aware that Varlesi had received the best evaluation possible in her first year internships, and the worst possible evaluation in her final internship. **Exhibit 5**, Lee 74

305.    Lee acknowledges that Stefanski  may have simply been completely wrong in her evaluation  of Varlesi, and that it could have been completely invalid or a result of bias.  **Exhibit 5**, Lee 75

306.    Lee is unaware of any other student dismissed from the MSW program with an A average.  **Exhibit 5**, Lee 42

307.    It is unusual for a student to be dismissed from the MSW program.  **Exhibit 5**, Lee 44

308.    Lee did not know that the committee could have requested additional data, recommendations, opinions and evaluations  from any appropriate source to assist it in reaching a decision, although this option is set forth in WSU's written policies; she understood the committee was only to look at the materials in the file presented by the Dean's office.  **Exhibit 5**, Lee 76; **Exhibit B**, p 60, #3; **Exhibit B**, Bates #68

309.    There are numerous pieces of information the committee would have liked to have, but did not, regarding Varlesi and her claims, some of which are "disturbing" and "of concern."  **Exhibit 4**, Gonzales-Prendes 58, 70, 72, 75-77; **Exhibit 3**, Brunhofer 63-64, 70, 74- 76, 80

310.    The file Lee reviewed included specific references to Varlesi's pregnancy, including that  Stefanski admonished her for rubbing her stomach, and told her to wear looser clothing.  **Exhibit 5**, Lee 52, 62-63

311.    The file Lee reviewed included Varlesi's claim that Premo said she might have to drop out of school because of the pregnancy.  **Exhibit 5**, Lee 59-60, 82-84

312.    Lee admits the committee also  had Premo's letter to Varlesi  denying any  "prejudice against pregnant individuals."  **Exhibit 5**, Lee 82-84

313.    Yet, Lee says the committee was unaware Varlesi was claiming discrimination. **Exhibit 5**, Lee 82

314.    The committee acknowledges that Stefanski may have had a bizarre agenda or bias against Varlesi.  **Exhibit 4**, Gonzales-Prendes 53

315.    The committee members are unaware of any other student getting a "does not meet" in virtually every category  of his or her field evaluation.  **Exhibit 4**, Gonzales-Prendes 52, 77

316.    The committee, after meeting 30-45 minutes, agreed to recommend against reinstatement.  **Exhibit 5**, L33; **Exhibit 4**,Gonzales-Prendes

317.    Lee then wrote a one paragraph form letter to the Dean recommending against reinstatement.  **Exhibit 5**, Lee 81; **Exhibit KK,**  9/17/08 letter

318.    The letter states that Varlesi did not meet the three criteria for reinstatement.  *Id.*

319.    The letter stated that Varlesi did not "accept personal responsibility for the actions that ultimately led to her termination."  *Id.*

320.   In the case of a student claiming she was being discriminated against, that criteria  (#2 - "accepting personal responsibility") may not be valid. **Exhibit 5**, Lee 85; Exhibit 4, Gonzales-Prendes 37-38

321.   In the case of a student claiming she was being discriminated against, the 3rd criteria (showing changed circumstances, and a plan of action to correct the problem that lead to termination) may not apply either.  **Exhibit 5**, Lee 85; Exhibit 4, Gonzales-Prendes 38

322.   By letter dated 9/24/08 Varlesi was advised that her reinstatement request was denied.  **Exhibit 1**, Varlesi 232; **Exhibit KK**, 9/24/08 letter from Vroom

323.   Vroom's denial of Plaintiff's reinstatement requests was  untimely.  **Exhibit 10**, Vroom 256-257

324.   The School of Social Work has reinstated students who have failed numerous classes <u>and</u> received a U in field work.   **Exhibit 10**, Vroom 251

## Student Files Produced by WSU

325.   In the WSU School of Social Work, students with perceived performance issues are to be given  a plan containing identifiable and agreed upon performance goals.  **Exhibit 6**, Najor-Durack 66, 58.

326.   WSU takes the position that any performance concerns with respect to its students should be brought up promptly, as "the earlier they're brought up, the more time they have the opportunity to work it out and resolve it."  **Exhibit 6**, Najor-Durack 68

327.   The WSU Defendants have produced the student files of approximately ten (10)  social work students who, according to Defendants, had performance issues, and are Plaintiff's comparables.

328.   The files of these students contain documentation of contemporaneous meetings and  discussions regarding perceived performance issues and a plan to get the student back on track.  Some of this documentation includes  notes from the student's academic advisor,  OASS (Office of Student Services) contact logs, detailed descriptions and "careful documentation" of perceived performance issues including the  student's response.   **Exhibit 6**, Najor-Durack 95-107

329.   No such documentation exists for  Ms. Varlesi.  **Exhibit 6**, Najor-Durack 106- 107

## Miscellaneous Additional Material Facts

330.   **Defendant Premo  admits to practicing social work without a license.  Exhibit 8**, Premo 39,41; 310

331.   Practicing social work without a license is a felony.  **Exhibit MM,**  MCL 333.16294

332.   Varlesi was advised by agents of WSU that some of her records may have been lost or destroyed.  **Exhibit 1**, Varlesi 381

333.   WSU's <u>Field Education Manual</u> states that WSU is committed to a policy of non-discrimination ... in all of its operations, employment opportunities, educational programs and related activities; that this

policy embraces all persons regardless of .... gender... [or] marital status... and expressly forbids... discrimination in...[the] treatment of students; and that WSU complies with Title IX. **Exhibit B**, p 9

334.    Varlesi filed a MDCR Charge of Discrimination against WSU, and a three hour fact finding conference was held in June 2009, attended by Varlesi, Stefanski, Premo, Najor-Durack, and WSU's OEO Director. The fact finding conference was conducted by Nichole Pardo, a seasoned Civil Rights Investigator. Pardo, her supervisor, and the MDCR staff attorney were all in agreement that the matter should proceed to a formal charge (meaning discrimination had occurred) and reconciliation. **Exhibit 7**, Pardo 6, 8, 16, 55

I.      OVERVIEW

Tina Varlesi  alleges that the WSU Defendants illegally  terminated her from graduate school (MSW program) due to discrimination and retaliation; and denied her due process of law.

Plaintiff's claims as against the WSU Defendants are:

Count    I        sex, pregnancy and marital status/parental status discrimination in violation of Title IX  (WSU; Premo, Najor-Durack and Vroom in their official capacities)

Count II          retaliation in violation of Title IX (WSU;  Premo, Najor-Durack and Vroom in their official capacities)

Count III         sex/pregnancy and marital status discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act (ELCRA)   (Premo, Najor-Durack, Vroom)

Count V          retaliation in violation of Michigan's ELCRA (Premo, Najor-Durack, Vroom)

Count VI         §1983 due process violations (Premo, Najor-Durack, Vroom, Lee, Gonzales-Prendes, Brunhofer in their individual capacities)  **Exhibit A**, Second Amended Complaint

II.   FACTS

   A.    Summary of Key Facts

In the spring of 2008, Tina Varlesi was dismissed from Wayne State University's MSW program.  She had a term GPA of 3.96 and  an overall GPA of 3.69.  **Exhibit F**  Just weeks earlier, Varlesi's faculty advisor (Premo) told Varlesi that she was "doing great" and had all the skills needed to go out and do social work. **Exhibit 8**, Premo 353; **Exhibit 1**, Varlesi 170, 176, 187-189, 240; **Exhibit Z**.  Varlesi had also successfully completed two prior field internships, earning the highest overall mark possible in each of them. **Exhibits G&H; J.**  She also had prior field instructors rate her internship performance  as "exceeds expectations" in every single category, amid glowing reviews that Varlesi had shown amazing ability and excellent skills in field work, going above and beyond what is typically expected of MSW student interns.  **Exhibits G, H**

Defendants take the position that Varlesi nevertheless had to be kicked out of the program  because of  poor performance in her final year, final semester internship  at the Salvation Army (SA).  On the very last

-1-

day of that internship, Varlesi's field instructor at the SA (Stefanski)  handed Varlesi  a failing performance evaluation, giving her the worst possible rating ("does not meet expectations") in 53/54 categories – a review that was  unprecedented in the history of the School of Social Work – which virtually assured Varlesi would be kicked out of the program.  **Exhibit 1**, Varlesi 177; **Exhibit S**; **Exhibit 8**, Premo 272; **Exhibit 9**, Stefanski 172, 175;  **Exhibit 10**,  Vroom 215-216;  **Exhibit 6**,  Najor-Durack 255-257, 278-279.   Equally as outrageous, Defendants had <u>never previously  discussed with Plaintiff, nor put in writing, any purported performance issues at the SA,</u>  let alone a remediation or action plan designed to correct any  perceived issues.  **Exhibit 6**, Najor-Durack 50-52; **Exhibit 8**, Premo 109-110; **Exhibit 9**, Stefanski 64, 193; **Exhibit 1**, Varlesi 184

The issues that *are* well documented, however, are that Defendant Stefanski was "fixated" (to quote intern Amber Bergin) on Varlesi's personal life, and made many bizarre and discriminatory comments regarding Varlesi, who was unmarried, and her pregnancy ("*it's obvious you've had relations with someone,*" "*that [ring] on your finger does not deter the men... they can look but they can't touch*"; told Varlesi and WSU that she did not like Varlesi rubbing her stomach and complaining about being sick; stated she no longer wanted Varlesi as an intern soon after learning she was unmarried, and that if she kept her, she could  "just fail" her;  stated she did not want to see the "silhouette" of Plaintiff's belly; stated Varlesi's pregnancy sexually excited the men at the Salvation Army; and that Premo would "fail" her if she did not abide by Stefanski's directive to wear bigger clothing).  **Exhibit 2**, Bergin 66, 72-76, 98-99;  **Exhibit 1**, Varlesi 161-167;170-172;  314-319; **Exhibit 8**, ¶8.  Significantly, Stefanski's hostility regarding Varlesi's pregnancy surfaced only after learning that Varlesi was unmarried. **Exhibit** 1, Varlesi 315 (at that point "*things seemed to go south.*")  Also well documented are Varlesi's  numerous complaints to WSU about Stefanski's discriminatory comments,  and her concerns  about receiving a fair evaluation from this individual.  **Exhibit 1**, Varlesi 156-157; 160-161;  168-171; 176, 187, 196, 240, 330;  **Exhibit P**; **Exhibit 8**, Premo 343-344

Instead of attempting to reign in Stefanski, or removing Varlesi from this bizarre and discriminatory

-2-

work/educational environment, WSU's agents accepted and perpetuated it, as though Stefanski's obvious problem with Plaintiff's pregnancy was on some level normal, reasonable or legal, with Premo even telling Varlesi that if Stefanski didn't want to keep her in the internship, Varlesi would "*have to drop out of the program due to [your] pregnancy.*" **Exhibit 1**, Varlesi 166-167; **Exhibit 6**, Najor-Durack 180-181, 185, 188.  And, Varlesi's attempts to obtain redress for the unprecedented, clearly biased, failing evaluation she ultimately received from Stefanski were met with <u>blatant retaliation</u>:  Premo, furious that Varlesi had gone over her head and complained about pregnancy discrimination to WSU Director of Field Education Najor-Durack, angrily told Varlesi, she was in "*deep trouble*" and that "*I'm not changing your grade.*" **Exhibit 1**, Varlesi 239-240; **Exhibit D**, ¶9

Varlesi pursued every avenue available to her to challenge this lunacy (grade appeal, request for reinstatement), all without success, with the Dean and the Dean's reinstatement advisory committee rubber-stamping the dismissal decision.  Plaintiff's Statement of Facts, ## 258-324  Plaintiff's dismissal from the School of Social Work, and the destruction of her professional career, was completely outrageous and done *not* for academic reasons, but due to the discriminatory, retaliatory and reckless actions of Defendants.

## B.    Defendant Premo (WSU) and Defendant Stefanski (Salvation Army) are Unprofessional and Not Competent

The record contains additional, compelling evidence that the individuals who orchestrated Varlesi's dismissal from WSU, depriving her of both the MSW degree she had earned, as well as her chosen career as a social worker, are completing lacking in professionalism and competency, lack basic required social worker credentials, and have insurmountable credibility problems.

### 1.    Defendant Carol Premo

Premo has been an employee of WSU since '94 and a faculty advisor since '95.  **Exhibit 8**, Premo 8-9. Premo has a Ph.D. in psychology, obtained by taking a two month course at a Florida college ("Walden")

located on the ocean "in a bunch of condos." *Id.*, 18-19[5]

Premo does not know what she earns, does not sign a tax return, and does not open up her own mail, keep any records, or drive. **Exhibit 8**, Premo 10-11, 315. Her housemate handles all these things for her, including opening Premo's mail from WSU and managing all Premo's WSU student files, because Premo does not want to do it herself. *Id.,* 316- 318[6]

Premo (age 70) had to stop teaching four years ago because she can't remember anything, "words are lost" "because I am old" and has significant health issues; she has had several heart bypass operations. *Id.*, 20-22[7] She explained that "the bypass interferes with your memory." *Id.* She no longer goes downtown to WSU as there are steps and it's too difficult. *Id.*, 23

In response to questions about whether she had previously given a deposition, Premo launched into kidnapping and personal injury sagas. She was kidnapped in 1959 and involved in a high speed police chase (pulled into the back of a "four door Chrysler Imperial that took off going 90 miles an hour down Vernier" by MSU students who were going to take her to Toledo and rape and kill her; she hit the driver in the back of the head, opened the door with her legs, was planning on jumping out but couldn't; a "sheeny man" called the police which resulted in a chase; they hit a car broadside at 90 miles an hour; she was left with a "bunch of broken bones") which resulted in both criminal and civil trials. *Id.*, 28-34

Premo also sued an ambulance company in the 70s. She was playing tennis, went up for a backhand, came down and broke her ankle, an ambulance came to take her to St. Joes, she was strapped onto a gurney,

---

[5]Walden now offers exclusively on-line degrees. www.waldenu.com

[6]This practice clearly implicates FERPA (Family Educational Rights and Privacy Act of 1974), 20 USC §1232g *et seq.*

[7]Premo's other health issues include insulin dependent diabetes, an enlarged heart, and history of pulmonary embolism. **Exhibit 8**, Premo 20-22

the gurney broke as they were entering the hospital and the EMS staff dumped her over so that she was lying in the mud and water, tied down and wearing shorts in zero degree weather. *Id.* 36 She was awarded $20,000. *Id.*

Premo has a private practice (clinical social work) in which she sees patients out of her home, although she is doing so without a license, which she let  lapse over 10 years ago.  She understands a license is required to see patients, but does not believe what she is doing is illegal. *Id.* 39-41, 310  (In fact, it is a felony, *see* **Exhibit MM**.)

2.     **Defendant Joyce Stefanski**

Stefanski, age 75, was fired from her last counseling job (Hegria)  due to  poor performance, and lied about this fact at deposition. **Exhibit 8**, Stefanski 11-12; **Exhibit K,** Hegria documents.  At Hegria, she was rated incompetent in every competency field (technical domain, interpersonal domain, critical thinking domain). *Id.*

Premo recommended that WSU use Stefanksi as a field instructor for WSU social work students. **Exhibit 8**, Premo 86.  While WSU policies require field instructors to possess an LMSW (licensed masters of social work), Stefanski is not licensed, and does not have an MSW degree. *Id.,* 73, 77. Premo says Stefanksi is nevertheless being used by WSU as a field instructor with the understanding that she (Premo, who is also unlicensed) needs to closely supervise Stefanski. *Id.* at 78-79. [Stefanski was unaware that she was supposed to be an LMSW to be a field instructor for social work interns. **Exhibit 9**, Stefanski 38] No other faculty or staff at WSU works with Stefanski; only Premo's students are assigned to Stefanski. **Exhibit 8**, Premo , 89-90. Premo was unaware Stefanski was demoted (from Director to counselor) by the SA. *Id.* 233; **Exhibit 9**, Stefanski 7-9

Premo and Stefanski have never emailed about Tina Varlesi (Premo is "disappointed" that Stefanski never put anything in writing to her or Varlesi). **Exhibit 8**, Premo 105, 188. Stefanski is "lax" about following

-5-

through on the computer; doesn't have an operating computer; says she can read, but can't send emails; and only communicates with Premo by phone, or in person. *Id.* 188; **Exhibit 9**, Stefanski 56-60. Premo and Stefanski have recently chatted on the phone about Molly, Premo's pet squirrel. **Exhibit 8**, Premo 74-75, 307

These are the individuals WSU selected to provide Plaintiff with a professional, quality educational experience in her final internship at WSU. These are the same individuals who, amid blatantly discriminatory and retaliatory comments and threats regarding Varlesi's pregnancy and discrimination complaints, concluded that Varlesi, an A student with prior glowing reviews in field work (and who had spent $40,000 on her degree) had to be failed in her final field placement, and kicked out of the MSW program.

III.    LAW

A.    Summary Judgment Standards

If a reasonable jury could return a verdict for the plaintiff, then a genuine dispute of material fact exists and summary judgment may not be granted. *Satterfield v. State of Tenn.*, 295 F.3d 611, 615 (6th Cir. 2002), Fed.R.Civ.P. 56. In this case, the evidence of Defendants' discrimination, retaliation and reckless indifference to Plaintiff's rights is so overwhelming that summary judgment in *Plaintiff's* favor is appropriate. Fed.R.Civ.P. 56 (f)(1)

B.    Pregnancy / Marital Status Discrimination (Title IX, ELCRA)

Despite the overwhelming evidence to the contrary, the WSU Defendants assert that Plaintiff has insufficient evidence that she was discriminated on the basis of her pregnancy/marital status.

1.    Title IX prohibits sex, pregnancy and marital/parental discrimination

**Title IX** prohibits sex discrimination in any educational program or activity receiving federal financial assistance:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. 20 USC §1681(a)

-6-

The regulations promulgated under Title IX "unequivocally apply its prohibition against sex discrimination to discrimination **on the basis of pregnancy and parental status**":

> a recipient [of federal funds] shall not apply any rule concerning a student's actual or potential *parental, family or marital status* which treats students differently on the basis of sex. 34 CFR §106.40(a)

*Chipman v. Grant County School District*, 30 F.Supp.2d 975, 977 (E.D. Ky 1998)(Title IX action brought against school administration officials for excluding female high school students who became pregnant out of wedlock from national honor society organization.) And, a Title IX action can be maintained against individual defendants named in their official capacity. *Harris v. Board of Governors of Wayne State University,* 2010 WL 5173666 (E.D. MI 2010).

### 2. ELCRA prohibits sex, pregnancy and marital status discrimination (in educational institutions *and* places of public accommodation)

**Michigan's ELCRA** similarly prohibits <u>educational institutions</u> and their agents and <u>places of public accommodation</u> (the definition of which includes educational institutions) from engaging in sex discrimination. MCL 37.2401 (educational institutions); MCL 37.2301 (places of public accommodations). Pregnancy discrimination is a subset of sex discrimination. *Haynie v. State*, 468 Mich 302, 310, 664 NW2d 129 (2003)

Marital status is also a protected category under ELCRA. MCL 37.2102 ("*the opportunity to obtain ... the full and equal utilization of public accommodations... and educational facilities without discrimination because of ... marital status... is recognized and declared to be a civil right.*"); *Moon v Michigan Reproductive & IVF Center*, 2011 WL 4503310, *4 (Mich App)(places of public accommodation may not discriminate on the basis of marital status, which occupies a coequal place in the pantheon of protected characteristics under the ELCRA.) A copy of *Moon* is attached as **Exhibit NN.**[8]

---

[8] Defendants argue that ELCRA does not specifically prohibit marital status discrimination with respect to educational facilities, citing *Fonseca v. Michigan State University*, 214 Mich App 28, 542 NW2d 273 (1996), which involved an anti-nepotism policy. That court stated that the plaintiff could not state a claim but even if

-7-

3. **Plaintiff easily establishes a prima facie case of pregnancy and marital status discrimination**

Plaintiff agrees with WSU that discrimination claims under Title IX and ELCRA (and Title VII) are analyzed similarly, and agrees the WSU Defendants have generally set forth the proper framework for analyzing these claims.[9]

A plaintiff can establish a discrimination claim with direct evidence (evidence, which if believed, requires the conclusion that unlawful retaliation was at least a motivating factor in the decision at issue[10]) or absent direct evidence, inferentially under the *McDonnell-Douglas*[11] burden shifting framework.     Under *McDonnell-Douglas*, a plaintiff can establish a discrimination claim with evidence that **(1)** she was a member of a protected class; **(2)** she was performing the academic requirements at a level well enough to meet her educator's legitimate expectations (or was otherwise qualified); **(3)** she suffered adverse treatment; and **(4)** the educational program continued to instruct and credit other students (or, alternatively, that the adverse action occurred under circumstances giving rise to an inference of unlawful discrimination). *McConaughy v. University of Cincinnati*, 2010 WL 6511141 (S.D. OH); *Lytle v. Malady*, 458 Mich 153 (1998).[12]

Once this showing is made, a presumption of discrimination arises which the defendant can rebut by articulating a legitimate, non-discriminatory reason for its actions. *Lulaj v. Wackenhut Corp.*, 512 F.3d 760, 765

---

he could, there was no violation because marital status under ELCRA refers to *whether or not one is married*, not *who* one is married to.

[9]However, WSU's assertion that "disparate treatment" and "intentional discrimination" are distinct legal theories to which separate analyses apply is incorrect; they are one and the same. *Meagher v. Wayne State University*, 222 Mich App 700, 709, 565 NW2d 401 (1997); *Ricci v. DeStefano*, 129 S.Ct. 2658, 2672 (2009).

[10]*Sniecinski v. Blue Cross and Blue Shield of Michigan*, 469 Mich 124, 133; 666 NW2d 186 (2003)

[11]*McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817 (1973)

[12]There are various formulations of the *McDonnell-Douglas* test; the analysis is not to be applied mechanically. Instead, the elements of the prima facie case will vary according to the facts before the court. *Freeman v. Porter*, 200 Fed Appx. 439 (6th Cir. 2006)

(6th Cir. 2008).  The burden then shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the articulated reasons were a mere pretext for discrimination.  *Id.*  Pretext can be established by showing that the defendant's reason (1) has no basis in fact; (2) did not actually motivate the defendant's conduct; or (3) was insufficient to warrant the challenged conduct. *Wexler v. White's Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003).  Once evidence is adduced demonstrating that the defendant's reasons are pretextual, the above framework falls away and the plaintiff must prove by a preponderance of the evidence that discrimination motivated the adverse action. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097 (2000).  A *prima facie* case, combined with sufficient evidence that the defendant's  asserted justification is false, permits a fact finder to conclude that discrimination has occurred.  *Id*

The ultimate question for the fact finder is whether Plaintiff's (sex/pregnancy and marital status) *were factors that made a difference* in Defendants' decision to [dismiss] her *See* M Civ. JI 105.02.  ("*The plaintiff must prove that she was discriminated against because of [sex/pregnancy, marital status] .... [sex/pregnancy, marital status] does not have to be the only reason, or even the main reason, but it does have to be one of the reasons which made a difference in determining whether or not to ... discharge the plaintiff); see also Hazle v. Ford Motor Company,* 464 Mich 456,466,  628 NW2d 515 (2001) (citing M Civ JI 105.02)

Significantly, the U.S. Supreme Court recently agreed, in the employment context, that where an individual with discriminatory animus influences, although does not actually make, the adverse decision, liability may be imposed on the decision-maker ("cat's paw" theory of liability).  *Staub v. Proctor Hospital*, 131 S.Ct. 1186  (March 1, 2011).  A jury will easily conclude that Stefanski's discriminatory animus toward Varlesi (because Varlesi was pregnant and unwed) resulted in her  unprecedented, horrible field evaluation of Varlesi, which was relied upon by WSU in giving Varlesi a failing internship grade and kicking her out of the MSW program.  Under *Staub*, WSU is  liable for Stefanski's discriminatory animus (as well as the discriminatory animus of  WSU's own agents.)

a.      the evidence that Plaintiff's pregnancy was a factor in her dismissal

Defendants argue that Plaintiff has no "direct evidence" of pregnancy discrimination because Premo's statement that she might have to *"drop out of the program due to the pregnancy"* is a "stray remark."[13]

First, even aside from this statement (which is the polar opposite of a 'stray remark', discussed below) Plaintiff has presented abundant additional evidence of discriminatory comments and conduct by WSU (e.g., Premo and Najor-Durack buying into Stefanski's wacky theory that Plaintiff rubbing her stomach would "sexually excite" the men at the SA because they would find it "hot and stimulating;" Premo admonishing Varlesi to stop touching her stomach and to wear baggier clothing; Premo and Najor-Durack carrying on about Plaintiff's clothing and coddling Stefanski on this issue, even while admitting that Varlesi was always appropriately dressed; Najor-Durack telling Varlesi (in the context of discussing her pregnancy) that she should consider taking a year off.  (Plaintiff's Facts, ## 142- 143, 153, 176-177, 183, 185).  Any jury will easily conclude from this evidence that WSU's agents had an issue with Plaintiff's pregnancy.

Nor was Premo's comment about "dropping out due to pregnancy" even remotely a "stray remark." A true "stray remark," (which will be insufficient to constitute <u>direct evidence</u> of discrimination) is a vague but arguably discriminatory comment, typically made by a non-decision maker, and remote in time to the adverse action at issue. *See Lundy v. Thyssen Krupp Steel, NA,* 2011 WL 149985 (Mich App)(unpublished)("old bitch" and "old ass" comments made by a non-decisionmaker which plaintiff learned about second hand and admitted

---

[13]Defendants mischaracterize this statement, asserting that it was "*regarding Plaintiff's ability to stay in school if she failed her SA field placement.*"  Defendants' brief, p 11.  When this statement was made to Varlesi, there had been zero discussion of any performance issues (nor were there *ever* any such discussions with Varlesi), let alone that Varlesi was in danger of "failing" her SA placement.  Instead, the discussion that day (1/17/08) entailed Plaintiff's pregnancy, Stefanski's bizarre comments about Plaintiff's pregnancy (which the evidence clearly shows Premo and Najor-Durack condoned), Varlesi's request to switch placements due to Stefanski's behavior, and Stefanski's position that she didn't want Varlesi to remain at the SA.  These discussions were then followed up with Premo telling Varlesi that if Stefanski did not agree to take her back, Varlesi might have to "drop out due to the pregnancy."  (Plaintiff's Facts, ##141-144, 149-155)

-10-

was common "shop talk" did not constitute direct evidence of age discrimination.)

Factors to consider in assessing whether statements are "stray remarks" include: (1) whether they were made by a decision maker or an agent within the scope of his employment, (2) whether they were related to the decision-making process, (3) whether they were  vague and ambiguous or clearly reflective of discriminatory bias, (4) whether they were isolated or part of a pattern of biased comments, and (5) whether they were made close in time to the adverse [academic] decision.  *Ramanathan v. Wayne State University Board of Governors*, 480 Mich 1090, 1094-1095, 745 NW2d 115 (2008).  Even a cursory  analysis of these factors makes clear Premo's "**drop out of the program due to pregnancy**" comment does not constitute a "stray remark."  The comment was  made by a decisionmaker (#1); it directly relates to the issue of whether or not Varlesi could continue in the MSW program (#2); there is nothing vague or ambiguous about the statement, it is blatantly discriminatory (#3); it was part of a pattern of biased comments regarding Plaintiff's pregnancy and pregnancy attire (#4); and was made in the same semester that Varlesi was kicked out of the program (#5). Comments that are made close in time to the decision as issue  are more likely probative of discriminatory animus.  *See Hardeman v. The Salvation Army,* 2011 WL 5008398, *2-3 (E.D. MI Oct. 20, 2011), *citing  Wohler v. Toledo Stamping & Mfg., Co.,* 1997 WL 603422 at *3 (6th Cir. 1997)[14]

Defendants also apparently argue that the  "same actor inference" (e.g, that a presumption exists that if defendant hires a plaintiff in a protected  class, he or she  will not fire the plaintiff on that basis a short time later) warrants summary judgment on this claim. However,  Premo *never hired/selected* Varlesi.  Premo was *assigned* by WSU to be Varlesi's  faculty advisor based on the location of Varlesi's  internship. (Premo was faculty advisor for the entire site.)     And, at that time no one (including Varlesi) even knew about Varlesi's

---

[14]Defendants' entire argument on this point is inapposite, as even stray remarks by a decision-maker, when directed at the plaintiff, can support a discrimination claim.  *Pavicic v. Micro Lapping and Grinding Co.*, 1993 WL 498215at*5 (6th Cir. 1993)

pregnancy. (Subsequently, Premo went along with, and participated in, Stefanski's odd views and commentary regarding Varlesi's pregnancy, clothing, etc.)  In addition, the 6th Circuit has made it clear that the same actor inference cannot be used as the basis to grant summary judgment, as  doing so would run afoul of summary judgment standards. *Wexler, supra,* 317 F.3d at 573-574.

Defendants do not even attempt to argue that Plaintiff cannot make out her prima facie case inferentially under *McDonnell-Douglas.*

### b.    the evidence that Plaintiff's marital status  was a factor in her dismissal

Defendants baldly assert that Plaintiff has "no evidence" to suggest her marital status was a factor in the adverse actions taken against her (failing internship grade requiring dismissal; dismissal.) Defendants' Brief 10.  The evidence which, at a minimum,  raises an inference of marital status discrimination and creates a question of fact on this point includes: **(1)** Ms. Bergin's testimony regarding Stefanski's "fixation" on asking Varlesi, visibly pregnant, about the ring she was wearing and whether she was married, while making snide comments that it was "obvious" she had "had relations" (Plaintiff's facts #112), *Staub;* **(2)** Bergin's testimony that she observed that Stefanski had preset, negative  notions and ideas about Varlesi, prior to and independent of the Bergin email issue, *Id.;* (Plaintiff's facts #111); **(3)** Stefanski  boldly stating her intention to "fail" Varlesi, a week after learning she was unmarried, when she had recently confirmed to Premo that Plaintiff was "doing fine" (Plaintiff's facts, # 121-123, 131-132), *Staub;* **(4)** that after the 1/7/08 discussions where Stefanksi quizzed Plaintiff about her ring and marital status and learned she was not married, Stefanski's attitude toward Plaintiff seemed to "go south" (Plaintiff's facts ##133-137); *Staub.*

Clearly, ample evidence exists from which a jury could infer that Plaintiff's marital status was a factor in the adverse actions taken against her.

### 4.    Plaintiff easily establishes a prima facie case of illegal harassment (based on sex/pregnancy

-12-

Under federal law, harassment on the basis of pregnancy is sexual harassment. *Garrett v. Executive Fund Life Ins. Co.*, 1996 WL 67933, *1 (6th Cir 1996).[15]   Liability for harassment under Title IX exists where the funding recipient acts with <u>deliberate indifference</u> to known acts of harassment in its programs or activities and  where the harassment is so severe, pervasive and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit. *Davis v. Monroe County*, 526 U.S. 629, 119 S.Ct. 1661 (1999). Whether   harassing conduct is sufficiently pervasive or severe to establish a hostile work (educational) environment is "<u>quintessentially a question of fact</u>." *Hawkins v.Anheuser Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008)

Plaintiff has set forth, in detail, the evidence that Defendants' agents were obsessed with   Varlesi's pregnancy, pregnant body, and clothing – making  continuing  negative comments and  threats that  she may have to drop out of the MSW program or be "failed" for not wearing looser clothing and for complaining about discrimination, and then carrying through on those threats. (Plaintiff's facts ## 112- 113, 121-122, 140, 142-143, 150, 155, 157, 159, 161-163, 172, 173, 174-177, 181-187, 189)[16] Any reasonable jury could conclude that Defendants' actions created an untenable educational environment for Varlesi "<u>permeated with discriminatory intimidation, ridicule or insult.</u>" *Hawkins*, 517 F.3d at 333

That Defendants' acted with "deliberate indifference" to the harassment directed against Varlesi is also beyond any reasonable dispute. *See* Plaintiff's facts #211 (Premo "didn't care.")  In fact, WSU condoned and perpetuated the  hostile and untenable educational environment.

C.     Retaliation (Title IX, ELCRA)

Plaintiff alleges she was retaliated against for complaining about sex/pregnancy discrimination and

---

[15]A copy of *Garrett* is attached as **Exhibit OO**

[16]Comments and harassing acts of a continual nature are more likely to be deemed pervasive. *Albeita v. Transam,* 159 F.3d 246, 252 (6th Cir. 1998)

-13-

marital status discrimination, in violation of the anti-retaliation provisions of Title IX and Michigan's ELCRA. It is uncontested that Plaintiff's discrimination complaints were ongoing and well documented - to Premo, Najor-Durack, Vroom, WSU's OEO and ombudsman, etc. (Plaintiff's Facts ##156, 161-163, 172-173, 186, 189, 220, 230-235, 259)

As with discrimination claims, a plaintiff can establish her retaliation claims either with direct evidence; or indirect (circumstantial) evidence from which retaliation can be inferred, *supra.* Where a plaintiff can provide direct evidence of retaliation, the *McDonnell-Douglas* analysis is unnecessary. *Trans World Airlines v. Thurston*, 469 U.S. 111,121, 105 S.Ct. 613 (1985). Direct evidence is generally sufficient to submit the plaintiff's case to the jury. *Harrison v. Olde Financial Corp.*, 225 Mich App 601, 610; 572 NW2d 679 (1997).

### 1.      Direct Evidence

The WSU Defendants simply ignore the direct and compelling evidence of retaliation that exists in this case, which alone requires submission of this claim to a jury. On **5/1/08**, Defendant Premo angrily chastised Varlesi for contacting Najor-Durack with her discrimination issues, stating that Varlesi was in *"deep trouble"* and *"I am not changing your grade."* (Plaintiff's Facts, #230-231) Ms. Varlesi then received a letter, dated **5/2/08** officially terminating her from the WSU program. (Plaintiff's Facts, # 234); **Exhibit Y.** Subsequently, Premo began creating negative write-ups concerning Plaintiff, undermining Plaintiff's grade appeal and reinstatement attempts. **Exhibits DD, FF**

### 2.      Circumstantial Evidence of Retaliation

While unnecessary given the direct evidence, Plaintiff also easily establishes her retaliation claims inferentially, under *McDonnell Douglas*. A prima facie retaliation case is established by showing (1) she engaged in protected activity; (2) defendant knew she had engaged in protected activity; (3) plaintiff was subjected to a materially adverse action; and (4) there is a causal connection between the protected activity and adverse action. *Harris v. Metropolitan Gov't of Nashville and Davison County*, 594 F.3d 476, 485 (6th Cir.

-14-

2010).  Defendants challenge only element (4), which they do in a most cursory manner.

First, they allege that close timing between the protected activity and dismissal is insufficient to establish "causal connection."  To the contrary, where the adverse action is immediate, as it is here, the 6th Circuit has agreed that such close temporal proximity *is* sufficient.  *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523-526(6th Cir. 2008).

Moreover, Plaintiff is not merely relying just on temporal proximity.  Temporal proximity  between protected activity and adverse action(s), coupled with other evidence of retaliation will establish the required causal connection.  *Moore v. Kuka Welding Systems*, 171 F.3d 1073, 1080 (6th Cir. 1999).  Here, the "other evidence" (in addition to the 5/1 "deep trouble" warning and 5/2 termination letter) include: (1) Plaintiff's ongoing discrimination complaints; (2) Premo's admission that Plaintiff's discrimination complaints were "frustrating" Premo, and that she did not want Plaintiff contacting Najor-Durack (Plaintiff's Facts, ##161-162, 235); (3) Varlesi filing a discrimination complaint with WSU's OEO office and then immediately receiving a letter from Premo stating that she had "failed" her internship (Plaintiff's Facts ## 220-221); (4) Najor- Durack's "heads up" email regarding Plaintiff's OEO complaint in which she admits telling OEO that Varlesi had a file "as thick as a phone book" and bad-mouthing Varlesi to OEO (Plaintiff's facts ##241- 242); (5) Premo's 6/12/08 letter reiterating that Varlesi had been warned not to complain to Najor-Durack, and also complaining that Varlesi had gone to the OEO, **Exhibit DD**; (6)  Premo's letter to Vroom, in communications concerning Varlesi's grade appeal, referencing Varlesi's "totally implausible" discrimination claims, **Exhibit FF**; and (7) WSU's refusal to investigate Plaintiff's discrimination claims (Plaintiff's facts ## 240, 243-247)

Defendants also make a weak argument that no causal connection can exist because Premo could have "failed" Varlesi earlier, after her first discrimination complaints, but did not.  In *Hamilton v. General Electric Company*, 556 F.3d 428 (2009), the 6th Circuit  dispatched with such an argument:

GE argues that because it did not fire Hamilton at the first opportunity that arose after he filed his

-15-

EEOC complaint, the choice to fire him must not have been retaliatory.  GE asserts that its "favorable treatment [i.e., its decision to give Hamilton another chance] dissolves any inference of retaliatory motive on the part of G.E... . Were we to adopt GE's position, any employer could insulate itself from a charge of retaliatory termination by staging an incident to display its purported "favorable treatment" and then waiting for a second opportunity to terminate the employee.  Accordingly, we refuse to adopt GE's argument, and we hold that an employer's intervening "favorable treatment" does not insulate that employer from liability for retaliatory termination.

*Id., quoted in Morrison v. B. Braun*, 2009 WL 1163988(E.D. MI 2009)

At a very minimum, the evidence creates a question of fact (it actually compels the conclusion) that Plaintiff was retaliated against for complaining about discrimination.

Evidence of Pretext

The evidence from which a jury could infer Varlesi's "poor performance" in her final internship was a pretext for discrimination  and retaliation is beyond overwhelming.

Defendants' sole argument on pretext is that Varlesi cannot show she was performing to Defendants' "legitimate expectations" and thus cannot establish pretext.  Defendants' brief p 15.  This is flatly refuted, however, by Premo's recent admission to Varlesi  that she was **"doing great"** (<u>which Premo admits</u>) and that Varlesi had **all the skills necessary to go out and do social work.**  (Plaintiff's facts ## 188, 197) Coupled with Varlesi's term <u>GPA of 3.96</u>, Defendants cannot even make a straight-faced argument that Plaintiff was performing to Defendants legitimate expectations; this point is admitted by Premo.  Defendants' failure to discuss any performance issues with Varlesi at the SA or document any purported performance issues there at any time prior to giving her a failing evaluation, is also obviously compelling evidence that  Varlesi had no performance problems and was performing to Defendants' legitimate expectations.  (Plaintiff's facts, ##190-197)

As set forth above, the evidence  that  Defendants' true motivation was discriminatory and retaliatory (e.g, Premo telling Varlesi she might have to "*drop out due to pregnancy*" and that she was in "*deep trouble*" for complaining... "*I'm not changing your grade.*")  at a minimum, creates a question of fact as to pretext.

-16-

Defendants' assertion that this case is "on all fours" with the *Ivan v. Kent State*, 863 F. Supp. 581, 584 (N.D. OH 1994), aff'd 1996 WL 422496, is highly disingenuous. Unlike this case, in *Ivan* (which involved a graduate student returning to school after having a baby) the defendant university provided the plaintiff with ongoing feedback and written evaluations, "intense remediation" efforts, put their concerns in writing, and granted her an additional year to obtain clinical experience, all in an attempt to address defendants' well documented concerns about the plaintiff's performance (GPA lower than the minimum required by the program; lack of progress regarding her thesis, "very marginal" performance in her practicum). She nevertheless progressed through the program, obtained her MA, took a leave of absence, and brought suit on the basis that her "marginal" grade in clinic resulted in the loss of her employment as a graduate assistant. 863 F.Supp at 583-584. Also, unlike here, the plaintiff was unable to offer any evidence (let alone admissions from the university's agents) that the defendant's legitimate reasons for assigning her a marginal grade were untrue. *Id* at 586-587

E.      §1983 Due Process Violations (Count VI)

The actions of the individual WSU Defendants (Premo, Najor-Durack, Vroom, Lee, Gonzales-Prendes and Brunhofer) in ousting Varlesi (or rubberstamping the decision to oust Varlesi) violated Varlesi substantive and procedural due process rights. Defendants' actions were the opposite of "careful and deliberate," in violation of her constitutional rights.

1.      Substantive Due Process

That a medical school student has a protected property interest in continued enrollment, entitling him or her to substantive due process, has been presumed by both the Supreme Court and the 6th Circuit. *See Regents of the University of Michigan v Ewing*, 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985); *Ku v. State of Tennessee*, 322 F.3d 431 (6th Cir. 2003). A substantive due process claim is based on the <u>deprivation of a fundamental right or interest</u>, and a violation will be found where the conduct at issue is **unreasonable and**

arbitrary, "shocks the conscience", or is in **bad faith.** *Harrison v City of Akron*, 20 F.3d 1396, 1405 (6th Cir.

1994); *Ku, supra*, 322 F.3d at 438. *See also Alanis v University of Texas Health Science Center*, 843 S.2d 779,

789 (Tex App 1992)("Mr Alanis must show that Dr. McNeese's actions were arbitrary and capricious; that is,

that there was no rational basis for the University's decision or that the decision to dismiss was motivated by

bad faith or ill will unrelated to his academic performance," *citing Ewing.)*

 While in the above cited cases  the  courts determined that the plaintiffs  had not been able to make

such a showing,  none of them  involved the "shock the conscience" and bad faith presented by this case (e.g.,

orchestrating the dismissal of a high achieving graduate school student because of her (1) status as an unwed,

pregnant woman and (2) discrimination complaints.)  The following passage from  *Ku, citing Ewing,* illustrates

the distinction between those cases, and the case at bar, and also dictates that the **deference ordinarily given**

**to a university in an academic dismissal case is simply inapplicable where, as here, there is evidence**

**that the university has acted in bad faith**:

> Ku also challenges the College's action as a denial of his right to substantive due process.  When
> reviewing the substance of academic decisions, courts should 'show great respect for the faculty's
> professional judgment' and 'may not override it unless it is **such a substantial departure from**
> **accepted academic norms as to demonstrate that the person or committee responsible did not**
> **actually exercise professional judgment.'**  *Regents v. Univ of Mich v. Ewing*, 474 Mich 214, 225,
> 106 S.Ct. 507, 88 L.Ed.2d 523 (1985).... **Ku has not presented a shred of evidence that the**
> **College's actions constitute a substantial departure from accepted academic norms or were**
> **otherwise taken in bad faith.**   In fact, **the unrefuted evidence in this case demonstrates that** the
> **faculty decisions** culminating in the actions complained of were the result of **focused professional**
> **judgment** and **careful deliberation** during and after many months of observing and interacting with
> the plaintiff both in and out of the degree program.  We find that the College's decision to remove Ku
> from third year clinical rotations and require him to follow a particularized program of remediation
> before being allowed to reenter the third-year program was in no way arbitrary or capricious.
> *Ku,* 322 F.3d at 438 (emphasis added).

> Similarly, (from *Ewing*, supra):

> Ewing's claim, therefore, must be that the  University misjudged his fitness to remain a student in the
> Inteflex program.  The record unmistakably demonstrates, however, that the faculty's decision was
> made conscientiously and with careful deliberation, based on an evaluation of the entirety of Ewing's
> academic career. When judges are asked to review the substance of a genuinely academic decision,

-18-

such as this one, they should show great respect for the faculty's professional judgment.  Plainly, they may not override it **unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.**        474 U.S. at 225 (emphasis added).

In this case, the evidence of bad faith is crystal clear.  At a very minimum, a question of fact exists on this issue.  *Alcorn v Vaksman*, 877 SW2d 390 (Tex App 1994) is on point. In that case, the plaintiff was a history graduate student who was dismissed from a doctoral program and prevailed at trial on his constitutional claims. There the court made clear that the **deference** normally accorded to academic dismissal decisions was **not available given the evidence his dismissal was made in  bad faith.**

> It is true that when courts review the substance of academic decisions... they should show great respect for the teacher's professional judgment.  This sound rule is based on the belief that university administrators, not judges, should make academic decisions needed to run a university. **This assumes, however, that the academic decision was made in good faith.  The trial judge found that the appellants acted in bad faith.  If evidence supports that finding, relief was justified.  An actionable deprivation in an academic dismissal case  is proved ... if the decision was motivated by bad faith or ill will unrelated to academic performance.**
> *Id.*  877 S.W. at 397 (emphasis added).

In *Alcorn*, the appeals court agreed that there was ample evidence supporting the trial judge's findings of bad faith, including that the  defendants  intentionally  harmed  the  plaintiff  solely  because  of  personal disagreements or grievances wholly apart from academic considerations,  expelled him for alleged, if not fabricated, academic insufficiencies and over matters of personality and speech,  that his dismissal was "well beyond the limits" proscribed for learned professionals, and that the appellants were not entitled to the deferential standard of review used in cases of good faith academic dismissals.  *Id.* at 397-401[17]

### 2.      Procedural Due Process

Continued enrollment in a public university amounts to a property interest,  and a student is thus afforded protection from arbitrary dismissal under the due process clause of the 14th Amendment.  *See Zwick*

---

[17]A copy of *Alcorn* is attached as **Exhibit PP**

-19-

*v. Regents of the University of Michigan*, 2008 WL 1902031 (E.D. MI 2008) and cases cited therein.[18]

Due process is flexible and calls for such procedural protections as the particular situation demands. *Morrissey v Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593(1972). What process is due typically involves an analysis of the private interest that will be affected by the official action, the risk of an erroneous deprivation of such an interest by the procedures used, and the fiscal and administrative burdens the procedural requirements would entail. *See Goldberg v Kelly*, 397 U.S. 254, 263-271, 90 S.Ct. 1011 (1970). And, while a formal hearing is not required in an academic dismissal case, a plaintiff must be afforded effective notice; that is, she must be *"fully informed of the faculty's dissatisfaction with her clinical progress and the danger that this posed to timely graduation and continued enrollment."* *Bd of Curators of the University of Missouri v Horowitz*, 435 U.S. 78, 85, 98 S.Ct. 948(1978). And, the dismissal decision must be **"careful and deliberate."** *Ku v State of Tennessee*, 322 F.3d 431, 436 (6th Cir. 2003); *Horowitz*, 435 U.S. at 85. In addition, **an impartial and independent adjudicator is a fundamental ingredient of procedural due process.** *Gomes v University of Maine System*, 365 F.Supp.2d 6, 31 (D. Maine 2005), *citing Withrow v Larkin*, 421 U.S. 35, 46-47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975).

The **cornerstone of procedural due process is fundamental fairness.** *Gagnon v Scarpelli*, 411 U.S. 778, 790, 93 S.Ct. 17567 (1973). *See also Alcorn, supra,* 877 SW2d at 397, 400(actionable deprivation of a student's rights is proved if decision is motivated by bad faith or ill will unrelated to academic performance). If a plaintiff is able to raise a genuine issue as to the impartiality of the adjudicator(s), summary judgment on a procedural due process claim would be inappropriate. *See Gomes.*

In *Zwick,* Judge Battani agreed that Alissa Zwick, a third year Dental School student dismissed by the University of Michigan by a biased decision-maker, and under bizarre circumstances with parallels to the case

---

[18]A copy of *Zwick* is attached as **Exhibit QQ**

at bar, had been denied procedural due process, as a <u>question of fact existed as to whether she was "full informed" of the University's dissatisfaction with her performance;</u> and given the evidence that the decision was not the result of "<u>careful deliberation</u>" and "<u>focused professional judgment</u>" as is constitutionally required:

> Here, Plaintiff has presented sufficient evidence to show a material issue over the <u>requirement that the student be "fully informed... of the faculty's dissatisfaction with her clinical progress and the danger that this posed to timely graduation and continued enrollment,</u>" *Horowitz*, 435 U.S. at 89-90. Plaintiff has offered evidence indicating that though she was informed of the failing grades she received and her placement on probation, Plaintiff was never sent the letter the board resolved to send in May 2005 indicating their dissatisfaction with her progress and outlining the consequences to Plaintiff. Thus, it would be reasonable to conclude from Plaintiff's evidence that the Academic Review Board's decision to recommend dismissal, emanating from an unscheduled and apparently informal meeting, came without adequate notice to Plaintiff.

> Plaintiff's evidence similarly creates a question of fact as to whether the Academic Review Board's <u>decision was the result of "careful deliberation" and "focused professional judgment."</u> *Ku*, 322 F.3d at 438. Plaintiff presented facts and testimony that could <u>establish bias (if not animus)</u> on the part of Defendant Lantz. Plaintiff has further provided evidence of Defendant Lantz' prominent role in Plaintiff's dismissal and Defendant Lantz' activities on behalf of the Academic Review Board.... Additionally, Plaintiff has offered testimony that Defendant Lantz solicited letters from faculty members.... Finally, Plaintiff has submitted other evidence - such as the discrepancy between Plaintiff's grades and Plaintiff's post-hoc written evaluations - which support Plaintiff's theory that dismissal was made in bad faith.

> Plaintiff's cumulative evidence ... is sufficient to create a genuine issue of material fact as to both the information provided to Plaintiff and the careful deliberation of the Academic Review Board with regard to Plaintiff's dismissal. Plaintiff's due process claim therefore survives summary judgment....

*Zwick,* **Exhibit QQ** at *6 (emphasis added)

In this case, the evidence that Varlesi was not "fully informed" is even more compelling than in *Zwick* - Varlesi was literally not advised of any performance issues at the Salvation Army until the final day of her internship. Similarly, the evidence of bias/animus and retaliatory motive clearly creates a question of fact as to whether the decision of Premo *et al* was the result of "careful deliberation" and "focused professional judgment." *Zwick*

Finally, the evidence shows that WSU's "reinstatement advisory committee" process was a cursory, rubber-stamping of the dismissal decision, in which Varlesi was never even advised of the reinstatement

criteria, much of which the panel admits would not even have applied in the case of a discriminatory /retaliatory dismissal. (Plaintiff's facts, ##273-324)

Nor are Defendants entitled to qualified immunity. Qualified immunity protects state officials sued in their individual capacities from civil damages to the extent their conduct does not violate clearly established constitutional rights of which a reasonable person would have known. Stated differently, if the defendants had "fair warning" that their actions were unconstitutional, they are not entitled to qualified immunity. *Grawey v. Drury*, 567 F.3d 302, 313-314 (6th Cir. 2009). Here (and for reasons having nothing to do with academics) Defendants deprived Plaintiff of her continued enrollment at a public university, a protected property interest, *Ewing, Horowitz, Zwick, Flaim v. Medical College of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005). Qualified immunity is inapplicable.

## IV.    RELIEF REQUESTED

As set forth above, Plaintiff requests an order denying Defendants' motion in its entirety.

Respectfully Submitted,

**DEBORAH L. GORDON, PLC**
Deborah L. Gordon (P27058)
/s/Carol A. Laughbaum (P41711)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 275
Bloomfield Hills Michigan 48304
Telephone 248 258 2500
dgordon@deborahgordonlaw.com
claughbaum@deborahgordonlaw.com

Dated: November 4, 2011

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 4, 2011, I electronically filed the foregoing documents with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record in this matter.

DEBORAH L. GORDON, PLC
/s/<u>Carol A. Laughbaum (P41711)</u>
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 275
Bloomfield Hills Michigan 48304
Telephone 248 258 2500
dgordon@deborahgordonlaw.com
claughbaum@deborahgordonlaw.com