UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TINA M. VARLESI,

      Plaintiff,

-vs-                                 Case No. 10-CV-14793

WAYNE STATE UNIVERSITY, *a Michigan*       HON. MARK A. GOLDSMITH
*non-profit corporation;* CAROL PREMO, PH.D.,
ANWAR NAJOR-DURACK, DEAN PHYLLIS
I. VROOM,  SHAWNA J. LEE, ANTONIO
GONZALES-PRENDES, MARGARET
BRUNHOFER, THE SALVATION ARMY,
*a foreign non-profit corporation;* and JOYCE
STEFANSKI, *jointly and severally,*

      Defendants.

| | |
|---|---|
| Deborah L. Gordon, PLC | Miller Canfield Paddock and Stone |
| Deborah L. Gordon (P27058) | Megan P. Norris (P393 18) |
| Carol A. Laughbaum (P41711) | M. Misbah Shahid (P73450) |
| Attorneys for Plaintiff | Attorney for WSU, Premo, Najor-Durack, |
| 33 Bloomfield Hills Parkway, Suite 275 | Vroom, Lee & Gonzales-Prendes |
| Bloomfield Hills, Michigan 48304 | 150 W. Jefferson, Suite 2500 |
| 248-258-2500/FAX 248-258-7881 | Detroit, Michigan 48226 |
| dgordon@deborahgordonlaw.com | 313-963-6420 |
| claughbaum@deborahgordonlaw.com | norris@millercanfield.com |
| | shahid@millercanfield.com |
| Dykema Gossett | |
| Patrick F. Hickey (P36648) | Kotz Sangster Wysocki and Berg |
| Lauren M. Phillips (P74102) | John T. Below (P48677) |
| Attorneys for Stefanski | Heather Gelfand Ptasznik (P63344) |
| 400 Renaissance Center, 37th Floor | Attorneys for The Salvation Army |
| Detroit, Michigan 48243 | 400 Renaissance Center, Suite 3400 |
| 313-568-6800/FAX 313-568-6691 | Detroit, Michigan 48243 |
| phickey@dykema.com | 313-259-8300/ FAX 313-259-1451 |
| lmphillips@dykema.com | jbelow@kotzsangster.com |
| | hptasznik@kotzsangster.com |

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT STEFANSKI'S
<u>MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff **Tina M. Varlesi** by her attorneys **Deborah L. Gordon PLC** responds in opposition to

Defendant Stefanski's motion for summary judgment and as set forth in the accompanying Brief and Appendix, requests an order denying that motion in its entirety.

**DEBORAH L. GORDON, PLC**
Deborah L. Gordon (P27058)
/s/Carol A. Laughbaum (P41711)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 275
Bloomfield Hills Michigan 48304
Telephone 248 258 2500
dgordon@deborahgordonlaw.com
claughbaum@deborahgordonlaw.com

Dated: November 4, 2011

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TINA M. VARLESI,

      Plaintiff,

-vs-                                   Case No. 10-CV-14793

WAYNE STATE UNIVERSITY, *a Michigan*         HON. MARK A. GOLDSMITH
*non-profit corporation;* CAROL PREMO, PH.D.,
ANWAR NAJOR-DURACK, DEAN PHYLLIS
I. VROOM,  SHAWNA J. LEE, ANTONIO
GONZALES-PRENDES, MARGARET
BRUNHOFER, THE SALVATION ARMY,
*a foreign non-profit corporation;* and JOYCE
STEFANSKI, *jointly and severally,*

      Defendants.

---

| | |
|---|---|
| Deborah L. Gordon, PLC | Miller Canfield Paddock and Stone |
| Deborah L. Gordon (P27058) | Megan P. Norris (P393 18) |
| Carol A. Laughbaum (P41711) | M. Misbah Shahid (P73450) |
| Attorneys for Plaintiff | Attorney for WSU, Premo, Najor-Durack, |
| 33 Bloomfield Hills Parkway, Suite 275 | Vroom, Lee & Gonzales-Prendes |
| Bloomfield Hills, Michigan 48304 | 150 W. Jefferson, Suite 2500 |
| 248-258-2500/FAX 248-258-7881 | Detroit, Michigan 48226 |
| dgordon@deborahgordonlaw.com | 313-963-6420 |
| claughbaum@deborahgordonlaw.com | norris@millercanfield.com |
| | shahid@millercanfield.com |
| | |
| Dykema Gossett | |
| Patrick F. Hickey (P36648) | Kotz Sangster Wysocki and Berg |
| Lauren M. Phillips (P74102) | John T. Below (P48677) |
| Attorneys for Stefanski | Heather Gelfand Ptasznik (P63344) |
| 400 Renaissance Center, 37th Floor | Attorneys for The Salvation Army |
| Detroit, Michigan 48243 | 400 Renaissance Center, Suite 3400 |
| 313-568-6800/FAX 313-568-6691 | Detroit, Michigan 48243 |
| phickey@dykema.com | 313-259-8300/ FAX 313-259-1451 |
| lmphillips@dykema.com | jbelow@kotzsangster.com |
| | hptasznik@kotzsangster.com |

---

BRIEF IN SUPPORT OF
PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT STEFANSKI'S
<u>MOTION FOR SUMMARY JUDGMENT</u>

## STATEMENT OF ISSUES PRESENTED

I.      WHETHER DEFENDANT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED AS TO PLAINTIFF'S PREGNANCY/MARITAL STATUS DISCRIMINATION CLAIMS (ELCRA)?

II      WHETHER DEFENDANT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED AS TO PLAINTIFF'S RETALIATION CLAIMS (ELCRA)?

III.    WHETHER DEFENDANT'S MOTION SHOULD BE DENIED AS TO PLAINTIFF'S TORTIOUS INTERFERENCE CLAIM?

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

### Cases

*Cedronie v. Tomblinson, Harburn Associates,*
     290 Mich App 577, 802 NW2d 682 (2010)

*Derigiotis v. J.M. Feighery Co.,*
     185 Mich App 90, 94, 460 NW2d 235 (1990)

*Haynes v. Neshewat,*
     477 Mich 29, 729 NW2d 588 (2007)

*Horner v. Kentucky High Sch. Athletic Assn.,*
     43 F.3d 265 (6th Cir. 1994)

*St. Clair Intermediate School District v. Intermediate Educ. Assn/MEA,*
     548 Mich 540, 557, 581 NW2d 707 (1998)

*Wells v. Firestone Tire and Rubber Co.,*
     421 Mich 641, 364 NW2d 670 (1985)

### Other

Fed.R.Civ.P. 56

Michigan's Elliott-Larsen Civil Rights Act, MCL §37.2101 *et seq*
     MCL §37.2201 *et seq* (employers, employment agencies, labor organizations)
     MCL §37.2301 *et seq* (public accommodations and services)
     MCL §37.2401  *et seq* (educational institutions)

## COUNTER-STATEMENT OF MATERIAL FACTS[1]

1.      Not contested, although the SA provides social services.

2.      Not contested, although the SA provides social services

3.      Not contested, although the quoted excerpt from the SA's on-line mission statement has text cut off

4.      Admitted

5.      Admitted that  Defendant has accurately quoted from  the SA website

6.      Admitted that  Defendant has accurately quoted from the SA website

7.      Contested; clients of the Romulus ARC are offered on-site GED courses.  **Exhibit 1**, Varlesi 277-279, 347

8.      Admitted

9.      Contested as the second statement.  The facility was only at half capacity or less in the summer months, at which time it had only 1 or 2 interns.  **Exhibit D**, Varlesi Affidavit ¶13

10.     Contested as stated; the  faculty advisor (Premo) assigns the mark in field work  in  consultation with the field instructor (Stefanski).  **Exhibit A**, Field Education Manual p 57

11.     Admitted

12.     Admitted

13.     Contested; Plaintiff was not terminated from the VA, much less terminated due to performance. Instead, Plaintiff refused to return to the VA, a decision approved by Defendant Premo.   It is uncontested that Plaintiff was assigned an "incomplete" for her VA internship, subsequently changed by Premo to "Satisfactory," the highest internship mark possible. **Exhibit 1**, Varlesi 130-131, 140-141, 147; 260; **Exhibit J,**VA evaluation; **Exhibit 8**, Premo 103; **Exhibit 10**,  Vroom 25-26

14.     Contested as stated with respect to being afforded a "second chance."  Premo agreed that anything other than a "Satisfactory" grade with respect to Plaintiffs' VA internship was not justifiable, and agreed that Plaintiff could complete that internship at the Salvation Army. **Exhibit 1**, Varlesi 140, 145, 272

15.     Admitted that Plaintiff did not receive financial compensation from the Salvation Army

16.     Unknown

---

[1]Plaintiff objects to Defendant's "Statement of Material Facts" to the extent they are Defendant's legal arguments

17.   Admitted

18.   Contested in that the Stefanski Affidavit, cited as authority, does not support this statement

19.   Unknown

20.   Plaintiff does not contest that SA and WSU do not have a contract with respect to any specific intern. Defendant's Exhibit 9, cited as authority for this point, is a divorce petition having nothing to do with this case

21.   Contested in that the Bramwell Affidavit, cited as authority, does not support this statement. Admitted that Defendant has accurately quoted from the SA website.

22.   Contested only as to the last statement, as Premo told Plaintiff that Stefanski had no choice but to accept Plaintiff. **Exhibit 1**, Varlesi 279-280

23.   Admitted that Stefanski only gave Plaintiff two clients and that this was not something under Plaintiff's control. **Exhibit 1**, Varlesi 342

24.   Contested; there is no evidence of Stefanski reporting any performance issues.

25.   Admitted

26.   Contested to the extent this statement suggests Stefanski's "opinion" was honestly held, in good faith, or non-discriminatory

27.   Contested as the evidence shows Premo had not even seen the SA evaluation when she told Plaintiff she could file a response/rebuttal. **Exhibit 1**, Varlesi 187-189

28.   Contested as there is no evidence that Premo received the evaluation.

29.   Contested; Premo summarized her grading criteria as "a belief." **Exhibit 8**, Premo 254

30.   Admitted

31.   Admitted

32.   Admitted

33.   Admitted

## STATEMENT OF ADDITIONAL MATERIAL FACTS

### Plaintiff's Background

1.    Plaintiff Tina Varlesi was born 3/29/78.  **Exhibit 1**, Varlesi 6

2.    Varlesi has had a nearly life long passion and commitment to social work.  **Exhibit D**, Varlesi Affidavit ¶15

3.    In June 2006, Varlesi obtained a B.A. in psychology (with high distinction) from the University of Michigan - Dearborn.  **Exhibit 1**, Varlesi 27-28; **Exhibit A**, Second Amended Complaint, ¶16

4.    Also in June 2006, Varlesi  was accepted into graduate school, and specifically the MSW (Masters of Social Work) program at  Defendant WSU.  **Exhibit 1**, Varlesi 28, 71

5.    Varlesi had also been accepted into an MSW program at Ohio State University. **Exhibit 1**, Varlesi 51.

6.    Varlesi chose WSU over OSU as she was also working at a local social services agency (Vista Maria in Dearborn), working with at-risk girls, and had been promised a job there as a therapist upon receiving her MSW degree. **Exhibit 1**, Varlesi 48, 51-52

### Parties and Witnesses

7.    Defendant Premo was Varlesi's WSU faculty advisor with respect to her 2nd (final) year internships/field work.

8.    Defendant Najor-Durack is Director of Field Placement, WSU School of Social Work

9.    Defendant Vroom is the Dean of WSU's School of Social Work

10.    Defendants Lee, Gonzales-Prendes and Brunhofer are WSU School of Social Work faculty who composed the "reinstatement advisory committee" with respect to Plaintiff's appeal of her dismissal.

11.    Julie Alter-Kay was Ms. Varlesi's  WSU academic advisor

12.    Marilyn Knall is assistant to the Associate Dean at the School of Social Work

13.    Defendant Stefanski was Varlesi's Field Instructor in her final (2nd year, 2nd semester) internship at Defendant Salvation Army (SA).

14.    Gary Gillow was at pertinent times the Director of Rehabilitation Services at the SA and Stefanski's supervisor.  **Exhibit E**,  Gillow Affidavit ¶¶2-3

### 2006-2007:  1st Year of MSW Program

A.     Classroom

15.     In her first year in WSU's MSW program, Varlesi successfully completed all requirements, earning a cumulative GPA of 3.67. **Exhibit F**, WSU transcript.

B.     Field Work: Spectrum Internship (both semesters)

16.     In the fall of 2006, Varlesi was assigned by WSU to intern at Spectrum Human Services, a child welfare agency, in Southfield. **Exhibit 1**, Varlesi 91

17.     Varlesi's supervisor at Spectrum was Director of Family Services Amy Heincelman, MSW. **Exhibit 1**, Varlesi 91-93

18.     Varlesi's WSU faculty advisor at this time was Galen Duncan. **Exhibit 1**, Varlesi 94

19.     In her written evaluation of Varlesi's performance, Heincelman gave Varlesi the highest possible rating ("above expectations") in every single category. **Exhibit G**, Spectrum (1st semester) evaluation.

20.     Heincelman also attached a narrative to her evaluation of Varlesi, stating, among other things:

Since Tina has been at Spectrum, she has taken the initiative to learn and apply the knowledge to improve the lives of impoverished children and families....She clearly has shown an amazing ability to empathize and build a rapport with clients.... Tina is clearly adept at what it takes to be a successful social worker. She has gone above and beyond the required duties of a Masters level intern. She has been an asset to the agency and clients alike. **Exhibit G**, last page.

21.     Varlesi received the highest mark possible (Satisfactory) for her Spectrum internship, first semester. *Id,* first page

22.     Varlesi remained at Spectrum for the second semester of the '06-'07 school year. **Exhibit 1**, Varlesi 98

23.     Galen Duncan remained Plaintiff's WSU faculty advisor, while Varlesi was assigned a new field supervisor that semester, Marcy Johnson. **Exhibit 1**, Varlesi 99

24.     In her written evaluation of Varlesi's performance, Johnson (like Heincelman) gave Varlesi the highest possible rating ("above expectations") in every single category. **Exhibit H**, Spectrum (2nd semester) evaluation.

25.     Johnson also made positive comments about Varlesi throughout the evaluation, including:
Tina took the initiative to learn and understand the function and purpose of the agency.... Tina demonstrates excellent skills in engaging clients in the therapeutic process....Tina maintained professionalism at all times and exceeded the level of work and commitment typically expected of interns. Tina has an excellent knowledge of social work practice philosophy and skills. She has a great foundation from which to build from in her next practicum experience. *Id.*

-vi-

26.     Varlesi received the highest possible mark (Satisfactory) for her Spectrum internship, second semester. *Id.*

27.     Varlesi testified that she had no problems whatsoever with either of her field supervisors at Spectrum (Ms. Heincelman, Ms. Johnson) or with her WSU faculty advisor that year (Mr. Duncan). **Exhibit 1,** Varlesi 94, 97-100

**2007-2008; 2nd (Final) Year of MSW Program**

        **A.      Classroom**

28.     Plaintiff successfully complete all her classroom work during her second year, earning a cumulative GPA of 3.69. **Exhibit F**

        **B.      Field Work: VA Internship (1st semester)**

29.     For her second (final) year internship, Varlesi requested placement at the VA working in mental health. **Exhibit 1,** Varlesi 103-105,107-108; 125; 272

30.     In September 2007, Varlesi began an internship at the VA in Ann Arbor. **Exhibit 1,** Varlesi 105

31.     Plaintiff's field instructor at the VA was Pamela Mackey, and her WSU faculty advisor was Carol Premo. **Exhibit 1,** Varlesi 109

32.     Premo confirms Varlesi is polite, agreeable, cordial and friendly. **Exhibit 8,** Premo 127, 252

33.     Plaintiff was a paid employee of the VA. **Exhibit I,** VA personnel form, W-2

34.     One of Varlesi's initial assignments at the VA was to update a telephone list and various binders. **Exhibit 1,** Varlesi 111-112

35.     On or about 9/24/07, Varlesi told Mackey that she was pregnant. **Exhibit 1,** Varlesi 115

36.     According to Varlesi, she was experiencing morning sickness during this time for which she had to use the restroom, and felt animosity from Mackey who appeared irritated with Varlesi's requests for the restroom key. **Exhibit 1,** Varlesi 117

37.     Mackey later put in writing that she felt Varlesi was "very thin" and "unhealthy in appearance." *See* Mackey statement attached to Defendants' Exhibit 11.

38.     Also during this time, Mackey turned Varlesi's desk around so that Varlesi was facing a corner. **Exhibit 1,** Varlesi 122

39.     A social worker at the VA told Varlesi that the VA would never hire someone that was pregnant, which Plaintiff reported to the VA's EEO office. **Exhibit 1,** Varlesi 115-117

40.    Varlesi observed that other interns, unlike her, were actually working in the mental health clinic at the VA, which is what Varlesi had requested.  Instead, Varlesi was doing remedial tasks and discharge planning.  **Exhibit 1,** Varlesi 103-105, 111-112, 129, 262, 272

41.    Beginning in early October 2007, Varlesi began contacting Premo expressing concern that she was not getting adequate clinical experience at the VA and was interested in switching internships.  **Exhibit 1**, Varlesi 118

42.    Premo confirms that Varlesi expressed  concerns that she was not  receiving any experience doing intake evaluations, psychotherapy or service connection and was  not being adequately trained at the VA; and that Varlesi inquired whether Premo would consider a different placement.  **Exhibit 8**, Premo 97

43.    In her discussions with Premo about her internship, Varlesi requested that Premo come out to the VA.  **Exhibit 1**, Varlesi 118

44.    Varlesi also contacted Anwar Najor-Durack (Director of Field Placement) about switching placements.  **Exhibit 1**, Varlesi 129

45.    On or about 11/5/07, Varlesi discussed with Mackey her concerns that she was not getting the necessary experience out of the internship.  **Exhibit D**, Varlesi Affidavit ¶2

46.    In that 11/5/07 discussion, Mackey was angry with Varlesi and demanded an apology with respect to statements circulating at the agency to the effect that  Mackey was difficult to work with because she was bitter about her divorce (these comments originated with VA employees, not Varlesi; Varlesi merely repeated this theory as something she had heard).  **Exhibit 1**, Varlesi 265-267

47.    On 11/6/07, Premo came out to the VA and met with Varlesi and Mackey.  **Exhibit 1,** Varlesi 115, 121.  Plaintiff's pregnancy and due date were discussed.  *Id.*

48.    Also on 11/6/07, Varlesi reiterated that the remedial tasks she had been given were not consistent with her wish for a meaningful advanced (second year) internship and would not help her achieve her goals upon graduation, that the tasks she had been given did not afford her a chance to build a rapport with clients, and that she wanted to switch to a placement that would afford her more clinical experience.  **Exhibit 1,** Varlesi 122-123

49.     At that meeting, Mackey  expressed discontent that Varlesi wanted to leave the VA, stating that she felt "cheated" and liked having an intern.  **Exhibit 1,** Varlesi 122- 123, 129

50.    It was also agreed that Varlesi would do 2-3 biopsychosocial assessments per day and obtain more clinical experience, which was consistent with Mackey's prior representations that Plaintiff could shadow another therapist. **Exhibit 1,** Varlesi 107, 125

51.    It was also agreed that Varlesi would stay at the VA for two weeks (which was really 3 days, given the

VA holiday) after which time if Varlesi still wanted to switch placements, she could.  **Exhibit 1,** Varlesi 125

52.  On 11/6/07, **Mackey made no mention of any dissatisfaction with Plaintiff or her performance whatsoever.  Exhibit 1,** Varlesi 118-119; 128-129

53.  Nor was there any discussion that Plaintiff was expected to improve in some way. **Exhibit 1,** Varlesi 125

54.  Varlesi was never made aware about any complaints allegedly made by Mackey to WSU.  **Exhibit 1**, Varlesi 260

55.  Varlesi testified that following the 11/06/07 meeting where she stated she wanted to switch internships, it became "very tense" with Mackey.  **Exhibit 1,** Varlesi 125

56.  On 11/15/07, Varlesi met with her MSW academic advisor, Julie Alter-Kay, who asked if she had left work early without informing Mackey.  **Exhibit 1,** Varlesi 126-128

57.  Varlesi said she had not, and that her absences from work had been excused by Mackey.  **Exhibit 1,** Varlesi 127-128

58.  Varlesi advised Alter-Kay that she wanted to switch placements, do therapeutic intervention that coincided with the classes she was taking, and that the VA internship was not going to help her further her career goals.  **Exhibit 1**, Varlesi 130

59.  Varlesi  testified that on 11/19/07, she left work at 4:15 p.m. and  phoned Premo to discuss Mackey's "cold" attitude toward her.  **Exhibit 1**, Varlesi 130-131.

60.  When Premo asked Varlesi if she had left work early, Varlesi responded that she had not, explaining that she had *just* left.  **Exhibit 1**, Varlesi 130-131.  Premo then stated that Mackey told her (Premo) that Varlesi had left early.  *Id.*

61.  Varlesi immediately phoned  Mackey, who denied telling Premo that Varlesi had left early. **Exhibit 1,** Varlesi 130-131

62.  Varlesi then phoned Premo and stated, in so many words, that  she was not going back to the VA due to Mackey's gamesmanship and dishonesty. **Exhibit 1**, Varlesi 130-131

63.  In response, Premo agreed that Varlesi did not have to go back to the VA. **Exhibit 1**, Varlesi 130-131

64.  Varlesi terminated her VA internship, with Premo's approval.  **Exhibit 1,** Varlesi 130-131, 260; **Exhibit I,**  VA resignation

65.  On 11/27/07, Plaintiff returned to the VA for purposes of completing her evaluation. **Exhibit 1,** Varlesi

66.    Prior to 11/27/07, Varlesi had never been told of any performance issues at the VA. **Exhibit 1**, Varlesi 122-123; 129, 136, 266

67.    When Varlesi received her VA evaluation on 11/27/07, it did not yet have a grade. **Exhibit 1**, Varlesi 135; **Exhibit J**, VA evaluation

68.    Mackey's evaluation of Varlesi contained mostly "marginal" ratings and many "unsatisfactory" ratings. **Exhibit 1**, Varlesi 135; **Exhibit J**, VA evaluation

69.    Although required, Mackey placed no comments on the evaluation. *Id.;* **Exhibit 1,** Varlesi 138

70.    According to WSU policies, the faculty advisor (here, Premo) assigns the internship mark, in consultation with the field advisor.

71.    In December, Varlesi received a call from Premo who stated she "could not justify" giving Varlesi a "U" (unsatisfactory) mark for the VA internship. **Exhibit 1,** Varlesi 140

72.    Premo advised Varlesi that when she finished up her hours elsewhere, she would change Plaintiff's VA internship mark from an "I" (incomplete) to an "S" (satisfactory). **Exhibit 1,** Varlesi 140- 141

73.    Premo advised Varlesi that she had ten (10) hours to make up to get credit for her VA internship. **Exhibit 1,** Varlesi 141, 145

74.    It was agreed that Varlesi would finish up her hours (VA internship) at a different placement - the Salvation Army Adult Rehabilitation Center in Romulus. **Exhibit 8**, Premo 98

75.    Varlesi did complete her hours at the SA. Premo spoke with Varlesi's new field advisor at the SA, Joyce Stefanski, who confirmed that Varlesi was doing fine. **Exhibit 8**, Premo 99, 103

76.    Premo assigned Varlesi a mark of "S" as to her VA internship, the highest mark possible. *Id.;* **Exhibit 1**, Varlesi 147; **Exhibit J**

77.    Premo could have given Varlesi an "M" (marginal pass), a lower but still passing mark, for her VA internship, but instead gave her the highest "S" (satisfactory) mark. **Exhibit J; Exhibit 8**, Premo 99, 103

78.    WSU acknowledges that Varlesi and Mackey were "not a good fit." **Exhibit 6**, Najor-Durack 239-240

   C.    **Field Work: Salvation Army (2nd semester)**

      1.    **Background**

79.    Varlesi was in good standing as she entered her final semester in the MSW program. **Exhibit 6**, Najor-Durack 243-244

80.     Premo advised Varlesi she would be doing her final internship at the Salvation Army.  **Exhibit 1**, Varlesi 145, 272

81.     An internship is both a work and learning environment.  **Exhibit 10**, Vroom 111

82.     Varlesi was placed at the Salvation Army Adult Rehabilitation Center in Romulus, an in-house residential and rehab facility for men with substance abuse issues.  The agency provides various services (substance abuse therapy, independent living skills, job training, GED classes) to enable its clients to go out and function in society.  **Exhibit 1**, Varlesi 277-279, 347

83.     Field instructors are required to provide their student interns with a meaningful field placement experience that offers social work opportunities in accordance with outlined learning objectives, including weekly supervision. **Exhibit 10**, Vroom 76-77

84.     The field placement site is to provide students a quality learning experience consisting of professional guidance, appropriate working conditions and tasks related to learning objectives. **Exhibit 10**, Vroom 81-82

85.     Field work is the component of social work education that helps students integrate classroom learning and reinforce course content.  WSU's Office of Field Education (OFE) strives to ensure students are placed at sites that provide meaningful opportunities to grow and learn.   In addition the OFE is responsible for assigning faculty advisors and educating field instructors.  **Exhibit B**, Field Education Manual, p 10-11

86.     The field instructor is to meet with each intern weekly to evaluate the student, give assignments, review progress and performance, address any issues and questions, give feedback, and keep track of hours worked.  **Exhibit 8**, Premo 53, 576

87.     The intern/student is also to fill out a time log, which her supervisor should be reviewing each week; if there are any problems, the field instructor is to let the student and her faculty advisor (Premo) know. **Exhibit 8**, Premo 54

88.     The faculty advisor is supposed to ensure that the student placement experience is educational for the student. **Exhibit 8**, Premo 169-170

89.     Evaluation of a student doing field service is to be an ongoing and continuous process. **Exhibit 6**, Najor-Durack 172

90.     A student is certainly to be alerted to any significant performance issues he or she has. **Exhibit 6**, Najor-Durack 173

2.      Stefanski's Lack of Credentials

91.     Varlesi's  supervisor (field instructor) at the Salvation Army was Defendant Joyce Stefanski.

92.    Stefanski was fired for poor performance at her prior job (Hegria) and lied about it at deposition.
       **Exhibit 8**, Stefanski 11-12; **Exhibit K**, Hegria documents.

93.    WSU's School of Social Work policies require that a field instructor possess an MSW degree.  **Exhibit
       6**, Najor-Durack 33; **Exhibit B**,  39

94.    Stefanski does not have an  MSW degree.  **Exhibit 9**, Stefanski 10, 38; **Exhibit 8**, Premo 77

95.    WSU's School of Social Work policies require that a field instructor have two years of post MSW
       experience.  **Exhibit B**, 39

96.    Stefanski has no "post MSW" experience.  **Exhibit 10**, Vroom 79

97.    WSU's policies also state that a field instructor must be a LMSW (licensed master of social work.)
       **Exhibit B**, 39

98.    Stefanski is not a LMSW.  **Exhibit 10**, Vroom 75

99.    Stefanski is not even a social worker. **Exhibit 6**, Najor-Durack 168, 170, 306

100.   Stefanski met none of the criteria in Wayne State's Field Guide for being a field instructor.  **Exhibit 10**,
       Vroom 75

101.   WSU written policies do not state that WSU can override the requirement that its field instructors
       possess an MSW.  **Exhibit 6**, Najor-Durack 33

102.   WSU allowed Stefanski to serve as a field instructor, despite lacking the required credentials,  with the
       understanding that Defendant Carol Premo would be required to  closely supervise Stefanski.  **Exhibit
       8**, Premo 77-79

103.   Premo is  not a licensed social worker, either.  **Exhibit 8**, Premo 39-41, 310

104.   Thus, neither person Varlesi was working under in her final internship in Defendants' <u>Master of Social
       Work</u> program was a licensed social worker (and Stefanski was not a social worker at all, let alone an
       MSW).  **Exhibit 6**, Najor-Durack 168, 170, 306

105.    The SA had previously demoted Stefanski from Director of Rehabilitation Services to "counselor II."
        **Exhibit 9**, Stefanski 7

106.   Stefanski's master's degree is in counseling.  **Exhibit 9**, Stefanski 9

107.   Counseling and social work are two distinct disciplines, a fact which the School of Social Work stresses
       to its students.  **Exhibit 2**, Bergin 80-81

               3.      **Intern Amber Bergin**

-xii-

108.   Another WSU social work student, Amber Bergin, began an internship at the Salvation Army, working under Defendant Stefanski, at the same time as Varlesi.

109.   Bergin was in the undergraduate (BSW) program, was a high academic achiever, was in the University Honors program, and was attending Wayne on a Presidential Scholarship.  **Exhibit 10**, Vroom 103; **Exhibit 2**, Bergin 9, 78-79

110.   Bergin had a horrible internship experience under Stefanski, and left the program and WSU, citing the lack of professionalism displayed by the School of Social Work.  **Exhibit 2**, Bergin 70, 83 and passim; **Exhibit M**, Bergin letter

111.   According to Bergin, Stefanski appeared to have "preset ideas and notions" about Tina Varlesi. **Exhibit 2**, Bergin 67

112.   Bergin was present when Stefanski asked Varlesi, who was visibly pregnant, about the ring she was wearing, and if she was married; and told Varlesi it was "obvious" that Varlesi had "had relations." Stefanski did not make personal inquiries to any of the other interns, who were also present; she appeared "fixated" on Varlesi.  **Exhibit 2**, Bergin 66, 72-76

113.   Bergin also heard Stefanski tell Varlesi (wearing maternity clothes) to wear looser clothing because the men at the SA might get excited.  **Exhibit 2**, Bergin, 73

114.   Stefanski complained to Bergin about Varlesi being sick from her pregnancy. **Exhibit 2**, Bergin 98-99

115.   At Bergin's interview with Stefanski, Stefanski brushed off Bergin's questions about the internship, stated that she did not expect anything of her interns, and that Bergin would be making a lot of copies. **Exhibit M**; **Exhibit 2**, Bergin 70, 81-82

116.   Bergin testified that Stefanski wanted nothing to do with her interns at the SA, was "completely unapproachable," that the interns were generally on their own to find something to occupy their time for eight hours (some interns brought homework to do) and that Stefanski often could not even be found, and spent a lot of time outside on cigarette breaks.  **Exhibit 2**, Bergin 32-35, 49, 71

117.   When Bergin attempted to be proactive and find projects to work on, Stefanski took it personally, became upset, and shut down the projects.  **Exhibit 2**, Bergin 83-86

118.   Bergin grew increasingly frustrated at the SA because she was learning nothing, and "getting absolutely nothing out of" the internship.  **Exhibit 2**, Bergin 89-92

119.   Stefanski appeared to like no one, and bragged to Bergin that she didn't like her managers and they didn't like her either.  **Exhibit 2**, Bergin 38, 88

120.   Bergin sent an email to the BSW student body, which was critical of the School of Social Work and her internship experience.  **Exhibit L**, Bergin email.  In a meeting where the email was discussed, Bergin made it clear that she alone wrote the email and that Varlesi had absolutely nothing to do with it.

**Exhibit 2**, Bergin 51

121.    At that meeting, Stefanski made clear she did not want Varlesi or Bergin to remain as interns at the SA, and stated, "*Well I can keep them here but I can just fail them.*" **Exhibit 2**, Bergin 52

122.    Stefanski's preconceived ideas about Varlesi were evident before the Bergin email issue arose. **Exhibit 2**, Bergin 67

123.    Bergin testified that Stefanski's negative attitude toward Varlesi could not have been based on the email, as Bergin confirmed to Stefanski that Varlesi had nothing to do with it. **Exhibit 2**, Bergin 50-51; 56-57, 67

124.    Najor-Durack called Bergin a "rebel yeller" and told Bergin she was disappointed with Bergin for sending the email. **Exhibit 2**, Bergin 91-92, 95

125.    WSU's agents have no reason to believe Ms. Bergin is not being truthful. **Exhibit 6**, Najor-Durack 135

126.    If Bergin's statements are correct as to her internship experience at the SA, which include:
        -interns bringing their homework to the S.A.;
        -spending 7 hours a day "doing a whole lot of nothing";
        -field instructor (Stefanski) brushing off and refusing to interact with students;
        -field instructor (Stefanski) and another counselor openly discussing their dislike for each other;
        -field instructor (Stefanski) acting bitter, slighted and cold to interns who attempted to pro-actively find projects to do;

then the SA internship would not be an appropriate or proper internship experience for a WSU social work student. **Exhibit 6**, Najor-Durack 137-140 ; **Exhibit L**; **Exhibit 2** Bergin 70

        **4.**        **Plaintiff's Internship at the Salvation Army**

127.    In December 2007, Varlesi interviewed with Joyce Stefanski at the Salvation Army, which Varlesi felt went well. **Exhibit 1**, Varlesi 143, 150-152

128.    At that time, Varlesi was visibly pregnant.

129.    At that interview, Stefanski told Varlesi she did not have to work set hours at the SA, could come in when she got up, that Stefanksi would work around her schedule and would not be keeping track of her hours, and generally made clear that Plaintiff would be afforded flexibility to get in her required 225 internship hours at the agency. Stefanski also told Varlesi she did not want her driving after dark, citing her pregnancy. **Exhibit 1**, Varlesi 165, 275-277

130.    As Varlesi was never told about the orientation held for new interns at the SA, she did not attend it. **Exhibit 1**, Varlesi 280-281

131.    In  December 2007, Varlesi began working at the Salvation Army,  making  up the ten (10) hours she had been missing from her internship at the VA.  **Exhibit 1,** Varlesi 153, 281-283

132.    During this time frame, Stefanski confirmed to WSU (Premo) that Varlesi was doing fine. **Exhibit 8**, Premo 99, 103

133.    On 1/7/08, Varlesi officially began her Salvation Army internship.  **Exhibit 1,** Varlesi 153, 281-283

134.    That day,  Stefanski asked Varlesi personal question regarding her family and marital status. **Exhibit 1**, Varlesi 314

135.    Stefanski stated to Plaintiff, "*I see you have a ring on your finger*" and asked Plaintiff if she was married; Varlesi told her no. **Exhibit 1**, Varlesi 314

136.    Stefanski also said, "*Obviously you've had relations with someone.  That [ring] does not deter the men.... They can look, but they cannot touch.*" **Exhibit 1**, Varlesi 314

137.    Varlesi testified that prior to this discussion, Stefanski "seemed fine" with respect to her pregnancy, but that afterwards, "things seemed to go south." **Exhibit 1**, Varlesi 315

138.    On 1/14/08, Carol Premo made a  visit to the Salvation Army site to meet with all the WSU social work interns. **Exhibit 1**, Varlesi 154

139.    At that meeting, the Amber Bergin email was discussed, as was the fact that Varlesi  had absolutely nothing to do with it. **Exhibit 1**, Varlesi 154; **Exhibit 2**, Bergin 51

140.    At that meeting, Stefanski told Premo she did not want Varlesi to remain at the SA. **Exhibit 1**, Varlesi 162, 163, 303, 306-307; **Exhibit 9**, Stefanski 149

141.    On 1/17/08,  Varlesi met with Stefanski, Premo and Najor-Durack (WSU) at WSU. **Exhibit 1**, Varlesi 160, 307

142.    At that meeting,  Premo stated that Stefanski did not like Varlesi rubbing her stomach and complaining about being sick. **Exhibit 1**, Varlesi 161, 163, 315-316.

143.    Najor-Durack confirms they discussed Stefanski's complaints that Varlesi wore clothing  "formfitting to her [pregnant] belly" and rubbed her stomach, which could  "excite" the men at the SA. **Exhibit 6**, Najor-Durack 180- 181, 185, 188;  **Exhibit 9**, Stefanski 134-135

144.    Najor-Durack wrote a memo to Varlesi's student file purporting to "memorialize" this 1/17/08 meeting (WSU Defendants' Exhibit 18) which omits any mention any of these pregnancy related comments, which she admits were made.  *Id.*;  **Exhibit 6**, Najor-Durack 180-181; 185; 222-225

145.    Najor-Durack's memo, as she admits, contains no specifics as to anything else discussed on 1/17/08. **Exhibit 6**, Najor-Durack 180-181; 185; 222-225

-xv-

146. At the meeting, Varlesi was asked whether she had any attendance issues and she stated she did not, relaying what Stefanski had told her at interview about working around Plaintiff's schedule, etc. **Exhibit 1**, Varlesi 165

147. Varlesi always signed in and out on the time sheets kept in Stefanski's office. **Exhibit 1**, Varlesi 323-324

148. At the 1/17/08 meeting, Stefanski stated that she also wanted Varlesi to sign in and out at the front desk. **Exhibit 1**, Varlesi 323-324. Plaintiff began doing so. *Id.*

149. There was no discussion at the meeting about Varlesi's performance. **Exhibit 1**, Varlesi 165-166; **Exhibit 6**, Najor-Durack 180

150. Many months after the fact, Stefanski put together a memo regarding Varlesi, including the 1/17/08 meeting, which says nothing about Varlesi's performance. It does admit they discussed Varlesi's pregnancy, Stefanski's complaints about Varlesi rubbing her stomach, Stefanski feeling that this "could be construed as suggestive" to the men at the SA; and the fact that Stefanski didn't want Varlesi as an intern any longer. **Exhibit N**, Stefanski memo; **Exhibit 9**, Stefanski 133-134

151. At that (1/17/08) meeting, Varlesi stated that she wanted to switch internships, and offered several suggestions. **Exhibit 1**, Varlesi 165-166

152. Premo was not agreeable to the options Varlesi suggested. **Exhibit 1**, Varlesi 165-166

153. Najor-Durack admits she probably told Varlesi she could just take a year off from school. **Exhibit 6**, Najor Durack 207-208

154. It was decided that nothing would be done for two weeks, and that Varlesi would stay at the SA provided Joyce Stefanski would allow it. **Exhibit 1**, Varlesi 165-166, 307

155. After this 1/17/08 meeting, Premo walked Varlesi out to the elevator and told her that if Stefanski would not take her back, Varlesi would have to **"drop out of the program due to the pregnancy."** **Exhibit 1**, Varlesi 166-167

156. Varlesi immediately called WSU's Office of Equal Opportunity (Cynthia Moon) and also spoke with the WSU Ombudsman office (Vickie Anderson) about these discriminatory comments. **Exhibit 1**, Varlesi 171, 195

157. Anderson suggested that Varlesi should wear a lab coat while at the SA. **Exhibit 1**, Varlesi 173

158. Moon advised Varlesi to come in to the OEO office but Plaintiff declined, fearful of retaliation, but asked Ms. Moon to make a note that she had called. **Exhibit 1**, Varlesi 195

159. Stefanski continued to tell Varlesi to wear looser clothes, that men get turned on by pregnant women,

and that her pregnancy *was sexually exciting and stimulating to the men* at the SA.. **Exhibit 1**, Varlesi 317-319

160. Stefanski never stated or suggested to Varlesi that any men at the SA had actually made such comments. **Exhibit 1**, Varlesi 317-319

161. On or about 1/22/08, Varlesi called Premo and Najor-Durack regarding Stefanski's discriminatory comments, including Stefanski stating she didn't like Plaintiff rubbing her stomach.  She also sent Premo an email on the same topic, stating she was worried about receiving a fair evaluation from Stefanski.  Varlesi stated she would be documenting her work at the SA and keeping Premo advised. **Exhibit 1**, Varlesi 156-157; 160-161, 330;  **Exhibit P**,1/22/08 email to Premo;  **Exhibit 8**, Premo 183; and see **Exhibit R**, Varlesi emails to Premo documenting work at SA.[2]

162. Premo admits telling Varlesi she did not want Varlesi complaining to Najor-Durack about discrimination, and that Varlesi's complaints to Najor-Durack were "frustrating" Premo. **Exhibit 8**, Premo 361; **Exhibit 1**, Varlesi 157

163. Varlesi continued to phone the OEO office, at least weekly, to complain about her treatment and the pregnancy related comments.  **Exhibit 1**, Varlesi 196

164. On 1/30/08, Varlesi sent Premo an email detailing her progress and completed work at the SA. **Exhibit O**, 1/30/08 email to Premo

165. In response, Premo emailed back, "*You have no idea how much that pleases me.  I knew I was backing a winner.*" **Exhibit Q**, 2/2/08 email from Premo; **Exhibit 8**, Premo 206

166. Stefanski rarely gave Varlesi any work to do;  instead, Varlesi was left to her own devices to try and find projects. **Exhibit 1**, Varlesi 329-330; 347

167. In Stefanski's nightly "group sessions" at the SA, she typically had the men watching Three Stooges videos.  **Exhibit 1**, Varlesi 339

168. In March or April, Stefanski instructed Varlesi to conduct a "group session" at the SA.  After Varlesi prepared for it, she was informed by one of Stefanski's clients that, per Stefanski, they were just going to watch a video instead.  **Exhibit 1**, Varlesi 341

169. Varlesi was prohibited from working more than 16 hours a week at the SA.

170. Varlesi was given two (2) clients, only,  to work with at the SA.  **Exhibit 1**, Varlesi 342

171. Varlesi observed that other interns did their homework at the SA.  **Exhibit 1**, Varlesi 345-346

---

[2] Stefanski also made disparaging comments to Varlesi about Varlesi's  presumed socioeconomic background.  **Exhibit P**

172.    Throughout the semester, Varlesi spoke to Premo about Stefanski's comments relating to Plaintiff's pregnancy, including that Plaintiff needed to wear baggier clothing and that her pregnancy excited the men at the SA. **Exhibit 1**, Varlesi 168

173.    Premo says she called Najor-Durack in February to report that Varlesi felt she was being discriminated against, but never contacted her further about Varlesi's ongoing discrimination concerns, because she didn't agree. **Exhibit 8**, Premo 343-344

174.    Premo testified that in March (when Varlesi was 7 months pregnant) Stefanski called her to report that Varlesi was wearing tight clothing, that Varlesi's underwear lines were visible through her pants, that Varlesi was rubbing her belly, and that some of the men were getting stimulated. **Exhibit 8**, Premo 106-107, 117-119, 123, 188

175.    Stefanski now denies her "sexually stimulating" comment, claiming that it was *Premo* who told Varlesi her pregnancy could be sexually stimulating to the men at the SA. **Exhibit 9**, Stefanski 156-157

176.    Premo observed that Varlesi was always dressed professionally and appropriately. **Exhibit 8**, Premo 120; Gillow confirms the same thing. **Exhibit E**, ¶7

177.    Nevertheless, Premo asked Varlesi to wear looser clothing to accommodate Stefanski and the SA. **Exhibit 8**, Premo 123-125

178.    On 3/17/08, another meeting took place with Varlesi, Premo and Stefanski. **Exhibit 1**, Varlesi 169. Gary Gillow (SA) was also present. *Id.*

179.    Gillow had called the meeting because he wanted to replace Stefanski as Varlesi's field instructor/supervisor, as did Varlesi. **Exhibit 1**, Varlesi 169

180.    Premo made it clear that Gillow would not be allowed to supervise Varlesi because he did not have a master's degree. **Exhibit 1**, Varlesi 170

181.    Also at the 3/17/08 meeting, Stefanski's comments regarding Varlesi being pregnant and unwed were also discussed. **Exhibit 1**, Varlesi 170

182.    Stefanski stated that she did not want to see the silhouette of Plaintiff's belly. **Exhibit 1**, Varlesi 170

183.    Premo also asked Varlesi why she couldn't just go out and buy bigger clothes. **Exhibit 1**, Varlesi 173.

184.    Premo asked Stefanski if she thought what Ms. Varlesi had on (a wrap around top that covered her belly) was acceptable. **Exhibit 1**, Varlesi 169, 171-173 Stefanski agreed it was. *Id.*

185.    At the 3/17/08 meeting, Premo admits telling Varlesi to stop rubbing her stomach because (as reported to her by Stefanski) the men at the SA found it "hot and stimulating" **Exhibit 8**, Premo 363-364; and because it was "distracting." **Exhibit 1**, Varlesi 170-172

-xviii-

186.    Varlesi stated that she was being discriminated against, and discussed her contacts with WSU's OEO and ombudsman.  **Exhibit 1**, Varlesi 171, 174

187.    Varlesi also stated in this meeting that she was worried that Stefanski would fail her, given Stefanski's discriminatory comments.  **Exhibit 1**, Varlesi 169, 171-173

188.    In response, Premo stated to Varlesi that <u>she was not going to fail</u>, that only she (Premo) could give Varlesi her grade, and that Varlesi **had the knowledge to go out and do social work.  Exhibit 1**, Varlesi 170; **Exhibit 8**, Premo 256

189.    Another employee at the SA also made insulting comments about Varlesi's pregnancy (e.g., referring to her as a "*beached whale*") and having a baby out of wedlock ("*I'm sure [your parents] are really proud that they have a daughter who is having a baby out of wedlock;*" "*If you didn't live in Bloomfield Hills then you would be living in Taylor in a trailer park.*") Varlesi was upset and crying after these comments, and began having abdominal pains; she left the site early that day.  Varlesi reported the comments to WSU's OEO office. **Exhibit 1**, Varlesi 378-380; **Exhibit D**, Varlesi Affidavit ¶16

### Defendants Never Raise any Performance Issues with Varlesi
### Nor Put Anything in Writing, Yet Fail her on the Last Day of her Internship

190.    Defendants' agents put nothing in writing, prior to Varlesi's last day at the SA, discussing or documenting performance or attendance issues.  **Exhibit 6**, Najor-Durack 50-52; **Exhibit 8**, Premo 109-110 (not "a single thing" put in writing to Varlesi)

191.    Only after Varlesi was removed from the program did Premo put anything in writing regarding Varlesi's performance.  **Exhibit 8**, Premo 355-356

192.    Similarly, Stefanski admits she put nothing in writing regarding Varlesi's performance until after Varlesi "failed" the internship, and did so only at Premo's request, because of a "lawyer threat."  **Exhibit 9**, Stefanski 64, 193; **Exhibit 8**, Premo 356

193.    While Stefanski tried to suggest that the 3/17/08 meeting was when Varlesi was told that she had performance problems, she admits the meeting was actually called by Varlesi and Gary Gillow, not by Stefanski, and no performance issues were discussed.  **Exhibit 9**, Stefanski 167-168

194.    On 3/24/08, Varlesi gave Stefanski a performance evaluation form to fill out, as she was required to do.  **Exhibit 1**, Varlesi 177

195.    In late March 2008, Varlesi attended a licensing workshop with her academic advisor in preparation for graduation.  **Exhibit D**, Varlesi Affidavit ¶7

196.    On or about 3/31/08, after telling Varlesi, again, to wear bigger clothing, Stefanski said, *"If you don't do what I say then Carol Premo will fail you."* **Exhibit D**, Varlesi Affidavit ¶8

197.    In a phone conversation with Varlesi in early April 2008, in which Varlesi expressed concerns about getting a fair evaluation from Stefanski, Premo said she and Stefanski agreed Varlesi was "**doing great**" (Premo admits saying this) **Exhibit 8**, Premo 353;  **Exhibit 1**, Varlesi 176, 187, 240

198.    Premo also told Varlesi that Stefanski had never failed anybody. **Exhibit 1**, Varlesi 176, 187, 240

199.    On or about 4/14/08, Stefanski  filled out Varlesi's performance evaluation, except for the final mark, which was for Premo to complete.  **Exhibit 1**, Varlesi 177; **Exhibit S**, SA internship evaluation

200.    In it, Stefanski failed Varlesi in 53 out of 54 categories, checking  the box "does not meet" expectations 53 times.   *Id.*

201.    At the same time Varlesi received this evaluation - <u>apparently the worst one any WSU social work student has ever received</u> - she had a term GPA of 3.96. **Exhibit 10**, Vroom 215-216; **Exhibit 6**, Najor-Durack 255-257; **Exhibit 8**, Premo 272;  **Exhibit F**

202.    Stefanski has never given an intern an evaluation even remotely similar to the one she gave Varlesi (in 10+ years, she has only given one student 1 "does not meet" in 1 category.)  **Exhibit 9**, Stefanski 172, 175

203.    The evaluation was not "logical" but WSU accepted it.  **Exhibit 6**, Najor Durack 258-259

204.    Stefanski's evaluation was supposed to have a "learning plan" attached to it; it did not. **Exhibit 10**, Vroom 213; **Exhibit 6**, Najor-Durack 248-252, 266, 314

205.    A "learning plan" is a form that documents the assignments and expectations of the student in her internship.  **Exhibit 6**, Najor-Durack 248-249

206.    The lack of learning plan is a "deficit" for a WSU intern because they are supposed to be evaluated against it.  **Exhibit 6**, Najor Durack 315

207.    The evaluation was supposed to contain a specific comment with respect to every "does not meet" mark; it did not.  **Exhibit 6**, Najor-Durack 269

208.    The evaluation also failed to describe the student's assignments and field experiences, as is  required. **Exhibit 6**, Najor-Durack 272-274

209.    Najor-Durack is "fine" with the fact that WSU flunked an A student out of its MSW  program based on a field supervisor's abysmal evaluation which failed to comply with any of these requirements.  **Exhibit 6**, Najor-Durack 255-257, 278-279

210.    On 4/15/08, Varlesi sent Premo an email (subject: "urgent matter") stating, among other things,  that she had received a failing review from Stefanski, that Varlesi was livid, and that the review was discriminatory.  **Exhibit T**; **Exhibit 1**, Varlesi 180

211.   Premo did not consider this email urgent, "didn't care" and did not respond. **Exhibit 8**, Premo 216-217

212.   Prior to receiving this negative evaluation, Varlesi had not been made aware of any performance concerns at the SA.  **Exhibit 1**, Varlesi 184

213.   The review was completely at odds with Premo's recent admission that Varlesi was "doing great." **Exhibit 1**, Varlesi 187; **Exhibit 8**, Premo 353

214.   On 4/25/08, Varlesi was finally able to have a discussion with Premo about the SA evaluation.  **Exhibit 1**, Varlesi 187

215.   Premo told Varlesi to write something up explaining why she felt the evaluation was unfair.  **Exhibit 1**, Varlesi 187-189

216.   Varlesi asked Premo why she was making her jump through all these hoops, when Premo had recently told her she was "doing great;"Premo responded she was just making her jump through "a few hoops" and reiterated that she should put together a rebuttal.  **Exhibit 1**, Varlesi 187-189

217.   Varlesi wrote a rebuttal to the evaluation, refuting Stefanski's criticisms, giving examples of the work Varlesi had performed, and reiterating Stefanski's inappropriate and discriminatory comments regarding Varlesi's pregnancy.  **Exhibit U,** letter to Premo re SA evaluation

218.   She also drafted a "To Whom it May Concern" memo/email (later submitted as part of her grade appeal) regarding the biased evaluation and reiterating Stefanski's discriminatory comments and treatment and Premo's statement that Plaintiff may have to "drop out of program due to pregnancy." **Exhibit V**, 4/27/08 email, subject: Discrimination and Unfair Evaluation; **Exhibit 1**, Varlesi 192

219.   Around this time, Varlesi spoke with Julia Alter-Kay and attempted to clarify the process to follow with respect to challenging her evaluation, in that she had received conflicting information.  **Exhibit 1**, Varlesi 197-198

220.   On 4/29/08, Varlesi filed a discrimination complaint with WSU's Office of Equal Opportunity against Joyce Stefanski.  **Exhibit 1**, Varlesi 183, 189, 196; **Exhibit W**, OEO Complaint Intake Form.[3]

221.   Later that day (4/29/08) Plaintiff received a letter from Premo dated 4/25 stating that Plaintiff had failed her SA internship. **Exhibit X,** 4/25/08 letter; **Exhibit 1**, Varlesi 183-184

222.   One of Premo's criticisms in that letter is that Varlesi did not adhere to the directive to wear "looser clothing." *Id.*

223.   Contrary to Premo's letter, there was no discussion at the 3/17/08 meeting regarding a plan that,

---

[3]Varlesi's OEO complaint included numerous attachments (**Exhibits L, M, O, S, U, V** and others) **Exhibit 1**, Varlesi 192-193

going forward, Varlesi was to stay away from other workers, students and staff when they were working and not fraternize with staff/clients.  **Exhibit 1**, Varlesi 185

224.   Moreover, Stefanski's supervisor confirms that Varlesi never did any of those things.  **Exhibit E**, Gillow Affidavit, ¶ 10

225.   Nor was there a discussion on 3/17/08 about completing assignments.  **Exhibit 1**, Varlesi 185.

226.   With respect to performing biopsychosocial assessments, Varlesi could not complete them because she did not have the clients necessary to complete them.  **Exhibit 1**, Varlesi 186

227.   <u>Premo never signed the SA evaluation.</u>  **Exhibit S**; **Exhibit 8**, Premo 273-274

228.   Other than Premo's testimony, there is no evidence that Premo even looked at the evaluation until long after the fact.

229.   The internship grade is supposed to gauge whether the student achieves what the field supervisor wants, per the established learning goals, and if the student has competed her hours.  Defendants have no "learning goals" for Varlesi, and admit she completed all her hours.  **Exhibit 8**, Premo 247-249

230.   Premo admits that Plaintiff completed her 225 hours in the SA internship.  **Exhibit 8**, Premo 249

231.   At some point, Premo solicited statements from two other WSU interns, LaShawnda Harris and Carmen Ramos.  **Exhibit 1**, Varlesi 182

232.   Ramos told Varlesi that she and Harris wanted nothing to do with writing statements in support of Stefanski, but did it because they did not want to get on Premo's bad side.  **Exhibit 1**, Varlesi 320-321; 358; **Exhibit D**, ¶10

233.   Gary Gillow (to whom Stefanski reported) took the position that Stefanski's evaluation of Varlesi may have been biased.  **Exhibit E**, Gillow Affidavit ¶8

234.   Varlesi met all the requirements for her MSW degree, except for the grade on her final internship.  **Exhibit 6**, Najor-Durack 336

235.   At deposition, Premo attempted to take the position that something about Varlesi's "process recordings" was deficient - as they did not include  "cognitive distortion." Premo then admitted that the paperwork Varlesi was to fill out did not even include a section to note "cognitive distortions," that she never even discussed this with Varlesi at the SA, and that Premo never gave Varlesi any feedback and nothing in writing on this purported performance issue.  **Exhibit 8**, Premo 129, 141-145. Nor did Premo ever discuss Varlesi's process recordings with Stefanski.  *Id.* 161

236.   Premo admits that Varlesi told her Stefanski was prejudiced against her.  **Exhibit 8**, Premo 154

     5.    **Classroom**

237.    Plaintiff's GPA for her final semester was a 3.96; her overall GPA was 3.69 **Exhibit F**

**Interrelatedness of WSU and SA**

238.    WSU has been placing social work interns at the Salvation Armies at least since the 1990s. **Exhibit 8**, Premo 73

239.    WSU's School of Social Work Field Education Manual provides an "Affiliation Agreement Procedure" under which WSU and its field placement sites enter into an "affiliation agreement" documenting the agreement between the School and the field placement agency and including the terms and conditions of the field placement. **Exhibit B**, 47-48

240.    Field Education is an integral component of social work education. **Exhibit B**, p10

241.    The field placement site works in concert with WSU to provide students avenues for meaningful practice experiences. **Exhibit B**, 15

242.    By committing itself to an educational function and supporting the role of the field instructor the field placement site creates opportunities to develop an educational program meeting both agency and school expectations. **Exhibit B**, 15

243.    WSU expects that staff at the site will exhibit a supportive attitude to foster an educational relationship between students and field instructors. **Exhibit B**, 15

244.    Field instructors supervise students at their field placement site with their primary role being educational. **Exhibit B**, 18

245.    A field instructor assures that the student placement experience is educational. **Exhibit B**, 18

246.    As stated repeatedly in WSU's Field Education Manual, WSU and the agencies providing internships to its social work students are a "partnership." **Exhibit B**, p 6, 7, 8

247.    According to WSU's Field Education Manual, "without this longstanding and effective partnership, education for professional social work practice at the bachelor's and master's levels could not occur." **Exhibit B**, p 6

248.    The interns perform some of the work at the agency, thereby benefitting the agency. **Exhibit 6**, Najor-Durack 30

249.    WSU develops objectives, curricula, policies, standards, and procedures for field education. **Exhibit B**, p 10

250.    Field work is the component of social work education that helps students integrate classroom learning and reinforce course content. **Exhibit B**, p 10

-xxiii-

251.    Agencies must have an agency filed placement application on file and have a licensed, MSW-level social work practitioner available to provide supervision.   **Exhibit**, p 12.

252.    The Council on Social Work Education (CSWE) the accrediting body for social work education, requires colleges and universities offering accredited social work degrees to provide students educational instruction in five areas, including field education/work.  **Exhibit B**, p 9-10

253.    Najor Durack (WSU) is in charge of the (SA) field instructors.  **Exhibit 6**, Najor-Durack 68-69

254.    WSU (Premo) and the Salvation Army (Stefanski) collaborated on supervising student interns. **Exhibit 6**, Najor-Durack 305

**Miscellaneous Additional Material Facts**

255.    The Romulus Salvation Army ARC  receives  federal funding  (food stamp program).  **Exhibit 9**, Stefanski 52

256.    Defendant Stefanski does not practice any religion and has not done so for 30 years. **Exhibit 9**, Stefanski 17-18

257.    WSU's Field Education Manual  states that WSU is committed to a policy of non-discrimination ... in all of its operations, employment opportunities, educational programs and related activities; that this policy embraces all persons regardless of .... gender... [or] marital status... and expressly forbids... discrimination in...[the] treatment of students; and that WSU  complies with Title IX.  **Exhibit B**, p 9

258.    An internship is both a work and learning environment.   **Exhibit 10**, Vroom 111

259.    Varlesi filed a MDCR Charge of Discrimination against WSU, and a three hour fact finding conference was held in June 2009, attended by Varlesi, Stefanski, Premo, Najor-Durack, and WSU's OEO Director.  The fact finding conference was conducted by Nichole Pardo, a seasoned Civil Rights Investigator.  Pardo, her supervisor, and the MDCR staff attorney were all in agreement that the matter should proceed to a formal charge (meaning discrimination had occurred) and reconciliation.  **Exhibit 7**, Pardo 6, 8, 16, 55

260.    The Salvation Army's position statement on marriage includes the following language:

Marriage is the only proper context for sexual intimacy....  The Salvation Army promotes a culture that properly values marriage.   **Exhibit RR,** excerpts from Salvation Army website

I.      OVERVIEW

Plaintiff's claims against Defendant Stefanski are:

Count   IV      sex, pregnancy and marital status/parental status discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act (ELCRA)

Count V         retaliation in violation of Michigan's Elliott-Larsen Civil Rights Act (ELCRA)

Count VII       tortious interference with a contractual relationship and/or advantageous business relationship or expectancy

II.     FACTS

A.      Summary of Key Facts

In the spring of 2008, Tina Varlesi was dismissed from Wayne State University's MSW program.  She had a term GPA of 3.96 and  an overall GPA of 3.69.  **Exhibit F**  Just weeks earlier, Varlesi's faculty advisor (Premo) told Varlesi that she was "doing great" and had all the skills needed to go out and do social work. **Exhibit 8**, Premo 353; **Exhibit 1**, Varlesi 170, 176, 187-189, 240; **Exhibit Z.**  Varlesi had also successfully completed two prior field internships, earning the highest overall mark possible in each of them.  **Exhibits G&H; J.**  She also had prior field instructors rate her internship performance  as "exceeds expectations" in every single category, amid glowing reviews that Varlesi had shown amazing ability and excellent skills in field work, going above and beyond what is typically expected of MSW student interns.  **Exhibits G, H**

Defendants take the position that Varlesi nevertheless had to be kicked out of the program  because of  poor performance in her final year, final semester internship  at the Salvation Army (SA).  On the very last day of that internship, Varlesi's field instructor at the SA (Stefanski) handed Varlesi a failing performance evaluation, giving her the worst possible rating ("does not meet expectations") in 53/54 categories – a review that was unprecedented in the history of the School of Social Work – which virtually assured Varlesi would be kicked out of the program.  **Exhibit 1**, Varlesi 177; **Exhibit S**; **Exhibit 8**, Premo 272; **Exhibit 9**, Stefanski 172, 175; **Exhibit 10**, Vroom 215-216; **Exhibit 6**, Najor-Durack 255-257, 278-279.   Equally as outrageous,

Defendants had <u>never previously discussed with Plaintiff, nor put in writing, any purported performance issues at the SA,</u> let alone a remediation or action plan designed to correct any perceived issues. **Exhibit 6**, Najor-Durack 50-52; **Exhibit 8**, Premo 109-110; **Exhibit 9**, Stefanski 64, 193; **Exhibit 1**, Varlesi 184

The issues that *are* well documented, however, are that Defendant Stefanski was "fixated" (to quote intern Amber Bergin) on Varlesi's personal life, and made many bizarre and discriminatory comments regarding Varlesi, who was unmarried, and her pregnancy ("*it's obvious you've had relations with someone*," "*that [ring] on your finger does not deter the men... they can look but they can't touch*"; told Varlesi and WSU that she did not like Varlesi rubbing her stomach and complaining about being sick; stated she no longer wanted Varlesi as an intern soon after learning she was unmarried, and that if she kept her, she could "just fail" her; stated she did not want to see the "silhouette" of Plaintiff's belly; stated Varlesi's pregnancy sexually excited the men at the Salvation Army; and that Premo would "fail" her if she did not abide by Stefanski's directive to wear bigger clothing). **Exhibit 2**, Bergin 66, 72-76, 98-99; **Exhibit 1**, Varlesi 161-167;170-172; 314-319; **Exhibit 8**, ¶8. Significantly, Stefanski's hostility regarding Varlesi's pregnancy surfaced only after learning that Varlesi was unmarried. **Exhibit** 1, Varlesi 315 (at that point "*things seemed to go south*.") Also well documented are Varlesi's numerous complaints to WSU about Stefanski's discriminatory comments, and her concerns about receiving a fair evaluation from this individual. **Exhibit 1**, Varlesi 156-157; 160-161; 168-171; 176, 187, 196, 240, 330; **Exhibit P**; **Exhibit 8**, Premo 343-344

Instead of attempting to reign in Stefanski, or removing Varlesi from this bizarre and discriminatory work/educational environment, WSU's agents accepted and perpetuated it, as though Stefanski's obvious problem with Plaintiff's pregnancy was on some level normal, reasonable or legal, with Premo even telling Varlesi that if Stefanski didn't want to keep her in the internship, Varlesi would "*have to drop out of the program due to [your] pregnancy.*" **Exhibit 1**, Varlesi 166-167; **Exhibit 6**, Najor-Durack 180-181, 185, 188. And, Varlesi's attempts to obtain redress for the unprecedented, clearly biased, failing evaluation she ultimately

received from Stefanski were met with <u>blatant retaliation</u>:  Premo, furious that Varlesi had gone over her head and complained about pregnancy discrimination to WSU Director of Field Education Najor-Durack, angrily told Varlesi, she was in "*deep trouble*" and that "*I'm not changing your grade.*"  **Exhibit 1**, Varlesi 239-240; **Exhibit D**, ¶9

      Varlesi  pursued every avenue available to her to challenge this lunacy (grade appeal, request for reinstatement), all without success, with the Dean and the Dean's reinstatement advisory committee  rubber-stamping the dismissal decision.  Plaintiff's Statement of Facts, ## 258-325.  Plaintiff's dismissal from the School of Social Work,  and the destruction of her professional career, was completely outrageous  and done *not* for academic reasons, but due to the discriminatory, retaliatory and reckless actions of Defendants.

      **B.**    **Defendant Premo (WSU) and Defendant Stefanski (Salvation Army) are Unprofessional and Not Competent**

      The record contains additional, compelling evidence that the individuals who orchestrated Varlesi's dismissal from WSU, depriving her of both the MSW degree she had earned, as well as her chosen career as a social worker, are completing lacking in professionalism and competency, lack basic required social worker credentials, and have insurmountable credibility problems.

      **1.**    **Defendant Carol Premo**

      Premo has been an employee of WSU since '94 and a faculty advisor since '95.  **Exhibit 8**, Premo 8-9.  Premo has a Ph.D. in psychology, obtained by taking a two month course at a Florida college ("Walden") located on the ocean "in a bunch of condos." *Id.*, 18-19[4]

      Premo does not know what she earns, does not  sign a tax return, and does not open up her own mail, keep any records, or drive.  **Exhibit 8**, Premo  10-11, 315.  Her housemate handles all these things for her, including opening Premo's mail from WSU and managing all Premo's WSU student files, because Premo does

---

[4]Walden now offers exclusively on-line degrees.  www.waldenu.com

not want to do it herself.  *Id.,* 316- 318[5]

Premo (age 70) had to stop teaching four years ago because she can't remember anything, "words are lost" "because I am  old" and has significant health issues; she has had several heart bypass operations. *Id.,*  20-22[6]  She explained that "the bypass interferes with your memory."  *Id.*  She no longer goes downtown to WSU as there are steps and it's too difficult.  *Id.,* 23

In response to questions about whether she had previously given a deposition, Premo launched into kidnapping and personal injury sagas.  She was kidnapped in 1959 and involved in a high speed police chase (pulled into the back of a "four door Chrysler Imperial that took off going 90 miles an hour down Vernier"  by MSU students who were going to take her to Toledo and rape and kill her; she hit the driver in the back of the head, opened the door with her legs, was planning on jumping out but couldn't; a "sheeny man" called the police which resulted in a chase; they hit a car broadside at 90 miles an hour; she was left with a "bunch of broken bones") which resulted in both criminal and civil trials. *Id.,* 28-34

Premo also sued an ambulance company in the 70s.  She was playing tennis, went up for a backhand, came down and broke her ankle, an ambulance came to take her to St. Joes, she was strapped onto a gurney, the gurney broke as they were entering the hospital and the EMS staff dumped her over so that she was lying in the mud and water, tied down and wearing shorts in zero degree weather.  *Id.* 36 She was awarded $20,000. *Id.*

Premo has a private practice (clinical social work) in which she sees patients out of her home, although she is doing so without a license, which she let lapse over 10 years ago.  She understands a license is required

---

[5]This practice clearly implicates  FERPA (Family Educational Rights and Privacy Act of 1974), 20 USC §1232g *et seq.*

[6]Premo's other health issues include insulin dependent diabetes, an enlarged heart, and pulmonary embolism. **Exhibit 8**, Premo 20-22

to see patients, but does not believe what she is doing is illegal.  *Id.* 39-41, 310   (In fact, it is a felony, *see* **Exhibit MM**.)

2.    Defendant Joyce Stefanski

Stefanski, age 75, was fired from her last counseling job (Hegria) due to poor performance, and lied about this fact at deposition.  **Exhibit 8**, Stefanski 11-12; **Exhibit K,** Hegria documents.  At Hegria, she was rated incompetent in every competency field (technical domain, interpersonal domain, critical thinking domain).  *Id.*

Premo recommended that WSU use Stefanksi as a field instructor for WSU social work students.  **Exhibit 8**, Premo 86.  While WSU policies require field instructors to possess an LMSW (licensed masters of social work), Stefanski is not licensed, and does not have an MSW degree.  *Id.,* 73, 77.  Premo says Stefanksi is nevertheless being used by WSU as a field instructor with the understanding that she (Premo, who is also unlicensed) needs to closely supervise Stefanski.  *Id.* at 78-79.  [Stefanski was unaware that she was supposed to be an LMSW to be a field instructor for social work interns.  **Exhibit 9**, Stefanski 38]  No other faculty or staff at WSU works with Stefanski; only Premo's students are assigned to Stefanski.  **Exhibit 8**, Premo , 89-90.  Premo was unaware Stefanski was demoted (from Director to counselor) by the SA.  *Id.* 233; **Exhibit 9**, Stefanski 7-9

Premo and Stefanski have never emailed about Tina Varlesi (Premo is "disappointed" that Stefanski never put anything in writing to her or Varlesi).  **Exhibit 8**, Premo 105, 188.  Stefanski is "lax" about following through on the  computer; doesn't have an operating computer; says she can read, but can't send emails; and only communicates with Premo by phone, or in person.  *Id.* 188; **Exhibit 9**, Stefanski 56-60.  Premo and Stefanski  have recently chatted on the phone about Molly, Premo's pet squirrel.  **Exhibit 8**, Premo 74-75, 307

These are the individuals WSU selected to provide Plaintiff with a professional, quality educational experience  in her final internship at WSU.  These are the same individuals who, amid blatantly discriminatory

and retaliatory comments and threats regarding Varlesi's pregnancy and discrimination complaints, concluded

that Varlesi, an A student with prior glowing reviews in field work (and who had spent $40,000 on her degree)

had to be failed in her final field placement, and kicked out of the MSW program.

III.    LAW

A.    Defendant Stefanski is Covered by Michigan's Elliott -Larsen Civil Rights Act (ELCRA)

Like the Salvation Army, Stefanski does not even attempt to argue that insufficient evidence of

Defendants' discriminatory and retaliatory motives toward Plaintiff exists. Instead, Stefanski insists (incorrectly)

that she is not subject to Michigan's ELCRA.

1.    Stefanski is an Agent of an Educational Institution (WSU)

Under the educational provisions of ELCRA, an educational institution shall not:

Discriminate against an individual in the full utilization of or benefit[s of its] ...services, activities or programs... [nor] exclude, expel, limit or otherwise discriminate against... a student... because of ... sex.[7] MCL §37.2402

Under the Act, an educational institution includes an "agent of an educational institution." MCL

§37.2401[8]


An agency includes every relation in which one person acts for or represents another by his authority.

*St. Clair Intermediate School District v. Intermediate Educ. Assn/MEA*, 548 Mich 540, 557, 581 NW2d 707

(1998). Where the principal has the right to control the agent, with respect to matters entrusted to him, an

---

[7]Pregnancy discrimination is a subset of sex discrimination. *Haynie v. State*, 468 Mich 302, 310, 664 NW2d 129 (2003)

[8]A well established rule of statutory construction is that remedial statutes, like ELCRA, are to be liberally construed in favor of the persons intended to be benefitted. *Dudewicz v. Norris-Schmid, Inc.*, 443 Mich 68, 503 NW2d 645 (1993)

agency relationship may exist.  *Id.* And, an agency relationship is a <u>question of fact</u> if there is any evidence, direct or inferential, tending to establish it and describing the facts bearing on such a finding.  *Id.*

Here, Plaintiff has set forth ample evidence creating a question of fact as to whether Stefanski  was acting as an agent of WSU with respect to Plaintiff's field placement at the SA.  (Plaintiff's Facts ## 83-88; 102; 229-245)(the entities work "in concert"; are a "partnership"; WSU (Premo) and SA (Stefanski) collaborated on supervising student interns; Premo was to closely supervise Stefanski;  WSU (Premo) assigned the internship mark, in consultation  with the field instructor (Stefanski)  with WSU having the final say); **Exhibit B.**  WSU and SA/Stefanski have a longstanding, mutually advantageous  partnership/joint venture with respect to the social work internship program, with WSU (Najor-Durack, Director of Field Placement) admitting she is <u>in charge of the field placement as well as the  field instructors (Stefanski).</u>  *Id.,* **Exhibit 6**, Najor-Durack 68-69.

Clearly, a question of fact exists as to whether Stefanaksi is an agent of WSU under the educational provisions of the Act.

2.    The Salvation Army is a public service and a place of public accommodation

ELCRA prohibits discrimination, <u>including sex discrimination and marital status discrimination</u>, in public services and public accommodations.  MCL §37.2301 *et seq*.

<u>[A] person</u> shall not:

(a) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public services because of ... sex or marital status.  MCL §37.2302.

"**Public service**" [includes]  ... a  tax exempt private agency established to provide service to the public.....  MCL §37.2301(b) (emphasis added)

"**Place of public accommodation**" means a business, or an  educational... facility, or <u>institution of any kind</u>, whether licensed or not, whose goods, <u>services, facilities, privileges, or accommodations are extended, offered, sold, otherwise made available to the public.</u>   MCL §37.2301(a)

Significantly, the ELCRA public accommodations provisions forbid unlawful discrimination by <u>"a person"</u>

(Stefanski) against <u>any individual</u> in a place of public accommodation (e.g, a doctor with staff privileges at a hospital), not just against members of the public. *Haynes v. Neshewat*, 477 Mich 29, 729 NW2d 588 (2007); MCL 37.2302

The Salvation Army "provides <u>social services</u> to the disadvantaged." *Johnson v. The Salvation Army,* 2011 WL 3586786 (Ill App). The social services provided by the SA include drug and alcohol rehabilitation, housing and homeless services, youth camps, disaster relief, adult rehabilitation, prisoner rehabilitation, recreation, and elderly services. *Id.;* **Exhibit RR.** The Romulus Salvation Army ARC is used as an internship site by WSU to provide its <u>social work students</u> field experience in <u>social work</u> under the direction of Joyce Stefanski.

A plain reading of the definitions of "public service" and "place of public accommodation" clearly encompasses the Salvation Army and Stefanski. Since SA admits it is a private, non-profit agency, and it provides services to the public, which cannot be seriously contested (see FN 9,10) it fits squarely within the definition of "public service," *supra.* [9] It is also a business or facility whose services are made available to the public, fitting squarely within the definition of a "place of public accommodation." *supra.* Presumably, if Defendant had been able to locate any case, from any jurisdiction, agreeing that the Salvation Army is not a "public service" or a "place of public accommodation" for purposes of anti-discrimination laws it would have cited it.

And, other than Defendant's bald assertions on the point, there is no support for the notion that the Salvation Army is a "private club" or otherwise "not in fact open to the public" for purposes of the "private club"

---

[9]While Defendant claims the SA ARC "was not established to provide a general public service" its website (which SA selectively relies on in its brief), says just the opposite: "The Adult Rehabilitation Center ministry began in 1881 when William Booth, founder of the Salvation Army, opened shelters for homeless people on the streets of England and this initiative quickly spread to the United States." **Exhibit RR, p 5**

exemption.[10]  Not every organization (or group calling itself a club) is a "private club" under this provision.  For instance,  the Lions Club (a club, presumably with membership criteria, dedicated to public service) does not come within the private club exception, and has been found to be both a public service and a public accommodation under ELCRA.  *Rogers v. International Assn' of Lions Clubs*, 636 F.Supp. 1476 (E.D. MI 1986).  And, even private clubs that otherwise fit the definition of a place of public accommodation are not  exempted from the Act.  MCL §37.2303

Defendant relies solely on *Doe v. Young Marines*, 277 Mich App 391, 745 NW2d 168 (2007), which is inapposite.[11]  Young Marines  is not a social service organization that opens its doors to the homeless and hungry or those requiring rehabilitation services; it is a private organization  for children and teenagers that promotes character building and physical fitness to its members.  *Id* at 171   That "Young Marines" was found to be a  private club lends no support to the SA's position.   The case is neither factually on point, or controlling.

3.    **The Salvation Army is an employer and Stefanski is an agent of an employer**

Michigan's Elliott-Larsen Civil Rights Act provides in pertinent part:  "An employer shall not... discharge, or otherwise discriminate against an individual with respect to employment... or a term, condition, or privilege of employment ... because of ... sex...or marital status.  MCL §37.2202(1)(a).  An "employer" includes an agent of that person.  MCL §37.2201

When questions arise as to whether or not a worker is an "employee," the Michigan Supreme Court has made it clear that the "economic reality" test is to be utilized.  *See Wells v. Firestone Tire and Rubber Co.*,

---

[10]Defendant argues, apparently, that because the SA ARC does not have to take every member of the public who seeks its services or accommodations, it is "private."   This is  akin to arguing that a restaurant or other business with a "no shoes, no shirt, no service" policy is likewise "private" and exempt from anti-discrimination laws.

[11] The case involved  inappropriate touching by one member of the "Young Marines" against another member, which lead to her resignation from the group; she sued for being denied access to a place of public accommodation.

421 Mich 641, 364 NW2d 670 (1985).  The economic reality test looks to the totality of the circumstances surrounding the work performed.  Relevant factors to consider include (1) control of a worker's duties; (2) payment of wages; (3) right to hire, fire and discipline; (4) and performance of the duties as an integral part of the employer's business toward the accomplishment of a common goal.  *Chilingirian v. City of Fraser*, 194 Mich App 65, 486 NW2d 347 (1992) (Whistleblower case) *citing Derigiotis v. J.M. Feighery Co.*, 185 Mich App 90, 94, 460 NW2d 235 (1990).  All the factors are viewed as a whole and no single factor is controlling.  *Derigiotis*, 185 Mich App at 95.  Whether a company is a particular worker's employer is a question of law for the court to decide <u>if</u> the evidence on the matter is reasonably susceptible of a single inference, but where the evidence bearing on the company's status is disputed, or where conflicting inferences may reasonably be drawn from the known facts, **the issue is one for the trier of fact to decide.**  *Derigiotis*, 185 Mich App at 94.

Here, all the *Wells* factors, with the exception of the payment of wages, militate toward a finding that an employer-employee relationship exists.  And, the payment of wages is not dispositive.  *Derigiotis.*[12] Plaintiff's internship experience was supposed to provide her with other, non-financial compensation: practical social work field experience needed to graduate and prepare her for subsequent  employment.

At a minimum, this is an issue for the trier of fact.  *Derigiotis*

4.      Defendant's "same actor" inference is misplaced and unavailing

Stefanski also argues that the "same actor inference" (e.g, the  presumption  that if defendant hires a plaintiff in a protected  class, he or she  will not fire the plaintiff on that basis a short time later) warrants summary judgment on this claim.  However, Stefanski never selected  the pregnant Varlesi as an intern; Varlesi

---

[12]Some of the social work internships were paid, some were not.  Plaintiff was a paid, W-2 employee at her VA internship the prior semester.   **Exhibit I.** Under Defendant's analysis, Plaintiff could pursue a claim under ELCRA for any discrimination occurring at the VA, but is out of luck for any discrimination occurring at the SA the following semester, even  though both internships were part of the same WSU social work program, in the same year, reporting to the same WSU advisor, and governed by the same rules as contained in WSU's Field Education Guide.  **Exhibit B.**  Such a result is obviously incongruous and arbitrary.

<u>was assigned to</u> Stefanski.  **Exhibit 9**, Stefanski 38, 55  And, Premo told Plaintiff that Stefanski could not

decline, and "had to accept" her.  **Exhibit 1**, Varlesi 152.  Moreover, Stefanski did not know that Varlesi was

unwed until she quizzed Varlesi about her ring and marital status on 1/07/08, at which point Stefanski's

relationship with Varlesi "seemed to "go south."  (Plaintiff's facts ##111-112, 122, 133-137)

       In addition, the 6th Circuit has made it clear that the same actor inference cannot be used as the basis

to grant summary judgment, as doing so would run afoul of summary judgment standards. *Wexler, supra,* 317

F.3d at 573-574.

       D.     **Tortious Interference with a Contract or Beneficial Economic Relationship or Expectancy**

       The elements of a cause of action for tortious interference with a business relationship or expectancy

are: 1) the existence of a valid business relationship or expectancy that is not necessarily predicted on an

enforceable contract; 2) knowledge of the relationship or expectancy on the part of the defendant interferor;

3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship

or expectancy; and 4) resulting damage to the party whose relationship or expectancy was disrupted.  See,

*Mino v Clio School Dist.,* 255 Mich App 60, 78, 661 NW2d 586 (2003).  Plaintiff easily establishes this claim

under the facts and Michigan case law.

       While it has not been clearly established under Michigan law that the relationship between a student

and a university is <u>explicitly</u> contractual in nature, the relationship does constitute an implied contract.  *See*

*Carlton v. Trustees of the University of Detroit Mercy No.* 225926, 2002 WL 533 885 at *3 (Mich App 2002).

And, courts have agreed that tortious interference claims can be based upon implied contracts.  *See, e.g.,*

*Christopher v. Automotive Finance Corp.*, 2008 WL 2441399 at *6 (Oh App 7th Dist); *Isbell v. Travis Electric*

*Company*, 2000 WL 1817252 (Tenn Ct. App. 2000)

       Stefanski interfered with the implied contract between WSU and Varlesi that Varlesi would not be

dismissed from the program or denied her MSW degree for non-academic reasons.

A valid business expectancy is one in which there appears a reasonable likelihood or probability that the expectancy will come to fruition. *Cedronie v. Tomblinson, Harburn Associates,* 290 Mich App 577, 802 NW2d 682 (2010). Just weeks before graduation (Varlesi had already paid her graduation fees), Plaintiff was kicked out of school and unlawfully denied the MSW degree she had earned, based on Stefanski's unprecedented, ridiculous and clearly discriminatory evaluation. It also quashed her prospects for getting a job as a therapist with Vista Maria, a job that had been previously promised her upon graduation. **Exhibit 1,** Varlesi 48, 51-52. Thus, Varlesi lost out on a degree, a specific position, and was deprived of her chosen career and ability to obtain employment as a social worker.[13]

In *Patillo v. Equitable Life Assurance Society,* 199 Mich App 450, 502 NW2d 696 (1993) the court agreed that given the evidence of the office manager's animosity toward plaintiff and the evidence that the manager was motivated by that animosity in recommending plaintiff's termination, summary disposition was improper. *See also Feaheny v. Caldwell,* 175 MichApp 291, 305, 437 NW2d 358 (1989)(where a fellow employee, supervisor or manager of a company induces the company to discharge the employee, and the defendant is acting for his or her own behalf rather than on the employer's behalf, the plaintiff may maintain a claim for tortious interference).

The "wrongful" aspect of the interference in a tortious interference claim is satisfied if the third party intentionally does an act that is per se wrongful, *or* performs a lawful act with malice and that is unjustified in law for the purpose of invading the contractual rights or business relationship of another. *Patillo, supra,* 199 Mich App at 457. A "wrongful act per se" is an act that is inherently wrongful or an act that can never be justified under any circumstances. *Id.* There can be little dispute that Stefanksi's actions squarely fit the *Patillo*

---

[13] *See Hennessey v. National Collegiate Athletic Assn.,* 564 F2d 1136, 1143 (5th Cir. 1977)(tortious interference claim may be based upon interference with the securing of employment)

definition of "wrongful".

Stefanski's argument that it was Premo, not Stefanski, who ultimately assigned the failing grade is also misplaced. Obviously, the "interferor" in a tortious interference case is not the same person who ultimately pulls the trigger with respect to the adverse decision at issue. Instead, he or she is a third party who interferes with the plaintiff's rights by underlined influencing *someone else* to make a decision adverse to the plaintiff. And, the evidence certainly does not support Stefanski's assertion that Premo's decision was "independent" of anything Stefanski did; WSU admits it relied on Stefanski's bizarre evaluation in ousting Plaintiff. *See* **Exhibit 6**, Najor Durack 255-259, 278-279 (although the evaluation was "not logical," WSU accepted it; WSU was  "fine" with the decision to flunk an "A" student out of its MSW program based on a field supervisor's abysmal, unprecedented evaluation  which was also admittedly deficient in various ways.)

Nor does a "qualified privilege" exist with respect to Stefanski's discriminatory and reckless evaluation of Varlesi. No "qualified privilege" can exist where the act at issue is undertaken in bad faith, *Prysak v. R.L. Polk, Co.*, 193 Mich App 1, 15, 483 NW2d 629 (1992), and the evidence of Stefanski's bad faith (indeed, malice)  is overwhelming. *See,* e.g, Plaintiff's facts  ## 121, 196, 200-208, 212-213, 229

Defendant's argument as to "absolute privilege," while creative, is completely unsupportable legally. The concept that Plaintiff "consented" to receive a biased, failing evaluation  because she provided Stefanski with the form to fill out (as she was required to do by school policies and procedures) is, quite frankly, absurd.[14] Defendants' purported authority is not even remotely on point.

_____

[14]Defendant apparently argues that there would be no "absolute privilege" if  Stefanski had obtained the blank evaluation form from WSU directly, yet filled it out in an identical manner.

-13-

IV.    RELIEF REQUESTED

For all the above reasons, Plaintiff requests an Order denying Defendant Stefanski's motion in its

entirety

Respectfully Submitted,

**DEBORAH L. GORDON, PLC**
Deborah L. Gordon (P27058)
/s/<u>Carol A. Laughbaum (P41711)</u>
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 275
Bloomfield Hills Michigan 48304
Telephone 248 258 2500
<u>dgordon@deborahgordonlaw.com</u>
Dated: November 4, 2011              <u>claughbaum@deborahgordonlaw.com</u>

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 4, 2011, I electronically filed the foregoing documents with the Clerk
of the Court using the ECF system which will send notification of such filing to all counsel of record in this
matter.

DEBORAH L. GORDON, PLC
/s/<u>Carol A. Laughbaum (P41711)</u>
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 275
Bloomfield Hills Michigan 48304
Telephone 248 258 2500
<u>dgordon@deborahgordonlaw.com</u>
<u>claughbaum@deborahgordonlaw.com</u>